1    **JEROME M. JACKSON, ESQ. (SBN 64238)**
     **880 Apollo Street, Suite 238**
2    **El Segundo, California 90245**
     **Phone: (310) 726-4199**
3
     Attorney for Plaintiff
4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9         **CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION**

10

11   CHRISTOPHER L. CHESTER,              **CASE NO. 2:20-cv-10844 JFW (Ex)**
                                          [Judge John F. Walter, Magistrate
12                                        Charles F. Eick, Courtroom 7A]
                    Plaintiff,
13                                        **PLAINTIFF'S MEMORANDUM OF**
                                          **POINTS AND AUTHORITIES IN**
14   vs.                                  **OPPOSITION TO DEFENDANTS'**
                                          **MOTION FOR SUMMARY**
15                                        **JUDGMENT**
     COUNTY OF LOS ANGELES,
16   a public entity; LOS ANGELES         DATE:      December 27, 2021
     COUNTY SHERIFF'S                     TIME:      1:30 p.m.
17   DEPARTMENT, a public                 CTRM:      7A
     entity; LOS ANGELES
18   COUNTY FIRE DEPARTMENT,
     a public entity; and DOES
19   1-10, inclusive,

20                                        **Pre-Trial: 2/4/22**
                    Defendants.          **TRIAL: 2/22/22**
21

22

23   ////

24   ///

25   ///

26   ///

27   ///

28   ///

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................... iii

I.    INTRODUCTION ................................................... 2

II.   STATEMENT OF FACTS ........................................ 4

    A.   The Distinctive and Horrific Injuries Sustained by Sara and Payton Chester .................................................. 4

    B.   LASD's Photos of the Victims .................................. 5

        1.   Deputy Johnson Takes Photos of the Decedents' Remains ... 5

        2,   LASD's Photos of the Decedents' Remains Spread ............ 6

        3.   Defendant Cruz Shares Photos of Sarah and Payton's Distinctive and Horrific Injuries .................................... 7

    C.   The Fire Department's Photos of the Victims ...................... 7

        1.   A Supervisor Obtains Photos of the Victims' Remains ........ 7

        2.   Brian Jordan Takes Photos of the Decedents' Remains ........ 8

        3.   Arlin Kahan Takes Photos of the Victims' Remains ............ 8

        4.   After Taking and Sharing Photos of the Victims' Remains, Tony Imbrenda Shares Them Over Cocktails at a Gala .................................................. 8

    D.   Defendants' Destruction of Evidence ................................ 9

        1.   LASD Instructed Its Personnel to Delete Evidence ............ 9

        2,   Tony Imbrenda Orchestrated a Mass Deletion Campaign Within the Fire Department ........................... 10

        3.   LASD Personnel Dispose of Their Devices ..................... 11

III.  DEFENDANTS' MOTION FAILS BECAUSE MATERIAL FACTS ON WHICH IT RESTS ARE INCORRECT OR GENUINELY DISPUTED ................................................. 12

    A.   Defendants' Motion Contradicts Video Evidence and the Departments' Own Findings ..................................... 12

    B.   County Employees Have Made False Exculpatory Statements That Betray Consciousness of Guilt ..................... 13

    C.   Cell Records and Other Evidence Indicate Even Broader Dissemination Beyond What Defendants Admit .......... 13

i

Tables

D.  A Jury May Infer That the Evidence Destroyed by Defendants Would Have Been Unfavorable ...................... 14

IV.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON ANY OF PLAINTIFF'S CLAIMS ..................... 15

A.  The Entity Defendants' Failure to Establish a Policy or Train Their Personnel Resulted in Violations of Plaintiff's Constitutional Right to Control the Death Images of His Family ............................................. 15

1,  County Employees Violated Plaintiff's Right to Privacy ................................................................. 16

2.  The Departments' Deliberate Indifference Caused These Constitutional Violations ................................. 18

B.  Defendants Breached Their Duty to Use Ordinary Care in Handling the Chesters' Remains............................. 20

C.  Defendants Invaded Plaintiff's Privacy ............................... 22

1.  The Evidence Gives Rise to Genuine Issues of Material Fact as to the Extent of Dissemination by the Deputy Defendants ......................................... 22

2.  Plaintiff Chester had a Reasonable Expectation of Privacy Over His Family's Death Images, and the Offensiveness of Defendants' Intrusion Presents a Triable Issue of Fact ..................................... 23

D.  Plaintiff has Already Been Harmed by Defendants' Conduct and Has Article III Standing ................................. 24

V,  CONCLUSION ................................................................. 25

1

# TABLE OF AUTHORITIES

2   *Allen v. Jones,*
3      104 Cal.App.3d 207 (1980) ...…………………………………… 4

4   *Ambat v. City and Cnty. of S.F.,*
      757 F.3d 1017 (9th Cir. 2014) ……………………………..……… 12

5   *Berry v. Baca,*
6      379 F.3d 764 (9th Cir. 2004) …………………………………….. 18

7   *Brown v. USA Taekwondo,*
      11 Cal. 5th 204 (2021) ………………………………….. 20, 21

8   *Bryant v. Cnty. of L.A.,*
9      2020 WL 8024857, at *7 (C.D. Cal. Dec. 28, 2020) …………….. 20

10  *Canton v. Harris,*
      489 U.S. 378 (1989) …………………………………………… 18

11  *Castro v. Cnty. of L.A.,*
12      833 F.3d 1060 (9th Cir. 2016) ……………………….. 15, 18

13  *Catsouras v. Dep't of Cal. Highway Patrol,*
      181 Cal.App.4th 856 (2010) …………………………… 20, 21, 22

14  *Chaudry v. City of L.A.,*
15      751 F.3d 1096 (9th Cir. 2014) ……………………………… 24

16  *Christensen v. Superior Court,*
      54 Cal.3d 868 (1991) ……………………………… 20, 21

17  *Connick v. Thompson,*
18      563 U.S. 51 (2011) …………………………………… 18

19  *Denney v. Deutsche Bank AG,*
      443 F.3d 253 (2d Cir. 2006) ……………………………….. 25

20  *Doe v. John F Kennedy Univ.,*
21      2013 WL 4565061, at *11 (N.D. Cal. Aug. 27, 2013) …………… 22, 23

22  *Douglas v. Stokes,*
      149 S.W. 849 (Ky. 1912) …………………………………… 24

23  *Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
24      504 U.S. 451 (1992) ……………………………………… 12

25  *Epicor Software Corp. v. Alternative Tech. Sols., Inc.,*
      2015 WL 12734011, at *2 (C.D. Cal. Dec. 17, 2015) …………… 14, 15

26  *Ignat v. Yum! Brands, Inc.,*
27      214 Cal.App.4th 808 (2013) ………………………………... 23

28  *Issakhani v. Shadow Glen Homeowners Ass'n,*
      63 Cal.App.5th 917 (2021) …………………………………… 21

*Johnson v. Hawe,*
    388 F.3d 676 (9th Cir. 2004) ……………………………………….. 19

*Kinsey v. Macur,*
    107 Cal.App.3d 265 (1980) ……………………………………… 22

*Krottner v. Starbucks Corp.,*
    628 F.3d 1139 (9th Cir. 2010) …………………………………… 25

*Lamorie v. Davis,*
    485 F. Supp. 3d 1065 (D. Ariz. 2020) …………………………… 18

*Long v. Cnty. of Los Angeles,*
    442 F.3d 1178 (2006) ……………………………………………… 19

*Marsh v. Cnty. of San Diego,*
    680 F.3d 1148 (9th Cir. 2012) …………………… 2, 3, 16, 17, 18, 19, 25

*Moore v. Rodriguez,*
    2021 WL 2222590, at *21-22 (S.D. Cal. June 2, 2021) ……………… 21

*Nat'l Archives & Recs. Admin. v. Favish,*
    541 U.S. 157(2004) ……………………………………………… 4, 24

*Nayah v. Capital One Bank (USA), N.A.,*
    942 F.3d 480 (9th Cir. 2019) …………………………………… 23

*Nicholson v. City of L.A.,*
    935 F.3d 685 (9th Cir. 2019) …………………………………… 16

*Olejnik v. England,*
    147 F. Supp.3d 763 (W.D. Wis. 2015) …………………………… 18

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000) …………………………………………… 13

*Rochin v. California,*
    342 U.S. 165 (1952) …………………………………………… 16

*Ronnie Van Zant, Inc. v. Pyle,*
    270 F. Supp. 3d 656 (S.D.N.Y. 2017) …………………………… 15

*Ronnie Van Zant, Inc. v. Cleopatra Recs., Inc.,*
    906 F.3d 253 (2d Cir. 2018) …………………………………… 15

*Shulman v. Grp. W. Prods., Inc.,*
    18 Cal. 4th 200 (1998) ………………………………………… 23, 24

*Taus v. Loftus,*
    40 Cal. 4th 683(2007) ………………………………………… 23

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ………………………………………… 24

*Wereb v. Maui Cnty.*,
 830 F. Supp. 2d 1026 (D. Haw. 2011) ……………………………………… 19

*Wilson v. City of L.A.*,
 2021 WL 192014, at \*34 (C.D. Cal. Jan. 8, 2021) …………………....   20

42 U.S.C. § 1983 ……………………………………………………………..   18

1  **I.    INTRODUCTION**

2         Contrary to the "long-standing tradition of respecting family members'

3  privacy in death images," *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1154 (9th

4  Cir. 2012), personnel from the Los Angeles Sheriff's Department ("LASD") and

5  Los Angeles Fire Department ("LAFD") took and shared graphic close-ups of the

6  remains of 13-year-old Payton Chester and her mother, Sarah. Defendants have

7  conceded that these photos "served no business necessity," were "illicit," and "only

8  served to appeal to baser instincts and desires for what amounted to visual gossip."

9  (¶¶ 127, 177, 188.)[1] The "illicit" taking and sharing of these photos violated

10 Plaintiff Chester's privacy, and the manner in which this conduct was carried out—

11 described by the Sheriff as a "wildly inappropriate" and "disgusting" effort to

12 "take away a trophy" (¶ 128, 132)—shocks the conscience.

13        Turning the standard for summary judgment on its head, Defendants

14 repeatedly draw inferences in their own favor from disputed facts. Such a motion

15 cannot be granted. Plaintiff Chester has gathered ample evidence of Defendants'

16 wrongdoing and the harm it has caused him. The close-up photos of Payton and

17 Sarah's remains were passed around on at least 28 LASD devices and by least a

18 dozen firefighters. And that was only the beginning. The gratuitous sharing

19 continued in the following days and weeks and included such outrageous conduct

20 as flaunting the photos in a bar and showing them off over cocktails at an awards

21 gala. One deputy guffawed while sharing the photos; another described the crash

22 victims' remains as "hamburger" and "piles of meat." (¶ 278-79; 238-30.) The

23 callous and shocking behavior uncovered by Plaintiff Chester is more than enough

24 to survive summary judgment.

25        The inferences drawn from that evidence go farther still, because Defendants

26 have taken steps to prevent Plaintiff Chester from learning the full truth about what

27 _____

28 [1] Standalone paragraph citations refer to the Genuine Disputes of Material Fact.

Plaintiff Chester's Memorandum in Opposition to Defendants'
Motion for Summary Judgment

1   happened.  LASD deleted evidence that destroyed the forensic record, prompting
2   one veteran commander to ask: "Are we violating laws?" and to warn that "the last
3   time that our deputies got instructions from our executives in a federal case that
4   they were arrested and tried for crimes." (¶ 370)  Even more evidence was
5   destroyed after this litigation began, when Defendant Joey Cruz intentionally
6   wiped all of the data from his phone and nine personnel known to have possessed
7   the photos disposed of their phones before they could be forensically examined.
8   On the Fire Department side, a fire captain orchestrated a mass-deletion campaign
9   which the Department itself has characterized as a "primarily self-serving"
10  "attempt to cover up [the captain's] role in the reported misuse of the photos." (¶
11  252-257; 260) A reasonable jury could and should infer that the destroyed
12  evidence was incriminating—all the more so because County personnel have made
13  at least 68 false exculpatory statements regarding their conduct with the photos.
14  (¶591-659.)

15      Plaintiff Chester's evidence creates triable issues of fact.  The jury hearing
16  his *Monell* claim must decide whether Defendants' improper sharing of the photos
17  they took of the Chesters' remains "offend the community's sense of fair play and
18  decency" and shocks the conscience. *Marsh*, 680 F.3d at 1154 (citation omitted).
19  As in *Marsh*, Defendants violated the respect owed to the dead and the privacy of
20  the bereaved by sharing these gruesome photos.  In *Marsh*, a lone prosecutor
21  shared a single photo with two people, but the photo did not undergo "viral"
22  spread, was not publicized, and did not reach the internet.  Here, Defendants shared
23  numerous photos with exponentially more people, including with several
24  reporters—conduct that Defendants have admitted was "wildly inappropriate" and
25  "only served to appeal to baser instincts and desires for what amounted to visual
26  gossip." (¶188)

27      There is ample evidence to support a jury finding that this conduct resulted
28  from the County's deliberate indifference to a well-known risk that could occur.

1  Sheriff Villanueva has admitted that "ever since they invented the Polaroid camera,
2  this has been a problem in law enforcement across the nation," including officers
3  who keep "death books" with "photos from crime scenes throughout their careers."
4  (¶ 574)  Yet Defendants concededly provided no training and had no policies
5  whatsoever with respect to such conduct that violates constitutional rights.  (¶¶464-
6  482.)

7        The "well-established cultural tradition acknowledging a family's control
8  over the body and death images of the deceased" also "has long been recognized at
9  common law." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 168
10 (2004).  Defendants' arguments for summary judgment on Plaintiff Chester's
11 California law claims ask the Court to endorse novel limitations on the well-
12 established legal duty to respect the bodies and images of the deceased, and the
13 right to protect private death images from intrusion.  The law has long recognized
14 liability for such conduct because "insult and indignity" toward the dead "can visit
15 agony akin to torture on the living." *Allen v. Jones*, 104 Cal. App. 3d 207, 211
16 (1980).

17 **II.    STATEMENT OF FACTS**

18       On Sunday, January 26, 2020, while travelling to a youth basketball
19 tournament, Plaintiff Chester's wife, Sarah, and 13-year-old daughter, Payton, died
20 in a helicopter accident along with seven others.  (1)  The crash was so violent that
21 a search and rescue specialist described the scene as the most horrific he has seen
22 in 31 years, and "it ended up taking [him] several months to stop having flashbacks
23 of what [he] saw." (¶135)

24       **A.    The Distinctive and Horrific Injuries Sustained by Sara and
             Payton Chester**
25       Sarah Chester's remains were found in a vegetation-covered ravine,
26 approximately 100 yards north of the helicopter wreckage. (¶664)  The Plaintiff's
27 wife had suffered "a traumatic amputation of bilateral lower extremities at the level
28 of the pelvis and lumbar vertebra #2. (¶665)  As a consequence of this injury,

4

1   Sarah had been eviscerated: her liver, gallbladder, pancreas, spleen, kidneys,
2   ovaries, fallopian tubes, and external genitalia were either missing or could not be
3   identified. (¶666)  These internal organs either were destroyed upon impact or
4   spread across the 100-yard debris field that separated Sarah's remains from the
5   wreckage of the helicopter (*Id.*).  Some of her other internal organs, including her
6   uterus and distal rectum, were displaced, while others were found protruding from
7   Mrs. Chester's severed torso. (¶667)

8          The Plaintiff's wife also sustained a distinctive and disfiguring wound to her
9   head and face.  Her skull had been split in two.  Her facial structures, including the
10  oronasal cavity, and oral palate, maxilla, jaw bones, periorbital bones, and eye
11  globes were virtually obliterated.  Her brain cavity was destroyed. (¶668)

12         Payton's remains were discovered on a hiking trail approximately 100 yards
13  north of the helicopter wreckage (¶669).  The plaintiff's daughter also sustained
14  distinctive and disfiguring injuries to her head and face.  Plaintiff's facial features
15  were not identified, "either being absent or obscured by blunt force injury."  (¶670)
16  She sustained a comminuted skull fracture with missing bone, and "the structures
17  or rigidity of her face as it would be supported by her skull" was absent." (*Id.*)

18         **B.     LASD's Photos of the Victims**

19               **1.     Deputy Johnson Takes Photos of the Decedents' Remains**

20         According to Sheriff Villanueva: "[I]n this type of a scene, which is an
21  accident, there's only two groups of people that should be taking photos.  That is
22  the NTSB and then the Coroner's Office.  No one else has any -- any reason to take
23  any photos."  (¶127)  Nonetheless, Deputy Doug Johnson began gratuitously taking
24  photos of the victims' remains with his personal cell phone. (¶¶139-152) Shortly
25  thereafter, Johnson told a colleague that he took "over 100" photos.  (¶154)
26  Johnson has admitted that many of the photos were "close ups of the body parts.
27  (¶155.)  One of Johnson's photos focused on Sarah's dismembered body:  he
28  admitted photographing a body "down in the creek" which had been "cut in half

1  from the waist down." (*Id.*)  He also admitted taking a photo of a female decedent

2  whose "face was badly injured and torn up.  (*Id.*)

3            **2.      LASD's Photos of the Decedents' Remains Spread**

4            Johnson sent all of his photos from his personal cell phone to the personal

5  cell phone of his friend Deputy Raul Versales who was working the radio at

6  LASD's command post.  (¶267)  Johnson claims Versales asked him to take

7  photos, but Versales testified that he "did not need to have photographs" and was

8  "surprised to receive them."  (¶¶150-151; 269)  Versales nevertheless passed the

9  death images to four other members of the Department without any legitimate

10  reason.  (¶¶270-286).  For example, that evening, Versales sent the death images to

11  Detective Scott Miller's personal cell phone.  (¶¶276)  Miller overhead Versales

12  saying he had the photos, prompting Miller to ask: "Oh, can I see them?"  Versales

13  replied: "Oh, I'll just send them to you."  (¶277)  At home that evening, Miller

14  offered to show the photos to his wife, telling her that they showed "piles of meat."

15  (¶279)  In a later interview, Miller likened the victims' remains to "hamburger"

16  and "a deer that got hit by a Mack truck on the freeway."  (¶¶278-279)  Miller has

17  admitted there was no legitimate reason for him to receive photos of the victims'

18  remains.  (¶¶277; 281-282)

19            Versales also transmitted the photos to Deputy Rafael Mejia's personal cell

20  phone, despite Mejia having no reason to possess them.  (¶¶273-275)  Mejia then

21  sent them to two trainees, Deputy Joey Cruz and Deputy Ruby Cable, who have

22  admitted they had no legitimate reason for possessing them. (¶¶289-96)  Later in

23  the evening, Cruz sent the photos to Deputy Michael Russell, who admits he

24  requested them simply because he was "curious."  (¶¶298-301)  Russell saw

25  "grotesque" bodies in the photos and "couldn't believe how graphic they were."

26  (¶299) The following morning, Russell was at home playing an online video game

27  with a "good buddy," Deputy Benjamin Sanchez.  (¶307)  Sanchez was assigned to

28  a different station and had no role in responding to the accident.  (¶314)  As they

1  played *Call of Duty* and chatted on headsets, Russell sent photos of the victims'

2  remains to Sanchez's personal cell phone. (¶313) These are mere examples. As

3  illustrated by Exhibit 85, within 24 hours, at least *eleven* LASD personnel took or

4  obtained photos that the Sheriff has acknowledged "[n]ever should have been taken

5  in the first place." (Declaration of Craig Lavoie, Ex. 85)

6  **3.  Defendant Cruz Shares Photos of Sarah and Payton's Distinctive and Horrific Injuries**

7  Two days after the crash, Cruz spoke to his niece about it while visiting his

8  mother. (¶315) According to the findings of LASD's internal investigation, "Cruz

9  proceeded to show [his niece] photographs of the crash site, including those

10  containing bodies/body parts." (¶¶316-318)

11  Cruz showed off the photos again that same night over beers at a bar in

12  Norwalk. (¶¶319-385) Video footage shows Cruz smiling broadly as he displayed

13  his phone to a patron seated to his right, then handing his phone across the bar to

14  the bartender. (¶¶321-323) Later in the evening, the video shows Cruz and the

15  bartender huddled over Cruz's phone for more than a minute. (¶328) Cruz then

16  says something as the bartender walks away, and the two burst into laughter.

17  (¶¶329-330) The bartender has testified in graphic detail about the "very

18  gruesome" photos and told another bar patron that the photos depicted disfiguring

19  injuries identical to those which Sarah and Payton had sustained: photos of "guts

20  or intestines;" photos of "so many skulls, like, in half;' photos of "half of the skulls

21  missing;" and "photos of internal organs protruding from a torso. (¶338)

22  **C.  The Fire Department's Photos of the Victims**

23  The Fire Department responded to the crash scene on January 26 to

24  extinguish fires, not to document the incident. (¶158) At no point did the incident

25  commander who was manning the LAFD's command post request photographs of

26  any part of the crash scene. (¶159) Nonetheless, at least a dozen LAFD employees

27  took photos of the victims for no legitimate governmental purpose.

28  **1.  A Supervisor Obtains Photos of the Victims' Remains**

7

1    One of the first Fire Department employees who reported to the crash, a
2  supervisor, took it upon himself to start taking photographs. (¶162)  While taking
3  photos of the area where the helicopter came to rest, he encountered Deputy
4  Johnson.  (¶¶163, 497) Johnson told the supervisor that he had already taken
5  pictures of the entire scene.  (¶163) At the supervisor's request, Deputy Johnson
6  sent the supervisor all of the photographs he had taken.  (¶164)

7         **2.      Brian Jordan Takes Photos of the Decedents' Remains**

8    Brian Jordan, a safety officer, dispatched himself to the scene on January 26.
9  (¶167)  Minutes after the call came in regarding the crash, Jordan began texting a
10  group of reporters; he continued doing so throughout the day.  (¶¶168-170) After
11  news of the crash broke, Jordan walked up the trail to the crash scene and claimed
12  to be a fire chief in charge of media relations.  (¶¶172-174) Jordan had no
13  responsibility for media relations. (¶173)  As Jordan was escorted around the
14  scene, he asked specifically about the location of the bodies. (¶176)  In the
15  following days, Jordan resumed his communications with the reporters he was
16  texting on January 26 and sent them messages that attached pictures. (¶516)
17  Jordan also sent pictures via text message to an additional reporter, two police
18  officers, an LASD employee, his girlfriend, his neighbor, and five firefighters.
19  (¶¶510-521)

20         **3.      Arlin Kahan Takes Photos of the Victims' Remains**

21    The day after the accident, Arlin Kahan, an LAFD staff aide, reported to the
22  crash site and took 10 to 20 photos, most if not all of which contained human
23  remains.  (¶¶190-195) Gruesome images of body parts were readily visible in at
24  least five of them, including "the insides of humans splattered on brush." (¶194)
25  Nobody used Kahan's photos for any Department business. (¶195)

26         **4.      After Taking and Sharing Photos of the Victims' Remains,**
                **Tony Imbrenda Shares Them over Cocktails at a Gala**
27    Tony Imbrenda, a public information officer for the Fire Department,
28  received a "flood" of photos of the crash scene on both his personal and work

phones, including graphic photos of the victims. (¶¶208-211) He began receiving multiple photos on January 26 from Brian Jordan and at least four or five others Imbrenda claims he cannot identify. (¶212) Even more photos came in the next day—this time from Arlin Kahan and at least three other numbers Imbrenda claims he cannot identify. (¶¶217-218) While Imbrenda was at the crash site on January 27, he also took approximately five photographs of his own that show "human remains that would be indicative of a high-impact accident." (¶215)

About three weeks after the crash, Imbrenda attended a gala for members of the media at the Hilton Hotel in Universal City. (¶222) Imbrenda socialized at the event with a group of seven others: a work friend, two firefighters from a different agency, his girlfriend, and three others. (¶¶225-226) During the cocktail hour, Imbrenda told the group he had been to the Kobe crash site and afterward pulled out his phone to show off his personal collection of "Kobe pictures." (¶¶231-235) The photos he shared depicted gruesome images of human remains consistent with Sarah's evisceration. Those images were described variously as "an appendix," "inner intestines," and "some sort of internal abdominal organ." (¶237) A witness who complained to the Fire Department was "disgusted" and "disturbed" by Imbrenda's use of the photos as a "party trick." (¶¶235, 245)

### D.  Defendants' Destruction of Evidence

#### 1.  LASD Instructed Its Personnel to Delete Evidence

Minutes after Joey Cruz left the Norwalk bar where he was captured on video, the bartender approached a table of patrons and described "in very graphic fashion" what he had seen. (¶¶336-42) One patron, "extremely disturbed" and "shock[ed]" by what he heard, submitted an online complaint to LASD that "[t]here was a deputy at Baja California Bar and Grill in Norwalk who was at the Kobe Bryant crash site showing pictures of his . . . body." (¶¶344-346) The complaint was routed to the Lost Hills Station on January 29, and Captain Matthew Vander Horck assigned his best lieutenant to do an initial fact-finding inquiry.

1   (¶¶347-348)

2        But then Sheriff Villanueva and the head of his press office, Captain Jorge

3   Valdez, intervened. (¶¶353-355) While Vander Horck was asleep, Valdez called

4   one of Vander Horck's subordinates, Lt. Hector Mancinas, to convey orders from

5   the Sheriff that Lost Hills personnel should be ordered to the station and told that

6   they would receive a performance log entry in lieu of discipline if they deleted the

7   photos. (¶355) Upon learning of this order a few hours later, Vander Horck had "a

8   lot of concerns" and "immediately . . . told [Mancinas] to stop." (¶359) Vander

9   Horck then called Chief Dennis Kneer and "bombard[ed] him with questions,"

10   including: "Do you know if these things have evidentiary value?  Do you know if

11   the NTSB are going to want to know about this?  What about the FBI?  Are we

12   violating laws?  Are people going to be in trouble?" (¶370) A short while later,

13   Chief Kneer called Vander Horck to say: "I discussed this with the Sheriff and he

14   assures me that this is the proper way that we're gonna go." (¶373)

15        By January 31, several deputies represented that they had deleted their

16   photos. (¶378) But when deputies reported to the station as directed, Mancinas

17   did not review a single deputy's cell phone to determine whether they had shared

18   the photos with others. (¶¶384-385) Three weeks later, Vander Horck's

19   supervisors informed him that the Sheriff "no longer had confidence in [him]" and

20   that he would be demoted from captain to lieutenant and stripped of his assignment

21   leading the Lost Hills Station. (¶¶387-392) The Sheriff called Vander Horck to

22   say he could remain a captain but would be transferred to Men's Central Jail—a

23   "dumping ground" for captains who "fall out of favor with the Sheriff." (¶¶395-

24   397)

25       **2.**    **Tony Imbrenda Orchestrated a Mass Deletion Campaign Within the Fire Department**

26   Captain Vander Horck called the Fire Department on January 31, 2020 to

27   advise that two LAFD employees had taken and obtained photos at the crash scene.

28   (448) Yet LAFD took no serious steps to identify the employees involved. (¶¶449-

455)  This inaction allowed Tony Imbrenda to conduct what the Fire Department itself has concluded was a "primarily self-serving" "attempt to cover up his role in the reported misuse of the photos" after the media began reporting on the misconduct in late February 2020. (¶¶252-260)  Imbrenda deleted approximately 50 photos and instructed eight to ten others, including Jordan and Kahan, to "get rid of" their graphic photos and pass on the deletion instruction "to everybody that they knew." (¶259)  Imbrenda gave this instruction to "very connected people" within the Department who "extrapolate[d]" the deletion order to "many, many people." (¶257) By the time the Fire Department finally launched an internal investigation after a citizen complained about Imbrenda's conduct at the awards gala, highly relevant evidence on Imbrenda's, Kahan's, and Jordan's Department-issued cell phones had been destroyed, and the Department did not examine their personal devices at all. (¶¶263-265, 460, 463) As a result, it is no longer possible to determine how many people received photos of the victims from Imbrenda, Jordan, and Kahan. (¶¶457-459; 702-703)

### 3.    LASD Personnel Dispose of Their Devices

Vanessa Bryant sent a letter to LASD threatening legal action on March 2, 2020, submitted a notice of claim in May, filed suit in September, sought the Court's permission to publicly name the Deputy Defendants in February 2021, and amended her complaint to add the Deputy Defendants in March 2021. (¶¶429-433) Throughout this time—and continuing through November 2021—LASD never told the personnel known to have possessed photos of the victims' remains to preserve the cell phones on which they had received them. (¶435) Nine of the personnel testified that they never received (or do not recall receiving) any instruction to preserve evidence related to this lawsuit, and LASD never collected a forensic image of any devices to preserve data that was relevant to this lawsuit. (¶¶434-46)

As a result, after a duty to preserve evidence indisputably arose, nine of the eleven LASD personnel known to have possessed the photos lost or disposed of

11

their phones, and a tenth (Joey Cruz) intentionally wiped his phone of all data. (¶¶436, 693-95)  Two Defendants—Rafael Mejia and Michael Russell—disposed of their phones in 2021 after learning they would be added as individual defendants in this case. (¶¶443-44)  This blatant destruction of evidence means that virtually all of the phones submitted for Defendants' highly-touted "forensic examination" were not the devices used to take, send, or receive the photos in early 2020, rendering that forensic examination worthless. (¶¶436-437)  And almost all of Defendants' personnel refused to provide the passwords to their cloud accounts to the forensic examiner. (¶706)  Nor has any other storage media been secured and searched.

## III.   DEFENDANTS' MOTION FAILS BECAUSE MATERIAL FACTS ON WHICH IT RESTS ARE INCORRECT OR GENUINELY DISPUTED

As the moving party, Defendants "bear the heavy burden of showing there are no genuine issues of material fact." *Ambat v. City and Cnty. of S.F.*, 757 F.3d 1017, 1031 (9th Cir. 2014).  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [his] favor." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

Inverting this fundamental standard, Defendants' motion rests on drawing inferences in *their* favor from facts that are hotly disputed.  Consolidated discovery has developed ample evidence that would entitle a reasonable jury to find that events did not transpire as benignly as Defendants contend.  Because Defendants' motion does not grapple with that evidence, it necessarily fails.

### A.   Defendants' Motion Contradicts Video Evidence and the Departments' Own Findings

As an initial matter, Defendants' motion is simply wrong about three public displays of the photos. *First*, Defendants now claim that Cruz merely "*tr[ied]* to show scene photos to his niece, who refused to look at them." (Mot. at 13 (emphasis added).)  But LASD's own investigation found that Cruz actually did "show [his niece] photographs of the crash site, including those containing

12

bodies/body parts." (¶318)  *Second*, Defendants assert that Cruz's phone "did not leave his hand" while showing remains photos to the bartender and that he "did not show the photos to anyone else at the bar." (Mot. at 10, 13.)  But video shows Cruz handing his phone to the bartender moments after showing it to someone seated next to him.  (¶¶321-322)  *Third*, Defendants state that Imbrenda's display involved only firefighters (Mot. at 15), but LAFD's own investigation found that Imbrenda spoke about the incident "while surrounded by [his] colleague *and their dates*" and then "showed *the group*" photos of human remains. (¶615)  Witnesses confirm that four people who were not County firefighters saw Imbrenda's photos. (¶237)

**B.    County Employees Have Made False Exculpatory Statements that Betray Consciousness of Guilt**

In an interview, Sheriff Villanueva attempted to assure the public that LASD would not be the source of any photos of the victims' remains that appear online, but he added an important caveat: "Unless someone was lying all along, and then all bets are off." (¶130)  Sadly, all bets now appear to be off.  Personnel known to have possessed the photos have made 68 false exculpatory statements on material issues, including **21** such statements in their summary judgment declarations. (591-659) The extent of the dishonesty, fully detailed in the GDMF, is unsettling.

"[T]he factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 134 (2000).  A jury can and should infer from the County witnesses' false exculpatory statements that they shared the photos more broadly than they have admitted and that their conduct was completely improper.

**C.    Cell Records and Other Evidence Indicate Even Broader Dissemination Beyond What Defendants Admit**

Cell phone records of County personnel provide additional evidence of dissemination.  For example, Brian Jordan's cell records show that, in the days and weeks after posing as a media relations officer to take photos of the Decedents' remains, Jordan sent picture messages to six reporters and ten other people. (¶509-

521)  When questioned under oath, Jordan could not explain these texts and did not affirmatively deny that he shared his graphic photos, but rather equivocated and claimed he did not remember. (¶¶181, 511, 513, 516-521)  Considering the false pretenses under which Jordan obtained the photos, a jury should infer from Jordan's evasive testimony that his unexplained picture texts disseminated photos of the Decedents' remains.

Drawing from cell records and other evidence, Exhibit 85 illustrates how far and wide photos of the victims were transmitted, as well as reasonable inferences of additional transmission that a jury could draw based on circumstantial evidence. Among other things, the exhibit shows there are numerous copies of the photos that have not been secured or contained, undermining Defendants' unsupported refrain that "[t]he photos are gone." (Mot. at 8.)

The evidence shows the photos circulated even more broadly within LASD and LAFD than Defendants have admitted.  For example, an LASD dispatcher was shown photos depicting body parts late in the afternoon on the day of the crash by an unknown deputy for no apparent reason (¶502) and there are also at least *eight* firefighters who took or possessed graphic photos who cannot be identified because of Defendants' spoliation.  (¶¶212-265)  These employees' copies of the photos (and the copies of everyone who received the photos from those employees, and so on) remain entirely unsecured and at-risk of broader release at any moment. *Second*, the evidence also shows that photos leaked into the public domain almost immediately.  For example, in the days after the crash, an Orange County law enforcement officer displayed crash-scene photos at a bar in Cerritos, telling the bartender he received them from a colleague and "I'm not even supposed to have these." (¶498)  Around the same time, a man at a bar in Bellflower stated that he had been shown crash-scene photos on a deputy's phone. (¶¶501-502).  A Jury may Infer that the evidence destroyed by defendants would have been unfavorable

It is undisputed that County employees deleted vast quantities of data that

14

1   would have been relevant to this case, but their motivations for doing so are hotly
2   disputed.  The Fire Department itself has admitted Imbrenda's deletion campaign
3   was an attempted cover-up.  (¶260)  With respect to LASD, Defendants say that
4   the deletion was benevolent or innocuous, but consolidated discovery has adduced
5   evidence that the goal was to destroy evidence of misconduct.  The jury should
6   decide between these two competing accounts.  *See, e.g., Epicor Software Corp. v.*
7   *Alternative Tech. Sols., Inc.*, 2015 WL 12734011, at *2 (C.D. Cal. Dec. 17, 2015)
8   (question regarding defendant's intent was "an open question of fact . . . suitable
9   for resolution by the jury" where plaintiff assembled substantial evidence from
10  which a reasonable jury could infer an intent to deprive plaintiff of the evidence).

11      As for Cruz, he intentionally wiped all data from his phone within weeks of
12  the commencement of litigation, and shortly after declining a request by the
13  County to examine his phone.  (¶¶681-695)  Because of Cruz's actions, the
14  forensic examiner was unable to analyze his phone at all.  (¶693)  The jury could
15  fairly infer that Cruz destroyed evidence because he had something to hide; the
16  same is true for the other three Deputy Defendants who disposed of their phones
17  after Mrs. Bryant filed suit without taking steps to preserve relevant evidence
18  before doing so.  Under Rule 37, this destruction of evidence during the pendency
19  of litigation warrants sanctions, and Plaintiff Chester will seek an adverse jury
20  instruction at trial.  *See, e.g., Ronnie Van Zant, Inc. v. Pyle*, 270 F. Supp. 3d 656,
21  670 (S.D.N.Y. 2017), *rev'd on other grounds sub nom. Ronnie Van Zant, Inc. v.*
22  *Cleopatra Recs., Inc.*, 906 F.3d 253 (2d Cir. 2018) ("[G]etting a new phone after
23  Plaintiffs brought the instant action" without preserving relevant data "evince[s]
24  the kind of deliberate behavior that sanctions are intended to prevent.").

25  ## IV.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT
26        ON ANY OF PLAINTIFF'S CLAIMS

27      **A.   The Entity Defendants' Failure to Establish a Policy or Train
           Their Personnel Resulted in Violations of Plaintiff's
28         Constitutional Right to Control the Death Images of His Family**

15

1
2
3
4
5
6
7
8

Ample evidence supports Plaintiff Chester's *Monell* claim under section 1983 because the entities' failure to establish a policy or train their employees regarding the taking and sharing of gratuitous death images reflected deliberate indifference that led to a violation of his constitutional right to privacy. *See Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1073 (9th Cir. 2016). Defendants' two grounds for summary judgment misapprehend the law and misstate the facts, and both should be rejected.

### 1.   County Employees Violated Plaintiff's Right to Privacy

9
10
11
12
13
14

Whether an officer's conduct is unconstitutional under the Fourteenth Amendment turns on the factual issue of whether the conduct "shocks the conscience." *See Nicholson v. City of L.A.*, 935 F.3d 685, 692-93 (9th Cir. 2019). This standard is met where the challenged conduct "offend[s] the community's sense of fair play and decency." *Rochin v. California*, 342 U.S. 165, 173 (1952). A jury could readily conclude Defendants' conduct here was conscience shocking.

15
16
17
18
19
20
21

"Few things are more personal than the graphic details of a close family member's tragic death. Images of the body usually reveal a great deal about the manner of death and the decedent's suffering during his final moments—all matters of private grief not generally shared with the world at large." *Marsh*, 680 F.3d at 1154. Given the "long-standing tradition of respecting family members' privacy in death images," the constitutional right to privacy "encompasses the power to control images of a dead family member." *Id.* at 1153.

22
23
24
25
26
27
28

Plaintiff Chester's evidence creates—at a minimum—a triable issue regarding such wrongdoing here. The County employees intruded on Plaintiff Chester's grief by turning photos of Sarah and Payton's private deaths into group-text fodder, barroom banter, and cocktail chit-chat. Indeed, this case is remarkable in that members of the public provably *did* have their consciences shocked by Defendants' behavior (leading, for instance, to two citizen complaints), and the County entities themselves described their employees' conduct as "disgusting,"

16

"base," "illicit," and "wildly inappropriate." (¶¶127, 132, 188)  At a minimum, whether Defendants' conduct is conscience-shocking is a question for the jury. *See Nicholson*, 935 F.3d at 692-93.  Defendants cannot dispute these points in general, and so offer two narrow legal arguments.  Neither withstands scrutiny.

*First*, Defendants suggest that *Marsh* involved "publication of death images" in the press and on the internet.  (Mot. 9 (citation omitted).)  They are wrong.  In *Marsh*, a district attorney kept a death photo and later sent a copy to two reporters. 680 F.3d at 1152.  But neither of the reporters published it, and it never appeared on the internet.  Appellees' Brief, *Marsh*, No. 11-55395, 2011 WL 3436959, at *1 (9th Cir. Aug. 1, 2011).  *Marsh* affirmed that the mishandling of the death images shocked the conscience, and that the district attorney's actions gave rise to the plaintiff's *fear* that she *might* one day "stumble upon photographs of her dead son," given the "viral nature of the Internet."  680 F.3d at 1155.  Just so here.  If anything, that risk is far greater in this case.  A reasonable jury could conclude that Jordan sent death images to at least six reporters (although evidence that would have confirmed this has been destroyed. (¶516)

Moreover, Defendants' argument reveals a complete misunderstanding of the privacy right recognized in *Marsh*.  That right rests on two pillars:  the government's responsibility to treat the dead with respect, and the survivor's right to control the death images of his loved ones.  *Marsh*, 680 F.3d at 1155-56.  The heartland of that right is a protection against the government gratuitously revealing "the graphic details of a close family member's tragic death."  *Id.* at 1154.  It is undisputed that Defendants did just that here—flaunting these "gruesome" photos of the disfiguring injuries sustained by Sarah and Payton during a barroom "show-and-tell," using those images as a "party trick" at a public awards ceremony, or referring to the Decedents' remains in conscience-shocking language, such as "piles of meat," "hamburger," and "a deer that got hit by a Mack truck on the freeway."  (¶¶278-279)  That Defendants' "unwarranted public exploitation of

17

1   death images" has not yet reached mass media, or that Plaintiff Chester has not

2   seen the photos, does not make their conduct permissible, *id.*, any more than the

3   conduct in *Marsh* was excusable because the news outlets never published the

4   photo.

5        *Second*, Defendants assert that two district court cases "negate" Plaintiff

6   Chester's claim. They are wrong; the cases they cite are far afield, and neither one

7   helps Defendants. In *Lamorie v. Davis*, 485 F. Supp. 3d 1065, 1072 (D. Ariz.

8   2020), the Department of Child Services allegedly failed to notify the plaintiff of

9   his son's cremation. The court held only that there was no constitutional right to

10  such notice. It did not address the privacy interest in death photos at all. The

11  Wisconsin district court in *Olejnik v. England*, 147 F. Supp. 3d 763, 777-78 (W.D.

12  Wis. 2015), also did not address the *Marsh* privacy right both because the Seventh

13  Circuit had not yet recognized it and because death scene images were not at issue

14  in that case.

15                **2.    The Departments' Deliberate Indifference Caused These
                          Constitutional Violations**

16       Substantial evidence supports a finding of deliberate indifference on the part

17  of LASD and LAFD, precluding summary judgment on Plaintiff's *Monell* claim.

18  A municipality is liable under 42 U.S.C. § 1983 where its failure to establish a

19  policy or adequately train its employees on a constitutional right "amounts to

20  deliberate indifference to the rights of persons with whom the [employees] come

21  into contact." *Canton v. Harris*, 489 U.S. 378, 388 (1989). The deliberate-

22  indifference standard is an objective inquiry, *Castro*, 833 F.3d at 1076, and it is

23  generally reserved for the jury, *Berry v. Baca*, 379 F.3d 764, 769 (9th Cir. 2004).

24       Deliberate indifference is established where "the need for more or different

25  training is so obvious" in light of the employees' duties, and the "inadequacy [is]

26  likely to result in the violation of constitutional rights." *Canton*, 489 U.S. at 390.

27  Thus, no pattern of prior constitutional violations is required to prove deliberate

28  indifference through a failure to train. *See Connick v. Thompson*, 563 U.S. 51, 63-

                                          18

1   64 (2011).  Liability can attach based on a single incident where, as here, there is
2   (i) a complete failure to train; (ii) the constitutional duty is implicated in recurring
3   situations; and (iii) the plaintiff's injury is a "highly predictable consequence" of
4   the "fail[ure] to train." *Id.* at 64 (citation omitted).  This standard is satisfied where
5   employees "have *no knowledge at all* of the constitutional limits" that apply in the
6   recurring situation. *Id.* at 67 (emphasis added).
7        The jury could find these standards met here.  Both LASD and LAFD have
8   acknowledged that as of January 26, 2020, they had no policies or training related
9   to photographs of human remains or incident photography more generally.  (¶¶464-
10  496).  Not a single employee was familiar with the constitutional right articulated
11  in *Marsh*. (471-475)  This complete lack of training was likely to result in
12  improper conduct given that County personnel regularly take incident
13  photographs—including on their personal cell phones—and regularly encounter
14  human remains at those incidents.
15       Plaintiff Chester's claim does not implicate any concerns about
16  "micromanaging local governments" in the "subtleties" of their training programs.
17  *See, e.g., Wereb v. Maui Cnty.*, 830 F. Supp. 2d 1026, 1034 (D. Haw. 2011)
18  (citation omitted).  No second-guessing of *how* the Departments chose to train their
19  personnel on the relevant constitutional right will occur because Defendants failed
20  to provide *any* training whatsoever. *See id.* at 1035.  The Departments simply did
21  not equip personnel with any "specific tools" they needed to handle the "recurring
22  situation" of photography at scenes with human remains. *See Long v. Cnty. of Los
23  Angeles*, 442 F.3d at 1186 (2006).
24       Viewing the evidence in the light most favorable to Plaintiff Chester, a jury
25  could fairly find that the lack of training left LASD and LAFD employees with
26  "the utter lack of an ability to cope with constitutional situations," and that Plaintiff
27  Chester's constitutional injury "'would have been avoided' had proper policies
28  been implemented." *Long*, 442 F.3d at 1190 (citation omitted); *see also, e.g.*,

19

1  *Johnson v. Hawe*, 388 F.3d 676, 686 (9th Cir. 2004) (evidence that department

2  failed to train officers about privacy statute created genuine issue as to deliberate

3  indifference); *Wilson v. City of L.A.*, 2021 WL 192014, at \*34 (C.D. Cal. Jan. 8,

4  2021)*, appeal filed,* No. 21-55056 (9th Cir. Jan. 25, 2021) (officer's testimony that

5  he had received no training on eyewitness identification techniques sufficient to

6  create a triable issue of fact on deliberate indifference).  Indeed, several employees

7  expressly testified that they would not have taken photos of the victims' remains at

8  the scene if a specific policy had been in place at the time. (¶473)

9  **B.    Defendants Breached Their Duty to Use Ordinary Care in
        Handling the Chesters' Remains**

10  "Generally speaking, all persons have a duty to take reasonable care in their

11  activities to avoid causing injury." *Brown v. USA Taekwondo*, 11 Cal. 5th 204,

12  209 (2021) (citing Cal. Civ. Code § 1714(a)).  There is no basis in policy or law

13  that would support limiting Defendants' generally applicable duty in this case,

14  where Plaintiff Chester was a foreseeable direct victim of Defendants' negligence.

15  California law has long recognized a duty to handle dead bodies with due

16  care because such conduct "is likely to cause serious emotional distress to

17  members of the decedent's immediate family regardless of whether they observe

18  the actual negligent conduct or injury to the remains of their decedent." *See*

19  *Christensen v. Superior Court*, 54 Cal. 3d 868, 894-95 (1991).  For similar reasons,

20  California law also specifically imposes a duty on law enforcement officers to

21  "refrain from exploiting gruesome death images by disseminating them to friends

22  and family members or others with no involvement in official [law enforcement]

23  activities." *Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856,

24  884 (2010).  As this Court itself recognized in ruling on Defendants' motion to

25  dismiss, "*Catsouras* strongly supports the existence of a duty in this case with

26  respect to the LASD deputies who took the photos of the victims and shared them

27  with others." *Bryant v. Cnty. of L.A.*, 2020 WL 8024857, at \*7 (C.D. Cal. Dec. 28,

28  2020).  So, too, for the Fire Department employees.

1      *Brown v. USA Taekwondo*, 11 Cal. 5th 204 (2021), is not to the contrary.

2    *Brown* did not overrule *Catsouras* or *Christensen* or even address the duties

3    recognized by those cases.  Instead, *Brown* clarified "the applicable framework for

4    determining whether a defendant has a duty to protect a plaintiff from harm *caused*

5    *by a third party*," a duty that generally does not exist.  *Id.* at 213 (emphasis added).

6    *Brown* held that an exception to the general "no-duty-to-protect rule" can exist

7    only if the plaintiff proves a special relationship with the defendant. *See id.* at 211,

8    219.

9          *Brown* has no application here because Defendants themselves, not a third

10   party, caused Plaintiff Chester's harm by gratuitously taking and sharing photos of

11   his loved ones' remains.  Thus, this case involves what *Brown* described as "active

12   misconduct working positive injury to others," rather than exceptional liability for

13   nonfeasance.  *Id.* at 214-15; *see, e.g.*, *Issakhani v. Shadow Glen Homeowners*

14   *Ass'n*, 63 Cal. App. 5th 917, 926 (2021), *review denied* (Aug. 18, 2021) (noting

15   that *Brown* involved a "circumstance where, unlike here, there is no underlying

16   duty running between the parties that might apply").  In such cases, courts have

17   continued to apply *Catsouras* after *Brown*. *Moore v. Rodriguez*, 2021 WL

18   2222590, at *21-22 (S.D. Cal. June 2, 2021) (relying on *Catsouras* to find a duty to

19   refrain from infringing on plaintiff's privacy interest in his psychiatric records).

20         Neither logic nor law warrants Defendants' efforts to limit *Catsouras* to a

21   duty to refrain from disseminating death photos on the internet.  The very same

22   policy considerations *Catsouras* relied upon to recognize a duty in that case apply

23   with equal force here.  "[I]t unquestionably was foreseeable" that taking and

24   disseminating gruesome photos of Sarah and Payton's remains would cause

25   Plaintiff Chester harm, *Catsouras*, 181 Cal. App. 4th at 882, and there is a close

26   connection between Defendants' conduct and that harm, *see id.* at 884-85.  The

27   conduct by the County's employees was morally blameworthy—in Defendants'

28   own words, it "was reprehensible and outrageous." *Id.* at 883; (¶¶132, 250)

"[C]oncepts of morals and justice clearly dictate that those upon whom we rely to protect and serve ought not be permitted to make our deceased loved ones the subjects of" lurid gossip or spectacle—regardless of where the spectacle-making occurs (whether a bar, a gala, in text messages, or online). *See id.* at 883. As in *Catsouras*, recognizing a duty on these facts would not impose an "intolerable burden" on agencies and their officers to control their future conduct (*id.* at 884), as evidenced by LASD and LAFD having since adopted policy directives to protect these fundamental rights. (¶¶88, 90, 470) Liability for the violations of those rights here would further those policy directives and help prevent future harm, which weighs strongly in favor of recognizing the duty. *See Catsouras*, 181 Cal. App. 4th at 885.

Defendants' arguments as to breach and harm are makeweight because they are premised on disputed facts. By way of example, consolidated discovery has adduced evidence showing that County employees did not share photos of the Decedents' mangled remains to "answer questions" at the scene or determine "what resources [were] needed." (Mot. at 28.) Likewise, contrary to Defendants' version of events, the evidence proves the dissemination spread far beyond Cruz's single friend at the bar, as demonstrated in Exhibit 85. Defendants also do not contend with other evidence that demonstrates breaches of their duty to "refrain from exploiting gruesome death images," such as Johnson's and Jordan's intrusive close-up photos of the Decedents' body parts and Imbrenda's display at an awards gala. On this record, a jury could fairly find in Plaintiff Chester's favor on his negligence claim.

**B.   Defendants Invaded Plaintiff's Privacy**

       **1.   The Evidence Gives Rise to Genuine Issues of Material Fact as to the Extent of Dissemination by the Deputy Defendants**

A claim based on public disclosure of private facts does not require publication on the internet or in the press. Disclosure of private affairs to a "diverse group of people" who know the plaintiff suffices. *See Kinsey v. Macur,*

1    107 Cal. App. 3d 265, 271 (1980); *see also Doe v. John F Kennedy Univ.*, 2013
2    WL 4565061, at *11 (N.D. Cal. Aug. 27, 2013) (alleged disclosure to six
3    classmates and one professor stated a valid invasion of privacy claim).[2]  Nor does
4    the tort require disclosure through a written communication.  *See, e.g., Ignat v.*
5    *Yum! Brands, Inc.*, 214 Cal. App. 4th 808, 819 (2013) (publicity element satisfied
6    by oral communications in the workplace).

7          As set forth above, consolidated discovery has adduced substantial evidence
8    of Defendants' public dissemination and display to a "diverse group of people."
9    Further, a jury could reasonably conclude the photos continued to spread beyond
10   those already identified.  A jury could also find that any evidentiary gaps exist
11   because Cruz intentionally wiped his phone to deprive Plaintiff Chester of
12   evidence in this lawsuit, and that the spoliated evidence would have been adverse
13   to Cruz.  A jury could draw the same inference about the lost content on the
14   devices the other three Deputy Defendants traded in after litigation had commenced.

15          **2.    Plaintiff Chester Had a Reasonable Expectation of Privacy**
                    **Over His Family's Death Images, and the Offensiveness of**
16                  **Defendants' Intrusion Presents a Triable Issue of Fact**

17          Defendants also improperly narrow Plaintiff Chester's invasion of privacy
18   claim to public disclosure of private facts.  But the common law privacy right
19   broadly protects against any "[h]ighly offensive intentional intrusions upon another
20   person's private affairs or concerns." *Taus v. Loftus*, 40 Cal. 4th 683, 725 (2007).
21   Such intrusions are tortious even if no publicity is garnered by the intrusion.  *See*
22   *Nayah v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 491 (9th Cir. 2019)
23   ("Importantly, '[t]he intrusion itself makes the defendant subject to liability, even
24   though there is no publication or other use of any kind of the photograph or
25   information outlined.'").  A privacy claim thus has only two necessary elements:
26   "(1) intrusion into a private place, conversation, or matter, (2) in a manner highly

27
28   [2] *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss at 10 n.7, *Doe v. John F Kennedy Univ.*, No. 4:13-cv-01137-DMR (N.D.

1  offensive to a reasonable person." *Shulman v. Grp. W. Prods., Inc.*, 18 Cal. 4th
2  200, 231 (1998).

3      It is well-settled under our case law and traditions that Plaintiff Chester had
4  a reasonable expectation of privacy in the death images of his deceased loved ones.
5  *See Favish*, 541 U.S. at 167-170.  As a Kentucky appellate court held more than a
6  century ago, unauthorized photographs of dead children constitute an invasion of
7  privacy akin to an intrusion on the bodies themselves.  *See Douglas v. Stokes*, 149
8  S.W. 849, 850 (Ky. 1912).  A jury could fairly conclude that LASD's photographic
9  intrusion on her loved ones' remains was highly offensive, as was the subsequent
10  sharing of those photos.

11      **C.**    **Plaintiff Has Already Been Harmed by Defendants' Conduct and Has Article III Standing**
12      Defendants' argument that Plaintiff Chester lacks standing under
13  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), is meritless because
14  *TransUnion* is inapposite.  That case addressed standing based on potential *future*
15  harms to plaintiffs who did not allege any "current emotional or psychological
16  harm."  *Id.* at 2211, n.7.  Plaintiff Chester, by contrast, has already suffered—and
17  continues to suffer—injuries, which he has described in an accompanying
18  declaration.  (¶¶660-663)

19      This emotional harm is a concrete and particularized injury that supplies
20  Article III standing.  *See, e.g., Chaudry v. City of L.A.*, 751 F.3d 1096, 1109 (9th
21  Cir. 2014) (plaintiffs' emotional harm from being unable to bury family member in
22  accordance with their religion constituted injury in fact).  541 U.S. at 168.[3]

23      Moreover, unlike in *TransUnion*, the risk of future harm has itself caused a
24  present emotional injury—fear and anxiety.  Because the photos were passed
25  around by a multitude of County employees and stored on dozens of devices,

26

27  Cal. June 28, 2013), ECF No. 28.
28  [3] The intrusion on privacy is also a concrete injury in and of itself.  *See, e.g., Patel v. Facebook, Inc.*, 290 F.Supp.3d 948, 954 (N.D. Cal. Feb. 26, 2018); *Opperman v. Path, Inc.*, 87 F.Supp.3d 1018, 1057-58 (N.D. Cal. 2014).

24

1  Plaintiff Chester lives with a constant fear that he and his family will confront
2  Defendants' horrific photos online, and the Ninth Circuit has recognized this "fear
3  is not unreasonable given the viral nature of the Internet." *Marsh*, 680 F.3d at
4  1155.  If that was true in *Marsh* where just *two* people obtained death photos, *id.*,
5  the fear is certainly not unreasonable here where more than *20* people (at a
6  minimum) received copies of such photos.  Lavoie, Declaration, Ex. 85.
7  Plaintiff's stress and anxiety that the photos could go viral at any moment is a
8  cognizable injury in fact.  *See, e.g., Krottner v. Starbucks Corp.*, 628 F.3d 1139,
9  1142 (9th Cir. 2010) ("generalized anxiety and stress" confers standing); *Denney v.*
10 *Deutsche Bank AG*, 443 F.3d 253, 265-65 (2d Cir. 2006) (same).

11 **V.    CONCLUSION**

12       Defendants' motion should be denied outright.

13 DATED:      December 6, 2021

16 By _____
17       Jerome M. Jackson
         Attorney for Plaintiff

Plaintiff Chester's Memorandum in Opposition to Defendants'
Motion for Summary Judgment