JEROME M. JACKSON, ESQ. (SBN 64238)
880 Apollo Street, Suite 238
El Segundo, California 90245
Phone: (310) 726-4199

Attorney for Plaintiff
CHRISTOPHER L. CHESTER

[Additional counsel continued on next page.]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

| | |
|---|---|
| CHRISTOPHER L. CHESTER,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, a public entity; LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, a public entity; LOS ANGELES COUNTY FIRE DEPARTMENT, a public entity; and DOES 1-10, inclusive,<br><br>Defendants. | **CASE NO. 2:20-cv-10844 JFW (Ex)**<br>[Judge John F. Walter, Magistrate Charles F. Eick, Courtroom 7A]<br><br>**PLAINTIFF'S MOTION *IN LIMINE* NO. 1 TO (1) PRECLUDE DEFENDANTS FROM PROFFERING EXCULPATORY TESTIMONY AND ARGUMENT REGARDING SPOLIATED EVIDENCE, AND (2) ADMIT EVIDENCE OF DEFENDANTS' DESTRUCTION OF EVIDENCE**<br><br>**Pre-Trial: 2/4/22**<br>**MIL Hearing:  2/11/22**<br>**TRIAL: 2/22/22** |

///

///

///

///

///

///

///

///

# **TABLE OF CONTENTS**

I.    IDENTIFICATION OF THE MATTER IN DISPUTE …………….. 7

II.    PLAINTIFF'S POSITION …………………………………….. 7

A.    Factual Background ………………………………………….. 9

    1.    Rather Than Secure the Devices or Forensically Preserve Their Contents, LASD Instructed Its Personnel to Delete Evidence ………………………………. 9

    2.    LASD Personnel Disposed of Their Devices ………………… 10

    3.    The Fire Department's Failure to Preserve Evidence …………………………………………… 12

B.    Defendants Spoliated Extensive Evidence of Their Misconduct, Warranting Evidentiary Sanctions ……………………. 14

    1.    Defendant Joey Cruz Destroyed All ESI on His Phone After This Litigation Began, and the ESI Cannot be Replaced ………………………… 14

    2.    Defendants Rafael Mejia, Michael Russell, and Raul Versales Disposed of Their Phones After They Had a Duty to Preserve, and the Lost Data Cannot be Replaced ………………………… 15

    3.    The Sheriff's Department Deletion Order and Failure to Take Reasonable Steps to Preserve Evidence Constitutes Spoliation ……………………… 16

        (a)    LASD's Preservation Duty Attached Upon Receiving the Citizen Complaint Regarding Deputy Cruz's Public Sharing of Photos at Bar ………………………… 16

        (b)    LASD Failed to Take Reasonable Steps to Preserve Evidence, and the Lost Evidence Cannot be Restored or Replaced ………………………………… 18

    4.    The Fire Department's Failure to Take Reasonable Steps to Preserve Evidence Constitutes Spoliation …………………………… 20

        (a)    The Fire Department's Preservation Duty Was Triggered by Late January 2020 ………………………………… 20

        (b)    The Fire Department's Breach of its Preservation Obligations Resulted in Permanent Data Loss …………………………… 21

C.   Defendants' Spoliation of Evidence Has Prejudiced
     Plaintiffs' Meriting Sanctions Under Rule 37(e)(1) ..................... 22
     1.   Defendants' Spoliation Has Prejudiced
          Plaintiffs by Limiting Their Ability to Prove
          the Full Extent of Defendants' Wrongdoing ...................... 22
     2.   Plaintiff's Prejudicial Spoliation Merits
          Evidentiary Santions Under Rule 37(e)(1) ........................ 25
III.  DEFENDANTS' CONTENTIONS OF POINTS
      AND AUTHORITIES ........................................................ 27
A.   Facts ............................................................................... 29
     1.   The LASD Crash Site Photos ....................................... 29
          (a)   LASD Receives a Complaint ................................ 29
          (b)   LASD Takes Immediate Action ........................... 30
          (c)   The Internal Affairs Bureau Investigates ................... 30
     2.   The LACFD Crash Site Photos ..................................... 31
          (a)   LACFD Receives a Call from LASD ....................... 31
          (b)   LACFD Starts an Investigation............................. 32
     3.   Bryant's Letters and Tort Claims ................................... 32
     4.   LASD's Preservation Efforts ......................................... 33
     5.   LACFD's Preservation Efforts ...................................... 34
     6.   LACFD's Orders ....................................................... 35
     7.   The Forensic Examination ............................................ 36
B.   Legal Standard ................................................................. 36
C.   Defendants' Duty to Preserve Did Not Begin
     in January 2020............................................................... 37
     1.   The Citizen Complaint Did Not Trigger a
          Duty to Preserve............................................................ 38
     2.   An Internal Investigation Does Not
          Trigger a Duty to Preserve ............................................ 39
     3.   Bryant's Letters Did Not Provide Notice
          of Probable Litigation ................................................... 40
D.   Defendants Have Not Spoliated Evidence ............................... 41
     1.   Deletions that Predate Tort Claims are
          Not Spoliation ......................................................... 41
     2.   Upgrading Cellphones is Not Spoliation ......................... 42
E.   Chester Cannot Show Loss of Relevant Evidence ...................... 43
F.   The Request for Sanctions is Not Supported
     by the Record or the Law ................................................... 43
G.   Chester Has Not Been Prejudiced .........................................44
IV.  DEFENDANTS' CONCLUSION ............................................ 47

Plaintiff's MIL No. 1 Regarding Defendants' Spoliation

1

## <u>TABLE OF AUTHORITIES</u>

2

3
*Advantacare Health Partners v. Access IV*,
2004 WL 1837997, at *5-7 (N.D. Cal. Aug. 17, 2004) ......................   44

4
*Ahcom, Ltd. v. Smeding*,
2011 WL 3443499, at *8-9 (N.D. Cal. Aug. 8, 2011) .........................   44

5

6
*Alter v. Rocky Point Sch. Dist.*,
2014 WL 4966119, at *10 (E.D.N.Y. Sept. 30, 2014) ......................   20

7
*Apple Inc. v. Samsung Elecs. Co.*,
888 F. Supp. 2d 976, 998 (N.D. Cal. 2012) ...................................23, 41

8

9
*Aramark Mgmt., LLC v. Borquist*,
2021 WL 864067, at *18 (C.D. Cal. Jan. 27, 2021) ...........  15, 16, 20, 23, 42

10
*Browder v. City of Albuquerque*,
187 F. Supp. 3d at 1288 (2016) ...............................................  17, 40

11

12
*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*,
2021 WL 4190628, at *17 (S.D.N.Y. Aug. 18, 2021) .........................   25

13
*CTC Glob. Corp. v. Huang*,
2019 WL 6357271, at *2 (C.D. Cal. July 3, 2019) .............................   16

14

15
*Cahill v. Dart*,
2016 WL 7034139, at *4 (N.D. Ill. Dec. 2, 2016) .........................  22, 25

16
*Catsouras v. Dep't of Cal. Highway Patrol*,
181 Cal. App. 4th 856 (2010) ...................................................   44

17

18
*Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*,
783 F. Supp. 2d 736, 750 (S.D.N.Y. 2011) ...................................   43

19
*Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*,
337 F.R.D. 47, 68 (S.D.N.Y. 2020) ........................................  25, 27

20

21
*Colonies Partners, L.P. v. Cnty. of San Bernardino*,
2020 WL 1496444, at *7 (C.D. Cal. Feb. 27, 2020) ....................  15, 18, 41

22
*Cyntegra, Inc. v. Idexx Labs, Inc.*,
2007 WL 5193736, at *5 (C.D. Cal. Sept. 21, 2007) .......................  19, 20

23

24
*Edwards v. Junior State of Am. Found.*,
2021 WL 1600282, at *9-10 (E.D. Tex. Apr. 23, 2021) .......................   25

25
*Federated Univ. Police Officers' Ass'n v. Regents of Univ. of Cal.*,
2016 WL 9173457 (C.D. Cal. Sept. 8, 2016) ...................................   37

26

27
*Franklin v. Howard Brown Health Ctr.*,
2018 WL 4784668, at *7 (N.D. Ill. Oct. 4, 2018) ..............................   26

28
*GN Netcom, Inc. v. Plantronics, Inc.*,
930 F.3d 76, 83 (3d Cir. 2019) ...................................................   24

Plaintiff's MIL No. 1 Regarding Defendants' Spoliation

*Galicia v. Nat'l R.R. Passenger Corp.*,
2018 WL 6314191, at *4 (C.D. Cal. July 20, 2018) ………………… 28, 37, 39

*Garcia v. United States*,
2014 WL 12709430, at *1 (C.D. Cal. Sept. 3, 2014) ………………….. 37, 39

*Gerlich v. U.S. Dep't of Justice*,
711 F.3d 161, 171 (D.C. Cir. 2013) …………………………………… 20

*Halaco Eng'g Co. v. Costle*,
843 F.2d 376, 380 (9th Cir. 1988) …………………………………… 44

*Hamilton v. Signature Flight Support Corp.*,
2005 WL 3481423, at *8 (N.D. Cal. Dec. 20, 2005) …………………… 45, 46

*In re Hitachi Television Optical Block Cases*,
2011 WL 3563781, at *17 (S.D. Cal. Aug. 12, 2011) ………………… 44

*Karsch v. Blink Health Ltd.*,
2019 WL 2708125, at *27 (S.D.N.Y. June 20, 2019) ………………… 26

*Leon v. IDX Sys. Corp.*,
464 F.3d 951, 959 (9th Cir. 2006) …………………………………… 23

*Lewis v. Erfe*,
2020 WL 4581724, at *4 (D. Conn. Aug. 10, 2020) ………………… 27

*McGinnity v. Metro-N. Commuter R.R.*,
183 F.R.D. 58, 63 (D. Conn. 1998) …………………………………46-47

*Mfg. Automation & Software Sys., Inc. v. Hughes*,
2018 WL 5914238, at *11 (C.D. Cal. Aug. 20, 2018) ……………… 22, 23

*Marsh v. County of San Diego*,
680 F.3d 1148 (9th Cir. 2012)……………………………………… 43

*Mazloun v. Dist. of Columbia Metro. Police Dep't*,
530 F. Supp. 2d 282, 291–92 (D.D.C. 2008) ………………………... 16, 17, 38

*Montoya v. Orange Cnty. Sheriff's Dep't*,
2013 WL 12347292, at *8 (C.D. Cal. Oct. 15, 2013) ……….......... 18, 19, 41

*Mule v. 3-D Bldg. & Constr. Mgmt. Corp.*,
2021 WL 2788432, at *17 (E.D.N.Y. July 2, 2021) ………………….. 25

*Musse v. King Cnty.*,
2021 WL 4709875, at *3 (W.D. Wash. Oct. 8, 2021) ……………… 20, 21, 39

*NuVasive, Inc. v. Kormanis*,
2019 WL 1171486, at *2 (M.D.N.C. Mar. 13, 2019) ………….....…… 26

*Oppenheimer v. City of La Habra*,
2017 WL 1807596, at *10 (C.D. Cal. Feb. 17, 2017) ………………17, 40

*Paisley Park Enters., Inc. v. Boxill*,
330 F.R.D. 226, 235 (D. Minn. 2019) ………………………………… 20

*Perkins v. City of Modesto*,
2020 WL 1333109, at *16 (E.D. Cal. Mar. 23, 2020) .................. 17, 19, 38

*Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*,
264 F.R.D. 517, 526 (N.D. Cal. 2009) ............................................. 41

*Reinsdorf v. Skechers U.S.A., Inc.*,
296 F.R.D. 604, 627 (C.D. Cal. 2013) ...................................37, 43, 45

*Small v. Univ. Med. Ctr.*,
2014 WL 4079507, at *11 (D. Nev. Aug. 18, 2014) ............................19

*Spencer v. Lunada Bay Boys*,
2017 WL 11527978, at *6 (C.D. Cal. Nov. 29, 2017) .............. 14, 15, 16, 40

*Stanbro v. Westchester Cnty. Health Care Corp.*,
2021 WL 3863396, at *11 (S.D.N.Y. Aug. 27, 2021) ...................   21, 26, 39

*Toppan Photomasks, Inc. v. Park*,
2014 WL 2567914, at *9 (N.D. Cal. May 29, 2014) ............................ 45

*Ronnie Van Zant, Inc. v. Cleopatra Records, Inc.*,
906 F.3d 253 (2d Cir. 2018) ................................................ 15, 40

*Ronnie Van Zant, Inc. v. Pyle*,
270 F. Supp. 3d 656, 670 (S.D.N.Y. 2017) ................................... 15

*United States v. Cameron-Ehlen Grp., Inc.*,
2020 WL 9209366, at *12 n.10 (D. Minn. July 10, 2020) ................ 17, 20

*Valley Eng'rs, Inc. v. Elec. Eng'g Co.*,
158 F.3d 1051 (9th Cir. 1998) ................................................  44

*WeRide Corp. v. Kun Huang*,
2020 WL 1967209, at *9 (N.D. Cal. Apr. 24, 2020) ..........................  22

*Zbylski v. Douglas Cnty. Sch. Dist.*,
154 F. Supp. 3d 1146, 1163 (D. Colo. 2015) ................................ 21, 39

Federal Rule of Civil Procedure 37(e) ......................................... *in passim*

Plaintiff's MIL No. 1 Regarding Defendants' Spoliation

# I.     IDENTIFICATION OF THE MATTER IN DISPUTE

After a citizen submitted a complaint that a Sheriff's deputy was sharing photos of decedents' remains at a bar, senior officials within the Los Angeles Sheriff's Department ("LASD") and Los Angeles County Fire Department ("Fire Department") orchestrated the widespread deletion of evidence within their respective departments.  Even more evidence was destroyed after this litigation began, when the Deputy Defendants and other LASD personnel wiped and disposed of electronic devices on which they had possessed photos of Plaintiffs' loved ones' remains.

By this motion, Plaintiff respectfully requests evidentiary sanctions pursuant to Rule 37(e) precluding Defendants from offering unverifiable, self-serving testimony or argument at trial regarding the evidence they destroyed.  In particular, Plaintiff seeks an order precluding Defendants from denying electronic dissemination of the photos on the spoliated devices, disputing that the deleted photos in their possession depicted the remains of Plaintiff's loved ones, or claiming that all of their copies of the photos have been contained.  At a minimum, Plaintiff should be given the opportunity to present evidence of Defendants' destruction of evidence to the jury.

# I.     <u>PLAINTIFF'S POSITION</u>

Plaintiff Chester's efforts to wrest accountability from Defendants have been obstructed by Defendants' affirmative steps to prevent him from learning the full truth about what happened.

The Deputy Defendants destroyed the relevant evidence in their possession in one fell swoop after this litigation began.  Defendant Joey Cruz intentionally wiped all of the data from his phone by resetting his phone to its factory default settings.  The other three Deputy Defendants and six other LASD employees similarly disposed of their phones before they could be forensically examined. When the phones were wiped and discarded, the highly relevant ESI they

contained was permanently destroyed.  By engaging in this litigation misconduct, these public officials deprived this Court, the jury, and the community they serve the ability to learn to whom they texted the photos, whether photos were uploaded to the cloud, downloaded to other devices, shared by AirDrop, or transferred by any of the many other ways photos can be shared.  That the Deputy Defendants and other LASD employees engaged in this intentional destruction of evidence is not surprising.  After all, when a complaint about the misconduct first surfaced, Sheriff Villanueva immediately offered his employees a chance to avoid any discipline if they represented they had destroyed all evidence of their wrongdoing.  Those same employees never received any comparable instruction to preserve their devices—not even after Plaintiff filed his lawsuit.

The Fire Department accomplished much the same result when a senior fire captain orchestrated a mass-deletion campaign to ensure evidence of the photos' circulation within and beyond the Department was destroyed before the whole truth could be discovered.  The Department itself has characterized the captain's efforts as a "primarily self-serving" "attempt to cover up [the captain's] role in the reported misuse of the photos."  (ECF 124-5 [McCloud Dep. 159:20-161:21].)

By destroying the forensic trail, Defendants have prevented Plaintiff from ever finding out how far the photos spread, how many other people have seen photos of his loved ones' remains, and how many photos remain unsecured and susceptible to going viral online.  Now, Defendants seek to exploit the evidentiary void they have created by using it to downplay their misconduct at trial.  Defendants should not be able to ask the jury to take them at their word that they did not engage in any further dissemination before wiping their phones and destroying evidence.  Under these circumstances, sanctions under Rule 37(e) are necessary to protect the integrity of the judicial process and prevent Defendants from profiting from the evidentiary imbalance they have created.

///

### A.   <u>Factual Background</u>

**1.   Rather Than Secure the Devices or Forensically Preserve Their Contents, LASD Instructed Its Personnel to Delete Evidence**

On January 29, 2020, shortly after midnight, a citizen submitted a complaint through the "Contact Us" page on the LASD website.  The complaint informed the Sheriff's Department that a deputy who responded to the crash site had been showing graphic pictures of Kobe Bryant's deceased body at a bar in Norwalk. (ECF No. 125-19.)  First thing in the morning, the complaint was forwarded to the Malibu/Lost Hills Station.  (ECF No. 125-20.)  The Captain of that Station, Matthew Vander Horck, immediately alerted his supervisors and assigned his best lieutenant to do an initial fact-finding inquiry.  (*Id.*; ECF No. 133-15 [Vander Horck Dep. 66:10-67:13].)

Then Sheriff Villanueva and the head of his press office, Captain Jorge Valdez, intervened.  This involvement by the Sheriff's press office in responding to allegations of personnel misconduct was "extremely unorthodox, out of the ordinary, [and] outside the chain of command."  (ECF No. 133-15 [Vander Horck Dep. 112:17-19, 129:15-130:8]; ECF No. 123-13 [Mancinas Dep. 46:8-12]; ECF No. 123-21 [Valdez Dep. 41:18-23].)  While Vander Horck was asleep, Valdez called one of Vander Horck's subordinates, Lt. Hector Mancinas, to convey orders from the Sheriff that Lost Hills personnel should be ordered to the station and told they would receive a performance log entry in lieu of discipline if they deleted the photos.  (ECF No. 123-13 [Mancinas Dep. 48:4-49:19, 52:6-9, 53:19-54:1]; ECF No. 133-17 [Villanueva Dep. 55:25-56:12, 65:16-66:14, 75:9-23].)  This, too, was unconventional.  The personnel who carried out the deletion order have testified that they had never before ordered a subject or witness to delete or destroy material relevant to an investigation.  (ECF No. 123-21 [Valdez Dep. 202:7-17]; ECF No. 123-20 [Satterfield Dep. 137:7-138:1].)

///

Upon learning of the deletion order a few hours later, Vander Horck had "a lot of concerns" and "immediately . . . told [Mancinas] to stop." (ECF No. 123-13 [Vander Horck Dep. 104:18-106:18, 107:25-108:17].)  Vander Horck then called Chief Dennis Kneer and "bombarded him with questions," including:  "Do you know if these things have evidentiary value?  Do you know if the NTSB are going to want to know about this?  What about the FBI?  Are we violating laws?  Are people going to be in trouble?"  (ECF No. 133-15 [Vander Horck Dep. 134:11-135:16].)  Vander Horck also reminded Chief Kneer that "the last time that our deputies got instructions from our executives in a federal case that they were arrested and tried for crimes."  (ECF No. 133-15 at 2620.)  A short while later, Chief Kneer called Vander Horck to say: "I discussed this with the Sheriff and he assures me that this is the proper way that we're gonna go."  (*Id.* at 2621.)

Three weeks later, Vander Horck's supervisors informed him that the Sheriff "no longer had confidence in [him]" and that he would be demoted from captain to lieutenant and stripped of his assignment leading the Lost Hills station.  (ECF No. 133-15 [Vander Horck Dep. 220:15-221:24, 222:3-22].)  Vander Horck pressed his supervisors for reasons why the Sheriff had lost confidence in him and whether the supervisors agreed with the Sheriff's decision, but they refused to respond.  (*Id.* [223:3-21, 228:25-229:23].)  The Sheriff later called Vander Horck out of the blue to say he could "keep [his] bars"—*i.e.*, remain a captain—but would be transferred to Men's Central Jail, a "dumping ground" for those who "fall out of favor with the Sheriff."  (ECF No. 133-15 [Vander Horck Dep. 233:12-236:20, 248:6-249:9].)

## 2.    LASD Personnel Disposed of Their Devices

After the *Los Angeles Times* broke the story about the photo scandal on February 27, 2020 (J. Bryant Decl. Ex. A), the Sheriff's Department finally launched an internal investigation but did not forensically preserve or examine a single device.  *See* ECF No. 132-9 [Jaeger Dep. 120:14-121:25].

///

Vanessa Bryant sent LASD a letter threatening legal action on March 2, 2020 (J. Bryant Decl. Ex. B), sent another written request for information relevant to her claims a few days later (*id.* Ex. C) and submitted a notice of claim in May (*id.* ¶ 4).  Throughout this time—and continuing through November 2021—LASD never told the personnel known to have possessed photos of the victims' remains to preserve their cell phones.  (*See* ECF No. 132-9 [Jaeger Dep. 120:14-121:25].)

As a result, after a duty to preserve indisputably arose, nine of the eleven LASD personnel known to have possessed the illicit photos lost or disposed of their phones (J. Bryant Decl. Ex. D), and a tenth (Joey Cruz) intentionally wiped his phone of all data (ECF No. 132 at 4; Freskos Decl. ¶ 21).  Two Defendants— Rafael Mejia and Michael Russell—disposed of their phones in 2021 after learning that they would be added as individual defendants in this case.  (J. Bryant Decl. Ex. 7 [Mejia Dep. 235:1-239:17]; *id.* Ex. 8 [Russell Dep. 72:16-73:10].)  This destruction of evidence came on the heels of the deputies refusing to turn over the devices to the County's counsel for examination.

At the same time Deputy Defendants and other LASD personnel were getting rid of their phones, their counsel were actively negotiating a protocol for a forensic examination of their employees' devices with Plaintiff's counsel.  (J. Bryant Decl. ¶¶ 9-11.)  Despite repeated inquiries by Plaintiff's counsel, Defendants' counsel did not come clean about the disposed-of devices until near the conclusion of negotiations regarding the forensic protocol.  (*Id.*)  Not until October 4, 2021, did Defendants' counsel provide a complete list of LASD personnel who had discarded the phones on which they had previously possessed photos of the victims' remains:

///

///

///

///

| Custodian | Date Device Replaced / Upgraded |
|---|---|
| Stephanie Shrout | August 2021 |
| Scott Miller | February 2021 |
| Rafael Mejia | March 2021 |
| Michael Russell | April 2021 |
| Raul Versales | October 2020 |
| Benjamin Sanchez | April 2020 |
| Ruby Cable | November 2020 |
| Christopher Jauregui | July 2021 |
| Doug Johnson | January 2021 |

(J. Bryant Decl. Ex. D.)  As a result of this destruction of evidence, virtually all of the LASD phones submitted for Defendants' highly-touted "forensic examination" in this litigation were not the devices used to take, send, or receive the photos in early 2020, rendering the examination worthless.

### 3.     The Fire Department's Failure to Preserve Evidence

On January 31, 2020, Captain Vander Horck called the Department to advise that two Fire Department employees had taken and obtained photos at the crash scene.  (ECF No. 124-5 [McCloud Dep. 58:7-59:16].)  That same day, this information was conveyed directly to Fire Chief Osby and the head of the Fire Department's Leadership and Professional Standards Bureau, Chief William McCloud; Chief Osby also had a one-on-one conversation with Sheriff Villanueva about the situation.  (*Id.* [McCloud Dep. 58:7-59:16, 64:4-65:11, 72:3-23, 201:2-202:18].)  Yet the Fire Department did not take any serious steps to identify the employees involved.  (*See id.* [McCloud Dep. 64:22-65:3, 72:19-74:15, 76:8-77:11, 80:14-81:23, 84:2-25].)  During two phone calls made during the Department's admittedly "cursory assessment," Chief McCloud instructed two employees not to delete any photos in their possession because he "was anticipating that there might be an investigation" and he recognized that "it's important to preserve evidence that might be related to the investigation."  (*Id.*

[McCloud Dep. 72:19-73:14, 74:23-75:6, 82:17-83:7].)  But the Fire Department did not contact any of the other 50 personnel who responded to the scene to instruct them to preserve evidence.  (*Id.* [McCloud Dep. 201:17-206:16].)

This allowed then-Captain Tony Imbrenda to instruct eight to ten of his subordinates, friends, and acquaintances to delete all graphic photos from the crash, and to pass on the deletion order "to everybody that they knew" after the media began reporting on the misconduct in late February 2020.  (*Id.* Ex. G; ECF No. 132-8 [Imbrenda Dep. 162:13-163:23, 164:15-23].)  Imbrenda gave his instruction to "very connected people" within the Department who "extrapolate[d]" the deletion order to "many, many people."  (*Id.* [163:8-23].)  Imbrenda also personally deleted approximately 45 photos from the crash site from his personal cell phone and his work cell phone.  (*Id.* [116:15-117:3, 192:12-196:5].) Following an internal investigation, the Fire Department concluded Imbrenda's deletion was a "primarily self-serving" "attempt to cover up his role in the reported misuse of the photos."  (ECF No. 124-5 [McCloud Dep.)

A week later, on March 6, 2020, a citizen submitted a complaint that Captain Imbrenda had been discussing and sharing crash-site photos with a group of off-duty firefighters and their dates at a public awards gala.  Only then—a month after Chief Osby spoke with Sheriff Villanueva—did the Fire Department finally launch an internal investigation.  (ECF No. 124-5 [McCloud Dep. 86:4-89:25].)  The Department-issued cell phones used by other personnel known to have possessed photos of the victims' remains—Brian Jordan and Arlin Kahan—were not preserved until months later.  (J. Bryant Decl. Ex. H.)  By the time Imbrenda's, Jordan's, and Kahan's phones were finally preserved, the files they had deleted had already been overwritten and permanently destroyed (Freskos Decl. ¶ 25), and the Department did not examine their personal devices at all.  (J. Bryant Decl. Ex. G [Imbrenda Dep. 207:11-208:20]; ECF No. 124-2 [Jordan Dep. 146:21-25]; ECF No. 124-3 [Kahan Dep. 107:10-109:12, 110:21-111:2].)

**B.** **Defendants Spoliated Extensive Evidence of Their Misconduct, Warranting Evidentiary Sanctions**

The foregoing facts show that Defendants have engaged in spoliation: "the destruction or significant alteration of evidence, or the failure to preserve evidence, in pending or reasonably foreseeable litigation." *Spencer v. Lunada Bay Boys*, 2017 WL 11527978, at *6 (C.D. Cal. Nov. 29, 2017). Federal Rule of Civil Procedure 37(e) authorizes sanctions for a party's failure to preserve "electronically stored information," when it is shown (1) that information "should have been preserved in the anticipation or conduct of litigation"; (2) that information "is lost because a party failed to take reasonable steps to preserve it"; and (3) the information "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). Each of these three elements is satisfied with respect to each Defendant.

**1.** **Defendant Joey Cruz Destroyed All ESI on His Phone After This Litigation Began, and the ESI Cannot be Replaced**

There can be little doubt that Cruz spoliated evidence. (Freskos Decl.) In the weeks and months before the Forensic Examiner collected Cruz's device for examination, Plaintiff's counsel repeatedly sought assurance that Cruz would make his phone from January 2020 available for examination. (J. Bryant Decl. Ex. at D.) He and his counsel never disclosed that he had reset the phone and destroyed all of the evidence it contained. As a result of Cruz's actions, the third-party Forensic Examiner in this case was unable to conduct any analysis of Cruz's device or learn anything about Cruz's activity with the photos on the phone. (*Id.*) Document discovery has further confirmed Cruz's spoliation: Cruz has not produced a single document or text message in this case.[1] (J. Bryant Decl. ¶ 15.)

---

[1] In total, Cruz was identified as a custodian on only four documents: two came from his wireless cell phone provider, and the other two are records from LASD's files that list various training courses Cruz has attended. (J. Bryant Decl. ¶ 15.)

### 2. Defendants Rafael Mejia, Michael Russell, and Raul Versales Disposed of Their Phones After They Had a Duty to Preserve, and the Lost Data Cannot Be Replaced

Like Cruz, the other Deputy Defendants have not personally produced a single text message or other document in this litigation.  (J. Bryant Decl. ¶ 16.) And also like Cruz, this failure by the Deputy Defendants is a direct result of their failure to preserve the devices they were using on January 26, 2020.

All three of them got rid of their phones after Plaintiffs had filed their lawsuits; Mejia and Russell did so shortly after learning they were named as individual defendants in March 2021.  (Bryant Decl. Ex. E [Mejia Dep. 235:1-239:17]; Ex. F [Russell Dep. 72:16-73:10].)

Defendants have previously asserted—without citing any authority—that "[u]pgrading your cellphone is not spoliation."  (ECF No. 151 at 62.)  Abundant case law says otherwise.  *See, e.g.*, *Aramark Mgmt., LLC v. Borquist*, 2021 WL 864067, at *18 (C.D. Cal. Jan. 27, 2021) (trading in iPhone after litigation commenced without consulting counsel "was not reasonable").[2]  Even "routine" destruction of evidence constitutes spoliation where, as here, the party is under a duty to preserve evidence.  *Colonies Partners, L.P. v. Cnty. of San Bernardino*, 2020 WL 1496444, at *7 (C.D. Cal. Feb. 27, 2020).

The Deputy Defendants' discarded phones cannot be restored or replaced with additional discovery.  This is not a situation where the destroyed ESI "exists in multiple locations."  Fed. R. Civ. P.  37 advisory committee's notes to 2015

---

[2] *Spencer*, 2017 WL 11527978, at *12 ("[E]ven for an individual without sophisticated knowledge about litigation or forensic analysis, trading in a phone, without making a backup, and after becoming aware of pending litigation . . . would constitute a failure to take reasonable steps to preserve evidence"); *Ronnie Van Zant, Inc. v. Pyle*, 270 F. Supp. 3d 656, 670 (S.D.N.Y. 2017) ("[G]etting a new phone after Plaintiffs brought the instant action" without preserving relevant data "evince[s] the kind of deliberate behavior that sanctions are intended to prevent."), *rev'd on other grounds sub nom. Ronnie Van Zant, Inc. v. Cleopatra Records, Inc.*, 906 F.3d 253 (2d Cir. 2018).

amendment.  The discarded devices are irretrievably lost and "[g]etting rid of the device[s] . . . robbed Plaintiffs of an opportunity to attempt to recover" any deleted data or forensic artifacts that remained on the devices used in January 2020. *Aramark*, 2021 WL 864067, at *18.  The Forensic Examiner's analysis confirmed that the Deputy Defendants' copies of the photos, their messages transmitting the photos, and their related communications were not forensically recoverable.  (*See* Freskos Decl. ¶¶ 19-21.)

>    **3.    The Sheriff's Department Deletion Order and Failure to Take Reasonable Steps to Preserve Evidence Constitutes Spoliation**
>
>    *(a)    LASD's Preservation Duty Attached Upon Receiving the Citizen Complaint Regarding Deputy Cruz's Public Sharing of Photos at Bar*

"The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *CTC Glob. Corp. v. Huang*, 2019 WL 6357271, at *2 (C.D. Cal. July 3, 2019) (citations omitted).  The point at which litigation is reasonably foreseeable is "an objective standard that asks not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Spencer*, 2017 WL 11527978, at *6 (citation omitted).

Here, the Sheriff's Department should have anticipated litigation—and in fact *did* anticipate litigation—almost immediately upon receiving the citizen complaint on January 29, 2020 that a deputy was showing graphic photos of Kobe Bryant's remains at a bar.  *See Mazloun*, 530 F. Supp. 2d at 292 (court had "no difficulty concluding" defendants incurred an obligation to preserve evidence upon learning of complaint alleging police misconduct).  The citizen complaint made its way to the Sheriff on the same day it was submitted.  (J. Bryant Decl. Ex. I.)  As a

general matter, "[i]t is common knowledge that citizen complaints alleging police misconduct frequently form the basis of subsequent lawsuits." *Mazloun v. Dist. of Columbia Metro. Police Dep't*, 530 F. Supp. 2d 282, 291–92 (D.D.C. 2008); *see also Perkins v. City of Modesto*, 2020 WL 1333109, at *16 (E.D. Cal. Mar. 23, 2020) (police department had duty to preserve officer's cell phone upon receiving citizen complaint alleging officer misconduct).  Nothing about this particular citizen complaint would have given the Sheriff's Department reason to think this general principle would not apply.  If anything, the underlying facts—a graphic, disturbing show-and-tell of a local hero's dead body over drinks at a bar—made litigation even *more* reasonably likely here than in the case of the usual citizen complaint.

Sheriff Villanueva recognized that the "the usual routine" in such situations is that "everybody lawyers up." (Bryant Decl. Ex. J.)  When asked at deposition whether it occurred to him after learning of the citizen complaint that the Department might get sued, Captain Vander Horck testified: "I'm sure it crossed my mind." (ECF No. 133-15 [Vander Horck Dep. 131:1-13].)  Under these circumstances, it "defies reason" to suggest the Sheriff's Department was unaware that the photos and related communications could be relevant in potential litigation.  *See Mazloun*, 530 F. Supp. 2d at 292.

Regardless, litigation certainly should have been anticipated by early March, when Plaintiff's outside counsel served *two* written requests for information relevant to her potential claims.  *See, e.g.*, *Oppenheimer v. City of La Habra*, 2017 WL 1807596, at *10 (C.D. Cal. Feb. 17, 2017) (city's duty to preserve information arose when plaintiffs served a written request for information); *Browder v. City of Albuquerque*, 187 F. Supp. 3d at 1296 (2016) (letter from plaintiffs' attorney "made it crystal clear that litigation was reasonably foreseeable").

///

///

1

(b)    *LASD Failed to Take Reasonable Steps to Preserve Evidence,*

2

*and the Lost Evidence Cannot Be Restored or Replaced*

3        The foregoing establishes that the Sheriff's Department had a duty to take

4  reasonable steps to preserve relevant ESI in the days following the crash.  Fed. R.

5  Civ. P. 37(e).  But LASD did the opposite.  It took affirmative steps to encourage

6  its personnel to cover-up their wrongdoing.  In fact, not only did the Sheriff's

7  Department fail to forensically preserve the relevant devices itself, it failed to even

8  issue a preservation instruction to the personnel who possessed the photos—the

9  most fundamental step to preserve ESI.  (*See* Bryant Decl. Ex. K at Response to

10  Interrogatory Number 7.)  "A litigation hold, or preservation order, is often the

11  most appropriate mechanism to ensure potentially relevant documents and

12  information are not lost deliberately or unintentionally." *Colonies Partners, L.P. v.*

13  *Cnty. of San Bernardino*, 2020 WL 1496444, at *8 (C.D. Cal. Feb. 27, 2020).  Yet

14  the Sheriff's Department did not issue a litigation hold directly to the Deputy

15  Defendants or other LASD personnel known to have possessed the photos even

16  after this litigation was filed.  While the Department "had an obligation to contact

17  the key players involved . . . to ensure that they preserved evidence in their

18  possession and on their [devices]," *Montoya v. Orange Cnty. Sheriff's Dep't*, 2013

19  WL 12347292, at *8 (C.D. Cal. Oct. 15, 2013), virtually none of the LASD

20  personnel known to have possessed the photos were made aware of their

21  preservation obligations,[3] which paved the way for their wholesale disposal of their

22  devices, which resulted in permanent data loss.

23        Nor can LASD avoid the consequences of its employees' failure to preserve

24  the phones they used at the crash site.  It of course cannot claim a lack of control

25

26

27

28

---

[3] While Defendants have submitted carefully parsed submissions about various personnel who did receive hold notices, they do not deny that the individuals actually involved in the improper sharing did not receive such instructions.  (*See* Bryant Decl. Ex. M [Cruz Dep. 281:20-282:2]; *id.* Ex. E [Mejia Dep. 240:22-241:4]; *id.* Ex. N [Versales Dep. 298:2-10]; *id.* Ex. F [Russell Dep. 266:15-22]; *see also* ECF No. 191 ¶ 434.)

over the LASD-issued phones used by Sergeants Scott Miller and Stephanie Shrout, which were replaced while this litigation was pending.  (*See* Bryant Decl. ¶ 12).  Yet, for reasons that remain unexplained, the Department never preserved these LASD-issued devices before disposing of them.  *See, e.g.*, *Perkins v. City of Modesto*, 2020 WL 1333109, at *15 (E.D. Cal. Mar. 23, 2020) (finding spoliation where police department reset an officer's phone after litigation commenced).

LASD's preservation duties also extended to the other devices its personnel used in the ordinary course of their employment when responding to the crash on January 26, 2020.  "The obligation to retain discoverable materials is an affirmative one; it requires the agency . . . having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials."  *Montoya*, 2013 WL 6705992, at *8.  Moreover, "courts have extended the affirmative duty to preserve evidence to instances when that evidence is not directly within the party's custody or control so long as the party has access to, or indirect control over, such evidence." *Cyntegra, Inc. v. Idexx Labs, Inc.*, 2007 WL 5193736, at *5 (C.D. Cal. Sept. 21, 2007) (imposing adverse inference instruction where corporation failed to preserve evidence on third-party contractor's server). This includes where, as here, a party has indirect control over an employee device because it is used for work purposes.[4]  *See, e.g.*, *Small v. Univ. Med. Ctr.*, 2014 WL 4079507, at *11 (D. Nev. Aug. 18, 2014) (finding employer's failure to preserve, collect, or search personal mobile devices employees used at work resulted in spoliation); eDiscovery for Corporate Counsel § 29:6 (discovery obligations generally extend to employee phones used for work) (collecting authorities).  "To hold to the contrary would create an obvious loophole for businesses to exploit during litigation." *United States v. Cameron-Ehlen Grp.*,

---

[4] LASD employees testified that they routinely use their personal cell phones for work. (*See, e.g.*, ECF No. 196-15 [Flores 30(b)(6) Dep. 34:10-35:14, 36:10-37:6, 37:13-25, 38:17-23, 40:8-15, 55:18-56:25].)

*Inc.*, 2020 WL 9209366, at *12 n.10 (D. Minn. July 10, 2020), *affirmed in relevant part & overruled in part on other grounds*, 2021 WL 101193 (D. Minn. Jan. 12, 2021), at *25-28.[5]  LASD cannot "bypass this duty by abandoning its documents to [an employee's personal device] and claiming lack of control." *Cyntegra*, 2007 WL 5193736, at *5.

### 4. The Fire Department's Failure to Take Reasonable Steps to Preserve Evidence Constitutes Spoliation

#### (a) *The Fire Department's Preservation Duty Was Triggered by Late January 2020*

The Fire Department's preservation duty arose at the latest on January 31, 2020, when it was informed that firefighters were implicated in the illicit photo taking and sharing.  "

Evidence that a defendant *actually* anticipated litigation might include emails or meeting minutes discussing potential litigation, actions taken to retain a lawyer," or the assertion of work product protection for documents created during that time period. *Aramark*, 2021 WL 864067, at *4.  The County's privilege log in this case reveals that the Fire Department was *actually* anticipating litigation as of January 31, 2020, when the Department was preparing correspondence to the County's Board of Supervisors "in anticipation of litigation."  (Bryant Decl. Ex. L [County Privilege Log] at lines 13-15.)

A reasonably foreseeable internal investigation—a common precursor to litigation—is sufficient to trigger a preservation duty.  *See, e.g.*, *Gerlich v. U.S.*

---

[5] *See also, e.g.*, *Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 235 (D. Minn. 2019) ("The Court will not permit the . . . Defendants to claim that it was reasonable to assume data on their personal cell phones would not be subject to discovery when the record clearly shows that they used their phones for work purposes."); *Alter v. Rocky Point Sch. Dist.*, 2014 WL 4966119, at *10 (E.D.N.Y. Sept. 30, 2014) (entity defendants were obligated to preserve work-related ESI "on whatever devices contained the information," including "cellphones" and "any personal digital devices capable of ESI storage").

1    *Dep't of Justice*, 711 F.3d 161, 171 (D.C. Cir. 2013); *Musse v. King Cnty.*,

2    2021 WL 4709875, at *3 (W.D. Wash. Oct. 8, 2021) ("[A] defendant's decision to

3    open an investigation can indicate that it was reasonable to expect a lawsuit."

4    (citation omitted)); *Stanbro v. Westchester Cnty. Health Care Corp.*, 2021 WL

5    3863396, at *11 (S.D.N.Y. Aug. 27, 2021) ("In circumstances where a department

6    of corrections internally investigates an incident within a prison, the department is

7    obligated to preserve '[a]ll relevant evidence' . . . ." (citation omitted)); *Zbylski v.*

8    *Douglas Cnty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1163 (D. Colo. 2015) (collecting

9    cases).  Otherwise, "parties would have an incentive, or at least the opportunity, to

10   destroy evidence while avoiding undertaking any investigation that might confirm

11   suspicions of wrongdoing.  That simply cannot be." *Zbylski*, 154 F. Supp. at 1166–

12   67.

13           *(b)*       *The Fire Department's Breach of its Preservation Obligations*

14                     *Resulted in Permanent Data Loss*

15         The Fire Department did not make any effort to preserve the ESI on

16   Department-issued devices used by Imbrenda and others known to have possessed

17   photos until *after* Imbrenda had already issued widespread deletion instructions

18   and weeks *after* it had received notice that the improper photos were in circulation

19   within the Department.  Given the volatility of mobile data and the speed which

20   deleted data is overwritten and permanently destroyed (Freskos Decl. ¶¶ 5-8), the

21   Department's belated, post-deletion preservation efforts came far too late (*see id.*

22   ¶ 25).  As a result of the Department's inaction, Imbrenda was able to carry out his

23   cover-up campaign successfully, and it is no longer possible to determine how

24   many people received photos of the victims from Imbrenda, Jordan, and Kahan.

25   (ECF No. 124-5 [McCloud Dep. 147:12-21, 149:11-18, 156:18-157:9, 164:14-17,

26   166:9-16].)  The Fire Department's five-week delay in contacting relevant

27   employees and taking steps to preserve ESI breached its obligation under Rule

28   37(e).

1

**C.    Defendants' Spoliation of Evidence Has Prejudiced Plaintiffs, Meriting Sanctions Under Rule 37(e)(1)**

2

3      Sanctions are warranted because the foregoing deletion and destruction of

4   evidence in this case has irreparably impeded Plaintiffs' ability to obtain

5   reassurance that photos of their loved ones' remains have been contained and will

6   not someday become public.  Separate from and in addition to an adverse-inference

7   instruction under Rule 37(e)(2),[6] Plaintiffs respectfully request that the Court

8   impose measures "to cure the prejudice" that Defendants' spoliation has worked on

9   Plaintiffs in this litigation.  Fed. R. Civ. P. 37(e)(1); *see also, e.g.*, *Cahill v. Dart*,

10   2016 WL 7034139, at *4 (N.D. Ill. Dec. 2, 2016) (affirming magistrate judge's

11   recommendation under Rule 37(e)(1) that defendants be precluded at trial from

12   "[p]resenting their theory about" the content of "the missing video" they

13   spoliated).  "On considering a motion for [spoliation] sanctions, a district court

14   may make factual findings and assess the credibility of witnesses."  *WeRide Corp.*

15   *v. Kun Huang*, 2020 WL 1967209, at *9 (N.D. Cal. Apr. 24, 2020) (citations

16   omitted).  A party need only prove its entitlement to spoliation sanctions by a

17   preponderance of the evidence.  *See, e.g.*, *id.*

18      **1.    Defendants' Spoliation Has Prejudiced Plaintiffs by Limiting**

19           **Their Ability to Prove the Full Extent of Defendants' Wrongdoing**

20      "Once spoliation is established, upon a showing of prejudice to another party

21   from the loss of ESI that cannot be restored or replaced through additional

22   discovery, Rule 37(e)(1) provides that the Court may order measures no greater

23   than necessary to cure the prejudice."  *Mfg. Automation & Software Sys., Inc. v.*

24   *Hughes*, 2018 WL 5914238, at *11 (C.D. Cal. Aug. 20, 2018) (citation omitted).

25

26

---

27   [6] Plaintiff is entitled to sanctions under both 37(e)(1) and (e)(2) but addresses only the 37(e)(1) sanctions in this motion *in limine*.  The adverse inference instruction is

28   addressed in Plaintiff's concurrently filed memorandum regarding the parties' disputed jury instructions.

1   "An evaluation of prejudice from the loss of information necessarily includes an

2   evaluation of the information's importance in the litigation."  Fed. R. Civ. P. 37(e)

3   advisory committee's notes to 2015 amendment.

4           "When, as here, spoliation is shown, the burden shifts to the guilty party to

5   demonstrate that no prejudice resulted from the spoliation," particularly if the

6   spoliation was intentional.  *Mfg. Automation & Software v. Hughes*, 2018 WL

7   5914238, at *11; *see also, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d

8   976, 998 (N.D. Cal. 2012).  "The prejudiced party must not be held 'to too strict a

9   standard of proof regarding the likely contents of the destroyed or unavailable

10  evidence,' because doing so 'would allow parties who have destroyed evidence to

11  profit from that destruction.'"  *Aramark*, 2021 WL 864067, at *5 (citation

12  omitted); *see also, e.g.*, *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006).

13          By any standard, Defendants' spoliation has prejudiced Plaintiffs in this

14  lawsuit.  With the direct evidence of Defendants' photos of the crash-site

15  destroyed, Plaintiffs has been deprived of all direct evidence of what those photos

16  depicted; which victims were photographed; how many photos were taken and

17  shared; how far and wide those photos were stored and disseminated; or even what

18  Defendants wrote about the photos as they passed them around.  And without

19  information of this most basic kind, Plaintiffs have no hope of containing the

20  photos' spread.  Imbrenda testified, for instance, that he received crash-site photos

21  from approximately seven to nine different phone numbers.  (Bryant Decl. Ex. 10

22  [Imbrenda Dep. 72:15-74:5, 98:8-99:23].)  He could recall and identify only *two* of

23  the seven to nine individuals who sent him photos.  (*See id.*)  Because Imbrenda's

24  texts and photos from that day have been destroyed, the additional five to seven

25  Fire Department personnel who sent him photos of the crash cannot be identified,

26  and their copies of the photos remain unsecured and at-risk of release at any

27  moment.

28  ///

1    Nor can Plaintiffs know the full extent of Defendants' invasion of their
2    privacy or the full degree to which their misconduct shocks the conscience—issues
3    that go to the heart of Plaintiffs' claims.  The information that Plaintiffs have
4    managed to discover on these issues—despite Defendants' efforts to conceal their
5    conduct—supplies strong reason to suspect that the spoliated evidence would have
6    further shown that Defendants gratuitously took and widely shared graphic photos
7    of the victims' remains.  To take just one example, in the days following the crash,
8    Defendant Michael Russell texted photos containing human remains to a fellow
9    Sheriff's deputy—Ben Sanchez—with whom he regularly plays the video game
10   Call of Duty.  (*See* ECF No. 151 ¶¶ 307-313.)  Russell's cell phone records reveal
11   not only outgoing picture texts to Sanchez on the days immediately after the crash,
12   but also outgoing picture texts to four other friends with whom Russell plays video
13   games, including pictures sent in a group chat that included Sanchez.  (*Id.* ¶¶ 505,
14   507-508.)  When Plaintiff raised this issue, Defendants produced the group chat
15   text thread from Sanchez's phone, which revealed that several of Russell's
16   outgoing picture messages appear to have been surgically deleted by Sanchez,
17   raising the inference that Russell sent the photos of the victims' remains to his
18   entire video-game group, not just Sanchez.  (*See id.* ¶ 709.)  But because the texts
19   have been deleted by Russell and Sanchez (*id.* ¶¶ 378, 650), Plaintiffs have no way
20   to determine the content of the pictures Russell was group texting to his friends in
21   the days following the crash.
22          Given this evidence that Plaintiffs have managed to obtain in discovery, it is
23   reasonable to infer that the deleted evidence and timely forensic examinations of
24   the devices at issue would have revealed even more dissemination and other facts
25   that would have advanced Plaintiffs' case.  But Defendants' spoliation has
26   prevented Plaintiffs from obtaining this evidence—the precise kind of prejudice
27   Rule 37(e)(1)'s curative sanctions are designed to address.  *See, e.g.*, *GN Netcom,*
28   *Inc. v. Plantronics, Inc.*, 930 F.3d 76, 83 (3d Cir. 2019) (affirming finding of

prejudice resulting from party's spoliation of relevant emails); *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 2021 WL 4190628, at *17 (S.D.N.Y. Aug. 18, 2021) (finding prejudice).

> **2.      Plaintiff's Prejudicial Spoliation Merits Evidentiary Sanctions Under Rule 37(e)(1)**

Sanctions are also warranted under Rule 37(e)(1) to cure the prejudice Defendants' spoliation has caused.  Specifically, Defendants should be precluded from arguing at trial that (1) the photos did not depict human remains; (2) the photos depicted the remains of only certain crash victims; and (3) the photos were not electronically disseminated from the spoliated devices.  *See* Fed. R. Civ. P. 37(e) advisory committee notes to 2015 amendment (noting that Rule 37(e)(1) authorizes court "to exclude a specific item of evidence to offset prejudice caused by failure to preserve other evidence that might contradict the excluded item of evidence"); *see also, e.g.*, *Cahill*, 2016 WL 7034139, at *4 (affirming magistrate judge's recommendation that spoliating parties be precluded from offering any testimony that spoliated video "would have backed up [their] version of events"). Allowing Defendants to make these arguments would permit them to exploit the evidentiary imbalance they created and which, as a result of Defendants' spoliation, Plaintiffs cannot fairly rebut.  The Court should not permit Defendants to advance arguments that "tak[e] unfair advantage of an evidentiary gap" they "created . . . themselves." *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 68 (S.D.N.Y. 2020); *see also, e.g.*, *Edwards v. Junior State of Am. Found.*, 2021 WL 1600282, at *9-10 (E.D. Tex. Apr. 23, 2021) (precluding plaintiffs from offering evidence or argument regarding content of deleted Facebook messages "that Plaintiffs manifestly knew or should have known [were] critical to th[e] case" because plaintiffs' deletion created an "unfair imbalance between [the parties'] ability to procure, examine, and present evidence"); *Mule v. 3-D Bldg. & Constr. Mgmt. Corp.*, 2021 WL 2788432, at *17 (E.D.N.Y. July 2,

2021) (precluding spoliators "from offering testimony at trial regarding the coding and characterization of transactions in . . . discarded" bookkeeping records).

At a minimum, Plaintiffs should be given the opportunity to present evidence of Defendants' spoliation to the jury, and the jury should be permitted to consider that evidence in evaluating the strength of Plaintiffs' claims and Defendants' defenses. *See* Fed. R. Civ. P. 37(e) advisory committee notes to 2015 amendment (noting that Rule 37(e)(2) governs only "jury instructions that permit or require the jury to presume or infer that lost information was unfavorable to the party that lost it" but does "not prohibit a court from allowing the parties to present evidence to the jury concerning the loss and likely relevance of information and instructing the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision," a measure "available under subdivision (e)(1)"); *see also, e.g.*, *NuVasive, Inc. v. Kormanis*, 2019 WL 1171486, at *2 (M.D.N.C. Mar. 13, 2019) (allowing parties "to present evidence to the jury concerning the loss" of ESI and instructing the jury that it "may consider [such] evidence . . . in making its decision"); *Stanbro v. Westchester Cnty. Health Care Corp.*, 2021 WL 3863396, at *16 (S.D.N.Y. Aug. 27, 2021) (authorizing plaintiff "to adduce evidence at trial" regarding spoliated video); *Franklin v. Howard Brown Health Ctr.*, 2018 WL 4784668, at *7 (N.D. Ill. Oct. 4, 2018) (recommending that "parties be allowed to present evidence and argument to the jury regarding the defendant's destruction/failure to preserve electronic evidence in this case").

Allowing Plaintiffs to put on evidence and argument regarding the extent and motives for Defendants' spoliation will help "'rectify the evidentiary imbalance'" that Defendants have "created by spoliating relevant ESI" and will "provide the jury, as finder of fact, with context for that evidentiary imbalance." *Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *27 (S.D.N.Y. June 20, 2019). Moreover, evidence that Defendants willfully spoliated relevant evidence "is itself

relevant evidence going to the parties' credibility" that should be presented to the jury. *Id.*; *see also, e.g.*, *Lewis v. Erfe*, 2020 WL 4581724, at *4 (D. Conn. Aug. 10, 2020) (allowing parties "to present evidence and argument regarding the loss of [spoliated] surveillance footage" in part because "the failure to preserve the video may" bear "on the credibility of the Defendants"); *Charlestown*, 337 F.R.D. at 68-69 (allowing movant "to present evidence to the finder of fact regarding the loss of [important] emails" so that jury could consider it in evaluating witness credibility and making other factual determinations").

## III.

## DEFENDANTS' CONTENTIONS OF POINTS AND AUTHORITIES

Plaintiff's lawsuit is premised on two inconsistent claims: (i) that crash site photos taken by County personnel were deleted and he will never be able to track them down; and (ii) Chester lives in fear that the deleted photos he has never seen will one day be publicly disseminated. Since he cannot prove public dissemination by the County, he is asking this Court to give him the critical missing element of public dissemination by way of this motion *in limine*. The Court should refuse.

Chester has known since at least March 2020 that the photos had been deleted—months before filing his initial complaint. To confirm the photos were deleted, Defendants proposed a forensic examination of County devices. Chester agreed—hoping it would show that crash site photos were disseminated by the County. The parties selected Kroll. And, after reviewing over 20 LASD and LACFD devices, Kroll confirmed that there are *no* photos containing victims' remains and *no* evidence of public dissemination on any of the devices.

Left with no evidence of public dissemination by the County, Plaintiff is seeking spoliation sanctions precluding Defendants from denying that they publicly disseminated crash site photos—effectively establishing liability for Plaintiff's claims. Chester cannot show spoliation. He cannot show a "culpable state of mind"; he cannot establish, based on "concrete evidence rather than a

1   fertile imagination," that the photos would have "favor[ed]" him; and he cannot

2   show "prejudic[e]."  *Galicia v. Nat'l R.R. Passenger Corp.*, 2018 WL 6314191, at

3   *4 (C.D. Cal. July 20, 2018) (Walter, J.) (citations omitted).

4       In *Galicia*, plaintiff moved for terminating or, alternatively,

5   issue/evidentiary sanctions because defendants had failed to prevent video footage

6   from being overwritten.  2018 WL 6314191, at *1-2.  This Court refused to issue

7   any sanctions against the defendants, finding that (1) defendants did not have a

8   duty to preserve the footage merely because an accident had occurred; (2) the

9   video was overwritten pursuant to defendants' policies and procedures; (3) plaintiff

10  had failed to demonstrate relevant evidence was destroyed or that she was

11  prejudiced; and (4) plaintiff failed to demonstrate defendants acted in bad faith.  *Id.*

12  at *4-6.

13      The same is true here.  Sheriff Villanueva did not have a "culpable state of

14  mind" when a few days after the crash he acted to make sure the photos did not get

15  out and were deleted.  He did what he thought was right and necessary to protect

16  Chester.  The same is true of LACFD.  The deletions were not for a "culpable"

17  purpose.  They were intended to, and did, protect Chester's privacy.

18      Spoliation also requires the destruction of "favorable evidence" and

19  "prejudice."  Neither occurred here.  Chester got what he wanted by virtue of the

20  deletions: no publication.  As this Court concluded in dismissing the Sheriff in the

21  related lawsuit filed by Plaintiff Vanessa Bryant: "Although Plaintiff claims that

22  Sheriff Villanueva's conduct [ordering the deletions] was a 'self-serving attempt to

23  avoid embarrassment and legal headaches,' [his] conduct may have benefitted

24  Plaintiff by making it less likely that those photos would be disseminated."  (Dkt.

25  46 at 7.[7])

26

27  ───────────────

28  [7] This case and the Bryant litigation (*Bryant v. County of Los Angeles, et al.*,
    United States District Court for the Central District of California, Case No. 2:20-
    cv-09582-JFW-E) were consolidated for discovery purposes.  (*See* Dkt. 91.)  Cites

And in denying Chester's motion for spoliation sanctions, Magistrate Eick noted that granting the requested sanctions would be "at odds" with this Court's previous ruling.  Chester is essentially seeking a ruling that "the Sheriff's alleged instruction to delete the photographs establishes that the photographs *were* publicly disseminated."  (Dkt. 189 at 3.)

Through this motion *in limine*, Chester asks this Court for an order precluding Defendants from denying public dissemination of the photos, disputing that the deleted photos depicted the remains of Plaintiff's loved ones, or claiming that their copies of the photos have been contained.[8]  In other words, Chester wants the Court to give him the critical element that is missing from his case, *public dissemination* by the County, because he cannot prove this element and is trying to backdoor it by way of this motion *in limine*.

**A.** <u>**Facts**</u>

    **1.**       **The LASD Crash Site Photos**

        *(a)*       *LASD Receives a Complaint*

On January 29, 2020, the Sheriff's Information Bureau ("SIB") received an email from a citizen.  (Dkt. 151-56 ¶ 3.)  The email stated that a deputy had shown crash site photos to someone at a bar in Norwalk.  (*Id.*)  SIB shared the email with LASD command staff, who launched an immediate inquiry.  (*Id.*)

By the next day, LASD had identified Joey Cruz as the deputy and learned that he had shown photos on his cellphone to one of his friends, Victor Gutierrez, the bartender in Norwalk.  (Dkt. 151-57 ¶¶ 19-20.)  Deputy Cruz was a 25-year-old

---

to the docket in Defendants' opposition are to the docket in the Bryant litigation, unless otherwise indicated.  That is because Plaintiffs filed a prior motion for sanctions as a discovery motion in the Bryant litigation, which was denied by Magistrate Judge Eick.

[8] Chester also seeks an adverse inference instruction pursuant to Fed. R. Civ. P. 37(e)(2).  Although Plaintiff is not entitled to such an instruction for the same reasons he is not entitled to sanctions,  Chester's request is specifically addressed in Defendants' memorandum regarding the parties' disputed jury instructions.

deputy trainee who had been at the crash site.  (*Id.* ¶ 2.)

According to Victor Gutierrez, he saw between one and three photos, which Deputy Cruz swiped through while holding his phone.  (Dkt. 151-66 Ex. J [Gutierrez Dep. 20:24-21:8]; Dkt. 151-57 ¶ 14.)  He recalled seeing various body parts in the debris field.  (Dkt. 151-66 at Ex. J [Gutierrez Dep. 30:9-13].)  Deputy Cruz did not show the photos to anyone else in the bar, but he did try and show scene photos to his niece, who refused to look at them.  (Dkt. 151-57 ¶ 13.)

(b)        *LASD Takes Immediate Action*

When Sheriff Villanueva learned about the potential showing of crash site photos, he directed his personnel to launch an immediate inquiry and make sure *no* photos "saw the light of day," that no photos got outside the department.  (Dkt. 151-66 at Ex. R. [IAB Investigative Summary at 3].)  He said if everyone was honest, and did not publicly disseminate any photos, they would receive a performance log entry in their personnel file in lieu of more severe discipline.  (*Id.*)

Malibu/Lost Hills Station Lieutenant Mancinas and Sergeant Phillips immediately interviewed 28 deputies, reserve deputies, sergeants, and civilian volunteers.  (Dkt. 151-56 ¶ 5.)  They determined that all LASD personnel who had taken, shared or received crash site photos had deleted them.  (*Id.* ¶ 6.)  Only Deputy Cruz had shown a photo to anyone outside LASD.  (*Id.* ¶ 8.)  By the conclusion of this initial inquiry—within a few days of the crash—all of the LASD employees had deleted the photos per the Sheriff's instruction.[9]

(c)        *The Internal Affairs Bureau Investigates*

Once the initial inquiry was complete, IAB conducted a comprehensive investigation.  (Dkt.  151-56 ¶¶ 4-8.)  That is the standard operating procedure at LASD.  (*Id.* ¶ 4.)  IAB interviewed 41 witnesses and compiled a comprehensive

---

[9] (Dkt. 151-57 ¶¶ 15-18; Dkt. 151-67 ¶¶ 9-12; Dkt. 151-64 ¶¶ 17-20; Dkt. 151-70 ¶¶ 13-16; Dkt. 151-65 ¶¶ 10-12; Dkt. 151-55 ¶¶ 11-14; Dkt. 151-59 ¶¶ 13-15; Dkt. 151-62 ¶¶ 12-15.)

1   1,140-page report.  (*Id*. ¶ 7.)

2       The investigation revealed that the photos came from the first deputy on

3   scene, Deputy Johnson, who is not named as a defendant.  (Dkt. 151-66 Ex. R

4   [IAB Investigative Summary at 4].)  He took crash site photos for investigative and

5   operational purposes to communicate to the command post what he was seeing.

6   (Dkt. 151-60 ¶ 10.)  Deputy Johnson sent the photos to Deputy Versales, who was

7   handling communications at the command post.  (*Id*.)  Deputy Versales sent the

8   scene photos to Deputy Mejia, who was working with dispatch to help identify the

9   helicopter, and to the other personnel at the command post.  (Dkt. 151-70 ¶ 12;

10  Dkt. 151-64 ¶ 10.)

11      Deputy Mejia sent the photos to two deputies who were also on scene,

12  including his trainee, Deputy Cruz.  (Dkt. 151-64 ¶ 14.)  Deputy Cruz sent the

13  photos to Deputy Russell, who was at the command post helping to keep

14  unauthorized individuals, and the media, away.  (Dkt. 151-57 ¶ 12; Dkt. 151-67 ¶

15  4.)  Deputy Russell sent the photos to a deputy who was working at another station

16  and planned on responding to the scene the following day.  (Dkt. 151-67 ¶ 8; Dkt.

17  151-68 ¶ 3.)

18      **2.        The LACFD Crash Site Photos**

19          *(a)        LACFD Receives a Call from LASD*

20      On January 31, 2020, LASD Captain Vander Horck[10] called LACFD Fire

21  Chief Anthony Marrone.  (Dkt. 151-66 Ex. E [Marrone Dep. 154:12-19].)  He told

22  Chief Marrone that there was a complaint about a deputy sharing crash site photos

23  containing victim remains and advised him that there were two LACFD employees

24  at the crash site on January 26, 2020.  (Dkt 151-63 ¶ 4.)

25

26  _____

27  [10] Captain Vander Horck is now a Captain at Men's Central Jail.  As he testified,
    that transfer had nothing to do with this incident.  (Dkt. 151-66 Ex. I [Vander
    Horck Dep. 321:21-232:4]; Dkt. 151-69 ¶¶ 4-7.)  Chester's insistence on alleging
28  otherwise is misleading.  Defendants have moved to exclude all evidence of
    Captain Vander Horck's transfer in their contemporaneously filed MIL No. 3.

Chief Marrone notified Deputy Fire Chief McCloud, who oversaw the Leadership and Professional Standards Bureau at that time.  (Dkt. 151-66 Ex. E [Marrone Dep. 155:16-156:2].)  LACFD worked to identify the personnel who had been present on the first day of the crash site investigation.  (*Id*. Ex. K [McCloud Dep. 77:12-79:22].)  At that time, there were no allegations that LACFD personnel had shared photos improperly.  (*Id*. [McCloud Dep. 57:6-10]; Ex. E [Marrone Dep. 163:11-18]; Dkt. 151-63 ¶ 4.)

        *(b)*        *LACFD Starts an Investigation*

On or around March 6, 2020, a civilian witness reported to LACFD that a LACFD employee had been showing crash site photos on his phone at a first responders awards event on February 15, 2020.  (Dkt. 151-63 ¶ 5.)

LACFD hired an outside law firm to investigate the allegations.  (*Id.* ¶ 6.) The investigation revealed that on February 15, 2020, then-PIO Captain Imbrenda had shown crash site photos on his phone to one LACFD employee and two Los Angeles Fire Department Captains who had worked the incident; and that all LACFD photos had been deleted.  (*Id.*; Dkt. 151-58 ¶ 13.)

**3.**        **Bryant's Letters and Tort Claims**

On March 2, 2020, Bryant's attorney sent letters to LASD and LACFD. (Dkt. 151-7 Exs. 20, 21.)  The letters asked the departments to "take immediate action to secure all photos and videos of the January 26, 2020 crash scene" in their possession, "including any photos or videos in the possession of or disseminated by [the departments'] personnel."  (*Id.*)

Bryant's letters alleged that LASD and LACFD owed a duty of care to victims' families "*to refrain from publicly disseminating photos of victims' remains*."  (*Id.* (emphasis added).)  The letters did not threaten litigation or identify any legal claims against either department.  (*Id.*)  The only potential liability the letters referenced was for the public dissemination of photos, which had not occurred.  Indeed, it has now been almost two years since the crash, and there has

1    still been *no public dissemination by the County*.

2        On March 8, 2020, Bryant's attorney sent LASD another letter.  (*Id.* Ex. 23.)

3    The letter acknowledged Bryant's awareness that LASD employees had deleted

4    photos of the crash site.  (*Id.*)  There was no objection to the deletion of photos or

5    request that LASD refrain from deleting photos.  The letter did not demand that

6    LASD preserve any documents or materials related to the January 26, 2020 crash.

7    No potential claim against LASD was identified.

8        Two months later, on May 8, Bryant submitted a tort claim against LASD.

9    (Dkt. 151-66 Ex. P.)  A tort claim against LACFD followed on July 20, 2020.  (*Id.*

10   Ex. Q.)

11       **4.        LASD's Preservation Efforts**

12       On May 11, 2020—three days after receipt of the tort claim—Captain

13   Maldonado of the Risk Management Bureau notified Captain Becerra of the

14   Malibu/Lost Hills Station of Bryant's May 8, 2020 tort claim.  (Dkt. 151-56 ¶ 11.)

15   The notice stated the relevant personnel at the station needed to "preserve all

16   evidence related to this claim in a location where it can be readily retrieved."  (*Id.*)

17   Captain Maldonado sent the same notice to Sheriff Villanueva.  (*Id.* ¶ 13.)

18       LASD Chief Legal Advisor Elizabeth Miller sent a litigation hold notice to

19   Commander Johnson of the Professional Standards Division, Lieutenant

20   Kallenberger of the Risk Management Bureau, Captain Jaeger of IAB, and Captain

21   Burson of the Professional Standards Division, relating to the alleged sharing of

22   photos involving the January 26, 2020 helicopter crash.  (*Id.* ¶ 15.)  The litigation

23   hold notice directed the recipients to "take steps to ensure that all evidence related

24   to the crash, the investigation, photos taken at the scene, etc. – all evidence in any

25   way related to the crash and any related investigation is preserved."  (*Id.* ¶ 16.)

26   Lieutenant Kallenberger responded and advised Chief Legal Advisor Miller that

27   her office would "notify appropriate involved units."  (*Id.* ¶ 17.)  Lieutenant

28   Kallenberger then asked Janel Ramos of the LASD Civil Litigation Unit to "notify

all appropriate involved units regarding the Bryant crash," which she did.  (*Id.* ¶ 18.)

Ms. Ramos forwarded the litigation hold notice to Captain Becerra, Lieutenant Mancinas, Sergeant Nevarez, and Sergeant Painter of the Malibu/Lost Hills Station, Commander Valdez, who was the Captain of SIB at the time, and Lieutenant Blanchard of the Office of the Sheriff.  (*Id.* ¶ 19.)  Ms. Ramos wrote that the "request for preservation of evidence related to the Bryant crash was sent from Chief Legal Advisor, Elizabeth Miller," and instructed the recipients to "ensure all evidence in any way related to the crash and any related investigation is preserved by your unit/station."  (*Id.* ¶ 20.)  That same day, Commander Valdez forwarded the litigation hold notice to Assistant Sheriff Gross, Chief Kneer of the North Patrol Division, and Constitutional Policy Advisor Glaciano for the Office of the Sheriff.  (*Id.* ¶ 21.)  Chief Kneer was involved in coordinating the response by LASD to the January 26, 2020 helicopter crash, the inquiry into the alleged sharing of crash scene photos, and disciplining certain LASD deputies.  (*Id.*)

Constitutional Policy Advisor Galviano then forwarded the litigation hold notice to Captains Jaeger and Burson and Lieutenant Hinchman.  (*Id.* ¶ 22.)  Captain Jaeger, who also received Chief Legal Advisor Miller's litigation hold, was involved in the IAB investigation into the alleged sharing of crash scene photos.  (*Id.*)  The recipients of these litigation hold notices were responsible for notifying the relevant LASD personnel of their obligations to preserve evidence relating to the crash, including documents relating to the inquiry and IAB investigation.  (*Id.* ¶ 23.)  This included LASD personnel at the Malibu/Lost Hills Station, SIB, and IAB.  (*Id.*)

**5.       LACFD's Preservation Efforts**

On March 3, 2020, LACFD Risk Manager Kim sent a litigation hold to Chief Marrone, Deputy Fire Chief Pena, Chief of Staff Aguirre, and Battalion Chief Sprewell.  (Dkt. 151-63 ¶ 10.)  She also forwarded the litigation hold to

Assistant Fire Chief Alkonis.  (*Id.*)  Ms. Kim instructed these individuals to "ensure that the appropriate divisions/sections in your respective bureaus have been notified."  (*Id.*)  She explained that "[a]ny and all existing records, documents, and/or information related to the Willow Incident should be preserved and forwarded to the Risk Management Division . . . as soon as possible."  (*Id.*)  These individuals received the litigation hold because it was understood that their bureaus or divisions had personnel that responded to the crash.  (*Id.* ¶ 11.)

The litigation hold instructed recipients to "confirm receipt of this notification and identify documents/files you have within your unit."  (*Id.* ¶ 13.)  They all confirmed receipt of the litigation hold and that the appropriate bureaus/divisions had been notified.  (*Id.* ¶ 14.)  The recipients confirmed that all relevant LACFD personnel, including LACFD personnel who responded to the January 26, 2020 helicopter crash, received written or verbal notice of the litigation hold.  (*Id.*)  Chief Marrone confirmed that he had given verbal notice of the litigation hold to then-Fire Captain Jordan and Fire Captain Kahan.  (*Id.* ¶ 15.)

On July 21, 2020, Ms. Kim sent a revised litigation hold to Chief Marrone, Deputy Fire Chief Pena, and Chief of Staff Aguirre.  (*Id.* ¶ 16.)  She also sent the revised litigation hold to Assistant Fire Chief Alkonis, Deputy Chief Anderson, and Deputy Chief Ewald.  (*Id.*)  She instructed the recipients to "ensure that any and all records, documents, information have been/are preserved."  (*Id.*)  The recipients all confirmed to Ms. Kim in writing and verbally receipt of the litigation hold and that the appropriate divisions/sections had been notified.  (*Id.* ¶ 18.)

## 6.        LACFD's Orders

On March 6, 2020, Deputy Fire Chief McCloud ordered then-PIO Captain Imbrenda to return his LACFD electronic devices, and to provide/show LACFD any photos taken involving the crash.  (Dkt. 151-63 ¶ 19 & Ex. E.)  In response to the direct order, Imbrenda turned over his LACFD devices.  (*Id.*)

On May 29, 2020, Chief Marrone ordered Fire Captain Kahan and former

Fire Captain Jordan to return their LACFD electronic devices, and to provide/show LACFD any photos taken involving the crash.  (*Id.* ¶¶ 20-21.)  Kahan and Jordan were also ordered to "[p]reserve all Electronic Media/Photographs involving the Willow Incident" that were in their possession.  (*Id.*)  They complied and turned over their devices.  (*Id.*)

The LACFD-issued electronic devices were forensically imaged by the Office of County Investigations ("OCI").  (*Id.* ¶ 22.)  OCI retained possession of the electronic devices and forensic images until they were turned over to counsel in this case.  (*Id.* ¶ 23.)  They were also provided to Kroll.  Ms. Kim reviewed the forensic images of the phones, including photos and text messages.  She confirmed that they did not contain any crash scene photos depicting human remains and there was no evidence anyone publicly disseminated any photos.  (*Id.* ¶¶ 25-27.)

### 7.        The Forensic Examination

After this lawsuit was filed, the parties agreed to have an independent forensic examiner (Kroll) examine the devices of LASD and LACFD personnel.  (Dkt. 151-66 ¶ 10.)  The objective of the examination was to determine whether the devices contained crash site photos depicting human remains and/or whether any crash site photos had been publicly disseminated.  (*Id.* ¶¶ 11-12.)

The forensic examination is complete.  Kroll "identified no photographs or videos of physical remains of the victims [of the crash]," and did not identify any evidence that such photos were copied, transferred and/or communicated.  (*Id.* ¶ 13 & Exs. C-D.)  There are no photos and no public dissemination by the County.

### B.   <u>Legal Standard</u>

"A party seeking sanctions for spoliation of evidence must prove the following elements: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind;' and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that

1   sought the discovery of the spoliated evidence[.]" *Galicia*, 2018 WL 6314191, at

2   *4 (alteration in original) (citation omitted).

3          It is the moving party's burden to "establish a reasonable possibility, based

4   on concrete evidence rather than a fertile imagination, that access to the lost

5   material would have produced evidence favorable to its cause." 2018 WL

6   6314191, at *4 (citation omitted).  The absence of evidence must be prejudicial to

7   the party alleging spoliation.  *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604,

8   627 (C.D. Cal. 2013).

9   **C.   Defendants' Duty To Preserve Did Not Begin In January 2020**

10          Chester's argument is premised on his claim that Defendants had a duty to

11   preserve evidence relating to crash site photos in January 2020.  This is wrong as a

12   matter of law.  For a party to be on notice of litigation such that the duty to

13   preserve attaches, the evidence must be relevant to a litigation that has "'more than

14   a possibility' of occurring." *Garcia v. United States*, 2014 WL 12709430, at *1

15   (C.D. Cal. Sept. 3, 2014) (citation omitted).  Specifically, "the fact that a tort might

16   have occurred cannot by itself be sufficient to place a defendant on notice of

17   impending litigation [because] . . . [t]hat is not the law." *Id.* at *2.  Instead, the

18   duty requires a higher standard—that the litigation is *probable. Id.*; *Galicia*, 2018

19   WL 6314191, at *4 ("[A] general concern over litigation does not trigger a duty to

20   preserve evidence." (citation omitted)).

21          Defendants did not have a duty to preserve evidence until they received

22   Bryant's tort claims on May 8, 2020 (LASD) and July 20, 2020 (LACFD).

23   Another court in the Central District has addressed this issue in a case concerning

24   audio and video footage.  *Federated Univ. Police Officers' Ass'n v. Regents of*

25   *Univ. of Cal.*, 2016 WL 9173457 (C.D. Cal. Sept. 8, 2016) (Staton, J.).  There, the

26   police chief allegedly "ordered the deletion of all audio recordings" and "oversaw

27   the continuing deletion of audio recordings." *Id*. at *2.  Plaintiffs sought an

28   adverse inference for summary judgment and trial that the "destroyed evidence"

1  would have shown "that the confidential communications . . . were recorded both

2  within and outside of the UCIPD and accessed by Defendants." *Id*. (alteration in

3  original).

4      The Court held that defendants did not have a duty to preserve at the time

5  the recordings were deleted, rejecting the "attenuated inference" that the police

6  chief "must have known the recordings were illegal and, therefore, must have

7  known of the potential for a claim and the possibility of subsequent litigation."

8  2016 WL 9173457, at *2.  Chester is making the same argument here.  At the time

9  the photos were deleted, litigation was *not* probable.  Sheriff Villanueva, the

10  deputies, and the LACFD captains were simply trying to avoid the harm Chester is

11  suing over: public dissemination of crash site photos.

12      **1.**       **The Citizen Complaint Did Not Trigger a Duty to Preserve**

13      Chester cites cases for his contention that a citizen complaint triggers a duty

14  to preserve; but when examined, these cases actually show that the County did *not*

15  have such a duty in January 2020.  In both *Mazloum* and *Perkins*, the complaints

16  had been submitted by the *plaintiffs* who themselves were harmed by police

17  conduct.  *See Mazloum v. D.C. Metro. Police Dep't*, 530 F. Supp. 2d 282, 292

18  (D.D.C. 2008) ("[D]efendants were aware that plaintiff had filed a police

19  complaint arising out of [the] incident."); *Perkins v. City of Modesto*, 2020 WL

20  1333109, at *14 (E.D. Cal. Mar. 23, 2020) ("Plaintiff submitted a citizen complaint

21  form to the MPD alleging misconduct in connection with the November 6, 2017,

22  officer-involved shooting of Plaintiff.").

23      Unlike the complaints at issue in those cases, the January 29, 2020 citizen

24  email to LASD did not identify any injury to the *complainant*.  The email did not

25  identify any injured party or potential legal claim against LASD at all.  (Dkt 151-

26  66 Ex. R [IAB Summary at 3].)  The email merely reported what the citizen had

27  heard from the bartender.  (*Id*. at 39.)  The individual who wrote the email had not

28  even seen the photos.  He was reporting what the bartender told him.  (*Id*.)

The January 29, 2020 citizen email did not notify LASD that litigation was probable. *Galicia*, 2018 WL 6314191, at *4; *Garcia*, 2014 WL 12709430, at *2. Instead, it notified LASD that it should investigate and determine whether there was a factual basis for the complaint. That is what LASD did. Within 24 hours, LASD had identified Deputy Cruz as the deputy at the bar and hailed 28 personnel into the station to answer questions about the crash site photos. (Dkt. 151-56 ¶¶ 3-6.) LASD determined that all LASD personnel who had taken, shared or received crash site photos had deleted them and that only Deputy Cruz had shown a photo to anyone outside LASD. (*Id*. ¶ 8.)

## 2.     An Internal Investigation Does Not Trigger a Duty to Preserve

Chester contends that LACFD had a duty to preserve beginning on January 31, 2020, because it anticipated an internal investigation. This argument also fails as a matter of law. None of the authorities Chester relies on stand for the proposition that "[a] reasonably foreseeable internal investigation" alone is "sufficient to trigger a preservation duty." (Plfs. Mot. at 20.) Rather, in each of those cases, courts found that the existence of an internal investigation, *when combined with other facts*, could serve to put defendants on notice of potential litigation.[11]

An internal investigation does not necessarily mean that litigation is probable. As authority from this district (which Chester cites) makes clear,

---

[11] *See e.g.*, *Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 171 (D.D.C. 2013) ("Department officials . . . were on notice that Department investigation *and future litigation* concerning the 2006 Honors Program improprieties were reasonably foreseeable." (emphasis added)); *Musse v. King County*, 2021 WL 4709875, at *3 (W.D. Wash. Oct. 8, 2021) ("A plaintiff's statements or conduct might put a defendant on notice that litigation was likely. Similarly, a defendant's decision to open an investigation *can indicate* that it was reasonable to expect a lawsuit." (emphasis added) (citation omitted)); *Stanbro v. Westchester Cty. Health Care Corp.*, 2021 WL 3863396, at *11 (S.D.N.Y Aug. 27, 2021) (regarding circumstances where a department of corrections investigates incident within a prison); *Zbylski v. Douglas Cty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1163-67 (D. Colo. 2015) (explaining that an internal investigation can trigger duty to preserve where the investigation provides notice of anticipated litigation).

determining "[w]hen litigation is 'reasonably foreseeable' is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Spencer v. Lunada Bay Boys*, 2017 WL 11527978, at *6 (C.D. Cal. Nov. 29, 2017) (citation omitted).

Chester is blurring the facts to paint a distorted picture. LASD and LACFD did everything right. They took a proactive approach even though there were no allegations putting them on notice of "reasonably foreseeable" litigation. (*See, e.g.,* Dkt. 151-64.)

### 3. Bryant's Letters Did Not Provide Notice of Probable Litigation

The March 2 and March 8, 2020 letters from Bryant's attorney did not trigger a duty to preserve for Defendants. (Plfs. Mot. at 11.) Chester cites *Oppenheimer v. City of La Habra* for the proposition that a written request for information triggers a duty to preserve evidence. This is wrong.

In *Oppenheimer*, the duty to preserve was not caused by the plaintiff sending a request for information, but rather by plaintiff filing a claim with the defendant city. 2017 WL 1807596, at *10 (C.D. Cal. Feb. 17, 2017). Chester's reliance on *Browder v. City of Albuquerque* is similarly misplaced. 187 F. Supp. 3d 1288, 1296 (D.N.M 2016). In *Browder*, plaintiffs' attorney's letter made litigation reasonably foreseeable where the stated purpose of the letter was to put the defendant on notice that plaintiffs intended to pursue a claim. *See Id.* The letter also requested a litigation hold on specific evidence. *Id.*

Bryant's letters demanded that the departments "take immediate action to secure all photos and videos of the January 26, 2020 crash scene," which they had already done. (Dkt. 151-7 Exs. 20, 21.) The letters referenced *possible* claims predicated on harm caused by the "dissemination of photos of victims' remains," which could not occur because the photos had been deleted. (*Id.*) The letters also acknowledged that the crash site photos had been deleted.

At most, the letters were an insufficient "vague hint" of possible litigation.

1     *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 881 F. Supp. 2d 1132, 1145 (N.D. Cal.

2     2012); *see also Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 264 F.R.D.

3     517, 526 (N.D. Cal. 2009) ("A general concern over litigation does not trigger a

4     duty to preserve evidence.").

5         LASD's duty to preserve arose when the May 8, 2020 tort claim came in.

6     (Dkt. 151-66 Ex. P [LASD tort claim].)  It issued its litigation hold on May 11,

7     2020, with follow-up notices in July 2020.  (Dkt. 151-56 ¶¶ 11-23.)  LACFD's

8     duty to preserve arose on July 20, 2020.  (Dkt. 151-66 Ex. Q [LACFD tort claim].)

9     It had already issued its litigation hold on March 3, 2020.  (Dkt. 151-63 ¶¶ 19-21.)

10    By the time Chester filed his complaint in this case, litigation holds were in

11    place.[12]

12   **D.**    **Defendants Have Not Spoliated Evidence**

13         In his bid to get spoliation sanctions— that effectively amount to terminating

14    sanctions—Chester points to three things:  (i) LASD personnel deleting photos in

15    January 2020; (ii) LACFD personnel deleting photos in February 2020; (iii) and

16    involved personnel upgrading their personal cellphones after all photos from the

17    crash site were deleted.  Chester also complains about witnesses being unable to

18    recall collecting materials for this litigation during their depositions.  (Plfs. Mot. at

19    18.)

20         **1.**    **Deletions That Predate Tort Claims Are Not Spoliation**

21         As explained above, Defendants' duty to preserve ESI did not arise until

22    May 2020 (LASD) and July 2020 (LACFD).  By that time, the photos had been

23    deleted.

24        •   LASD confirmed that the photos had been deleted by January 31, 2020.

25

26   [12] Chester's reliance on *Colonies Partners, L.P. v. County of San Bernardino*, 2020
WL 1496444, at *8 (C.D. Cal. Feb. 27, 2020), and *Montoya v. Orange County*
27   *Sheriff's Dep't*, 2013 WL 12347292, at *8 (C.D. Cal. Oct. 15, 2013), is misplaced.
Both involved defendants who failed to take *any* steps to preserve ESI *after* the
28   initiation of litigation.  Here, Defendants issued litigation holds and notified
relevant personnel before Chester's lawsuit was filed.

(Dkt. 151-56 ¶¶ 3-6.)  All of the individual LASD employees who possessed crash site photos on their phones have declared under oath that they deleted the photos and related text messages before there was any prospect of litigation.  (*See, e.g.,* Dkt. 151-57 ¶¶ 15-18; Dkt. 151-67 ¶¶ 9-12; Dkt. 151-64 ¶¶ 17-20; Dkt. 151-70 ¶¶ 13-16; Dkt. 151-65 ¶¶ 10-12; Dkt. 151-55 ¶¶ 11-14.)

- LACFD's investigation identified all of the personnel who had taken and possessed photos of the crash site.  (Dkt. 151-63 ¶¶ 6-7.)  The investigation confirmed that all photos had been deleted.  (*Id.* ¶¶ 22-28.)  The relevant LACFD employees have declared under oath that they deleted the photos and related text messages before there was any prospect of litigation.  (Dkt. 151-58 ¶ 18; Dkt. 151-61 ¶ 13.)

The County, its departments, and its personnel did not have a duty to preserve in January or February 2020.  Deletions during that period were not spoliation; they were efforts to prevent the public dissemination of crash site photos.

### 2.    Upgrading Cellphones Is Not Spoliation

Chester contends that upgrading and replacing cellphones is spoliation.  Chester even makes this argument for non-party witnesses.

All of the LASD and LACFD personnel—including Deputies Cruz, Mejia, Russell, and Versales—have declared under oath that their phones were replaced as part of a routine upgrade; months *after* the crash site photos had been deleted.  (*See, e.g.,* Dkt. 151-70 ¶ 22; Dkt. 151-64 ¶ 27; Dkt. 151-67 ¶ 18; 151-57 ¶¶ 24-25.)  Each of these individuals has also consented to (i) a neutral forensic examination of their devices, and (ii) production of their personal cellphone records. (Dkt. 151-70 ¶ 21; Dkt. 151-64 ¶ 26; Dkt. 151-67 ¶ 17; Dkt. 151-57 ¶ 23.)  The forensic examination by Kroll confirmed that the devices do not contain crash scene photos and that there is no evidence of public dissemination on them.  (*See* Dkt. 151-66 Ex. C [Kroll Report] at 69-76.)

Chester's reliance on *Aramark Management, LLC v. Borgquist*, 2021 WL 864067, at *18 (C.D. Cal. Jan. 27, 2021), and *Ronnie Van Zant, Inc., v. Pyle*, 270

F. Supp. 3d 656, 670 (S.D.N.Y. 2017), is misplaced.  In both of those cases, the defendants got rid of their phones despite knowing they contained relevant text messages.  That did not happen here.  Here, the LASD and LACFD personnel had deleted the photos before upgrading their phones.

## E. Chester Cannot Show Loss Of Relevant Evidence

Chester has the burden of showing that the deleted photos and upgraded phones would have contained relevant evidence.  *Reinsdorf*, 296 F.R.D. at 631 ("The deletion of irrelevant evidence does not support a spoliation claim." (citing *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, 783 F. Supp. 2d 736, 750 (S.D.N.Y. 2011) ("[A] discovery sanction cannot be based on a failure to preserve irrelevant evidence" (alteration in original)))).

Chester cannot establish "based on concrete evidence rather than a fertile imagination, that access to the lost [cellphones] would have produced evidence favorable to [his] cause."  *United States v. Town of Colorado City, Ariz.*, 2014 WL 3724232, at *7 (D. Ariz. July 28, 2014) (citation omitted).  Indeed, the actual "concrete" evidence in this case—including the 1,140-page IAB report, LACFD's investigation and forensic examination, and Kroll's neutral forensic examination of over 29 devices—has confirmed that no photos exist.

## F. The Request For Sanctions Is Not Supported By The Record Or The Law

Chester asks the Court to preclude Defendants from arguing at trial that (1) the photos did not depict human remains, (2) the photos depicted the remains of only certain crash victims, and (3) the photos were not publicly disseminated.  This request is for a merits ruling that contradicts all of the evidence in this case.  In effect, Plaintiff is trying to win the case by way of this motion.

Chester's claims require him to show public dissemination *by the County* of photos containing his family members.  *Marsh v. County of San Diego*, 680 F.3d 1148 (9th Cir. 2012) (autopsy photos of deceased child sent to the media);

1  *Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856 (2010) (crash

2  photos published on more than 2,500 websites).

3       But because there was *no public dissemination* by the County, Chester is

4  now asking for this Court to fill in the blanks and create viable legal claims.  This

5  is drastic, unprecedented and would be clearly erroneous.

6       In the Ninth Circuit, terminating sanctions, as effectively sought here, are

7  justified only in "extreme circumstances."  *See Halaco Eng'g Co. v. Costle*, 843

8  F.2d 376, 380 (9th Cir. 1988) (reversing dismissal sanction); *Ahcom, Ltd. v.*

9  *Smeding*, 2011 WL 3443499, at *8-9 (N.D. Cal. Aug. 8, 2011) (imposing monetary

10  sanctions for intentional destruction of evidence *after* litigation began).  Such

11  circumstances exist only where there are deceptive tactics that demonstrate a

12  pattern of disregard for the court or its orders.  *Valley Eng'rs, Inc. v. Elec. Eng'g*

13  *Co.*, 158 F.3d 1051, 1054, 1057 (9th Cir. 1998) (imposing terminating sanctions

14  when "smoking gun" destroyed after court order to produce); *Anheuser-Busch, Inc.*

15  *v. Nat. Beverage Distribs.*, 69 F.3d 337, 348-49 (9th Cir. 1995) (finding dismissal

16  warranted when "a party has engaged deliberately in deceptive practices that

17  undermine the integrity of judicial proceedings").

18       Courts have refused to impose terminating sanctions even when a party has

19  demonstrated a clear intent to actively destroy evidence *after* it has received notice

20  that such evidence must be preserved for ongoing litigation.  *See e.g.*, *In re Hitachi*

21  *Television Optical Block Cases*, 2011 WL 3563781, at *17 (S.D. Cal. Aug. 12,

22  2011) (no sanction imposed despite intentional destruction of evidence with

23  knowledge of litigation hold); *Advantacare Health Partners v. Access IV*, 2004

24  WL 1837997, at *5-7 (N.D. Cal. Aug. 17, 2004) (rejecting terminating sanction

25  even after defendants destroyed crucial evidence after being served with temporary

26  restraining order).  No such thing happened here.

27  **G.    Chester Has Not Been Prejudiced**

28       Sanctions are also not appropriate unless the moving is party actually

prejudiced.  *Reinsdorf*, 296 F.R.D. at 627; Fed. R. Civ. P. 37(e)(1).  There must b

e "concrete evidence" showing that the allegedly destroyed evidence would have been favorable to the moving party.  *Hamilton v. Signature Flight Support Corp.*, 2005 WL 3481423, at *8 (N.D. Cal. Dec. 20, 2005) (denying motion for sanctions).  Courts consider (i) whether the moving party has other evidence to prove its case, and (ii) the extent to which the non-moving party is prejudiced by the missing evidence.  *Toppan Photomasks, Inc. v. Park*, 2014 WL 2567914, at *9 (N.D. Cal. May 29, 2014); *Hamilton*, 2005 WL 3481423, at *8-9.

When the moving party fails "to provide any extrinsic evidence that the subject matter of the lost or destroyed materials would have been unfavorable to [the spoliator] or would have been relevant to the issues of this lawsuit," then the claim of prejudice is based on "pure speculation" and sanctions are not warranted.  *Hamilton*, 2005 WL 3481423, at *8 (alteration in original) (citation omitted).  Chester's argument that deleted photos and upgraded cellphones "could" have shown relevant evidence is based on "speculation."

Courts do not impose sanctions when the moving party has alternative evidence available to prove his claim.  *See Toppan*, 2014 WL 2567914, at *9.  Here, Chester has had every opportunity to prove his case at trial:

- Plaintiffs have IAB's 1,140-page report, which contains 41 witness interviews and IAB's conclusions and findings.  (Dkt. 151-66 ¶ 8 & Ex. R.)

- Plaintiffs have the entire file for LACFD's internal investigation.  That includes the forensic examinations of the LACFD-issued devices.  (*Id.*)

- Plaintiffs have taken 40 depositions.  (*Id.* ¶ 14.)  In each deposition, Plaintiffs asked about taking, sharing, and deleting crash site photos.

- Plaintiffs served over 100 written discovery requests: 9 interrogatories and 50 requests for admission on the County, 45 requests for admission on LACFD, and 5 requests for admission on LASD.  Defendants responded with substantive, verified responses.  (*Id.* ¶¶ 28-29.)

- Defendants collected 500,000 documents, reviewed over 150,000 for relevance, and produced over 35,000 pages to Plaintiffs. (*Id.* ¶ 8.)

- Chester has Kroll's reports on its neutral forensic examination of over 29 devices. (*Id.* ¶¶ 10-13 & Exs. C-D.)

- All Defendants, and even non-defendant witnesses, agreed to the production of their cellphone records—showing everyone who they called and texted during the relevant time period. (*Id.* ¶ 6 & Ex. A.)

Chester's inability to prove his case has nothing to do with Defendants' actions. Chester knows no crash site photos have ever been publicly disseminated by the County, and he admittedly has never seen crash site photos containing his loved ones. In response to questions about whether Chester has seen any crash site photos from the County, LASD, or LACFD, Chester confirmed he had not. (Tokoro Decl. Ex. F [Chester Dep. 36:7-23].)

Chester cites to one "example" of how he has been prejudiced—Deputy Russell's picture messages to his friends. (Plts. Mot. at 18-19.) Chester argues he has no way of knowing the content of those messages because Deputy Russell deleted the texts. (*Id.*) Not true.

Chester could have deposed those friends and requested that they produce the texts. He chose not to. Deputy Russell also testified at deposition that the picture messages did not include crash scene photos, but were instead GIFs and memes. (Dkt. 151-66 Ex. T [Russell Dep. 314:20-318:2].) His cellphone records show that he sent the same picture messages to his friends before and after the crash, showing that they were not crash site photos. (*Id.*) And the text chain was produced to Chester, which shows the texts had nothing to do with the crash. It's more unfounded speculation.

Courts also consider whether the party accused of spoliation will suffer prejudice. For example, one district court held that *both* parties were prejudiced by the missing footage. *Hamilton*, 2005 WL 3481423, at *7; *see also McGinnity v.*

*Metro-N. Commuter R.R.*, 183 F.R.D. 58, 63 (D. Conn. 1998) ("[A]ll parties are equally prejudiced by the absence of the tape recording, which might have supported plaintiffs' contention . . . or might have supported defendant's position . . . .").

Here, if Defendants had the photos and cellphones, they could conclusively establish that the photos were taken for legitimate reasons by hardworking First Responders in an extremely challenging situation.  The deleted photos and upgraded phones are just as likely to prove Defendants' case as they are to prove Chester's.

## II.

## **DEFENDANTS' CONCLUSION**

For the foregoing reasons, Plaintiff's motion should be denied in its entirety.


DATED:      January 20, 2022

                                        By  */s/ Jerome M. Jackson*_____
                                            Jerome M. Jackson
                                            Attorney for Plaintiff
                                            CHRISTOPHER L. CHESTER


DATED:  January 20, 2022            OFFICE OF COUNTY COUNSEL



                                    By:   _____*/s/ Jonathan C. McCaverty*____
                                          JONATHAN C. McCAVERTY
                                          Attorneys for Defendant
                                          LOS ANGELES COUNTY SHERIFF'S
                                          DEPARTMENT

DATED:  January 20, 2022          MILLER BARONDESS, LLP


By ___/s / Louis R. Miller___
          LOUIS R. MILLER
          Attorneys for Defendants
          COUNTY OF LOS ANGELES, LOS
          ANGELES COUNTY FIRE
          DEPARTMENT, JOEY CRUZ, RAFAEL
          MEJIA, MICHAEL RUSSELL, RAUL
          VERSALES, TONY IMBRENDA, and
          ARLIN KAHAN

Plaintiff's MIL No. 1 Regarding Defendants' Spoliation

# <u>ATTESTATION CLAUSE</u>

I, Jerome M. Jackson, attest under L.R. 5-4.3.4(a)(2)(i) that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated:  January 20, 2022                    */s/ Jerome M. Jackson*
                                            Jerome M. Jackson

Plaintiff's MIL No. 1 Regarding Defendants' Spoliation