Jerome M. Jackson (State Bar No. 64238)
jmjlaw@aol.com
880 Apollo St., Suite 238
El Segundo, California 90245
Telephone:  (310) 726-4199
Facsimile:   (310) 414-0486

Attorneys for Plaintiff Christopher L. Chester

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CHRISTOPHER L. CHESTER<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>Defendants. | Case No. 2:20-cv-10844-JFW-E<br><br>**PLAINTIFF'S UPDATED AND AMENDED MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Final Pretrial Conference:<br>    July 8, 2022 at 8:00 a.m.<br><br>Hearing on Motions *in Limine*:<br>    July 15, 2022 at 8:00 a.m.<br><br>Trial Date:  July 26, 2022<br><br>The Honorable John F. Walter |

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ............................................................................................. 1

II.    PLAINTIFF'S CLAIMS ................................................................................. 3

    A.    42 U.S.C. § 1983 – *Monell* (Agency Defendants) .................................. 3

        1.    Elements of Claim ................................................................ 3

        2.    Key Evidence in Support ....................................................... 6

    B.    Negligence (Deputy Defendants and Agency Defendants) .................. 10

        1.    Elements of Claim ............................................................... 10

        2.    Key Evidence in Support ...................................................... 11

    C.    Invasion of Privacy (Joey Cruz and Agency Defendants) ................... 12

        1.    Elements of Claim ............................................................... 12

        2.    Key Evidence in Support ...................................................... 14

III.   DEFENDANTS' AFFIRMATIVE DEFENSES.......................................... 15

    A.    First Affirmative Defense (Discretionary Act Immunity) ................... 16

        1.    Elements Required to Establish Discretionary Act Immunity............................................................................... 16

        2.    Key Evidence in Opposition ................................................. 17

    B.    Second Affirmative Defense (Superseding and Intervening Acts) ...... 17

        1.    Elements Required to Establish Superseding and Intervening Acts................................................................. 17

        2.    Key Evidence in Opposition ................................................. 18

    C.    Third Affirmative Defense (Qualified Immunity) ............................... 18

        1.    Elements Required to Establish Qualified Immunity ............... 18

        2.    Key Evidence in Opposition ................................................. 19

    D.    Fourth Affirmative Defense (Good Faith) .......................................... 19

        1.    Elements Required to Establish Good Faith............................ 19

        2.    Key Evidence in Opposition ................................................. 19

    E.    Fifth Affirmative Defense (No Vicarious Liability)............................ 20

PLAINTIFF'S AMENDED MEMORANDUM OF CONTENTIONS OF FACT AND LAW

# **TABLE OF CONTENTS**

Page

1.  Elements Required to Establish No Vicarious Liability ............ 20

2.  Key Evidence in Opposition ................................................ 20

F.  Sixth Affirmative Defense (Standing) .................................... 21

1.  Elements Required to Establish Standing .............................. 21

2.  Key Evidence in Opposition ................................................ 21

IV.  ANTICIPATED EVIDENTIARY ISSUES ........................................ 21

A.  Plaintiff's Motion *in Limine* #1 Regarding Defendants' Spoliation ........................................................................ 21

B.  Plaintiff's Motion *in Limine* #2 to Exclude Expert Testimony ............ 22

C.  Plaintiff's Motion *in Limine* #3 to Exclude Evidence of Plaintiff's Financial Condition .............. **Error! Bookmark not defined.**

D.  Plaintiff's Motion *in Limine* #4 to Admit Eyewitness Statements ....... 22

E.  Plaintiff's Motion *in Limine* #5 to Admit Recordings and Letters ....... 22

F.  Defendants' Motions *in Limine* .......................................... 23

V.  ISSUES OF LAW ........................................................................ 23

A.  The Constitutional Right Articulated in *Marsh* .................................... 23

B.  Defendants' Duty of Care ...................................................... 24

C.  The Contours of Plaintiff's Common Law Privacy Right .................... 26

VI.  BIFURCATION OF ISSUES ............................................................ 27

A.  Bifurcation Should be Granted Only Rarely ........................................ 28

B.  Bifurcation is Not Necessary in This Case ............................................ 29

1.  Holding Separate Trials on Plaintiff's Federal and State-Law Claims Would Not Promote Judicial Economy ................. 30

2.  Holding Separate Trials Would Prejudice Plaintiff and Inconvenience Non-Party Witnesses .............................................. 34

3.  Defendants Have Identified No Prejudice from Trying the Federal and State Law Claims in a Single Proceeding ................ 36

VII.  JURY TRIAL ........................................................................ 37

VIII.  ATTORNEYS' FEES ................... **ERROR! BOOKMARK NOT DEFINED.**

1

# **<u>TABLE OF CONTENTS</u>**

<u>Page</u>

IX.   ABANDONMENT OF ISSUES ......................................................................37

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>CASES</u>

*AE ex rel. Hernandez v. Cnty. of Tulare*,
   666 F.3d 631 (9th Cir. 2012) ................................................................. 16

*Allen v. Jones*,
   104 Cal. App. 3d 207 (1980) ................................................................... 2

*Anaya v. Super. Ct.*,
   78 Cal. App. 4th 971 (2000) .................................................................. 18

*Arthur Young & Co. v. U.S. Dist. Ct. (Kaufman)*,
   549 F.2d 686 (9th Cir. 1977) ................................................................. 30

*Barillas v. City of L.A.*,
   2021 WL 4434977 (C.D. Cal. Apr. 12, 2021) ....................................... 30

*Briones v. City of San Bernardino*,
   2012 WL 13124163 (C.D. Cal. Feb. 16, 2012) ..................................... 32

*Brown v. USA Taekwondo*,
   11 Cal. 5th 204 (2021) ........................................................................... 25

*Bryant v. Cnty. of L.A.*,
   2020 WL 8024857 (C.D. Cal. Dec. 28, 2020) ...................................... 25

*Campos v. Fresno Deputy Sheriff's Ass'n*,
   535 F. Supp. 3d 913 (E.D. Cal. 2021) ................................................... 19

*Catsouras v. Dep't of Cal. Highway Patrol*,
   181 Cal. App. 4th 856 (2010) ................................................ 11, 25, 26, 31

*Christensen v. Super. Ct.*,
   54 Cal. 3d 868 (1991) ...................................................................... 11, 25

*Clement v. Gomez*,
   298 F.3d 898 (9th Cir. 2002) ................................................................. 18

*Derrick Through Tina v. Glen Mills Schs.*,
   2019 WL 7019633 (E.D. Pa. Dec. 19, 2019) ........................................ 35

-iv-

## TABLE OF AUTHORITIES

Page

*Doe v. John F. Kennedy Univ.*,
2013 WL 4565061 (N.D. Cal. Aug. 27, 2013) .............................................. 13, 27

*Donnelly v. S. Pac. Co.*,
18 Cal. 2d. 863 (1941) ..................................................................................... 11

*Douglas v. Stokes*,
149 S.W. 849 (Ky. 1912) .................................................................................. 27

*Estate of Alderman v. City of Bakersfield*,
2018 WL 4156740 (E.D. Cal. Aug. 28, 2018) ................................................. 33

*Ford Motor Co. v. Home Ins. Co.*,
116 Cal. App. 3d 374 (1981) ............................................................................ 11

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
528 U.S. 167 (2000) .......................................................................................... 21

*Gravity Defyer Corp. v. Under Armour, Inc.*,
2013 WL 12138987 (C.D. Cal. July 23, 2013) ................................................. 35

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2009) ...................................................................................... 13

*Huskey v. City of San Jose*,
204 F.3d 893 (9th Cir. 2000) ............................................................................ 19

*IDS Prop. & Cas. Ins. Co. v. Fellows*,
2017 WL 202128 (W.D. Wash. Jan. 18, 2017) ................................................ 35

*Ignat v. Yum! Brands, Inc.*,
214 Cal. App. 4th 808 (2013) ........................................................................... 27

*Issakhani v. Shadow Glen Homeowners Ass'n*,
63 Cal. App. 5th 917, 926 (2021), *review denied* (Aug. 18, 2021) ..................... 25

*Jeewarat v. Warner Bros. Ent. Inc.*,
177 Cal. App. 4th 427 (2009) ........................................................................... 20

*Kimbro v. Miranda*,
2015 WL 7353927 (E.D. Cal. Nov. 20, 2015) ................................................. 29

# TABLE OF AUTHORITIES

**Page**

*Kinsey v. Macur*,
107 Cal. App. 3d 265 (1980) ........................................................ 13, 27

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .............................................................. 21

*Mackie v. Cnty. of Santa Cruz*,
444 F. Supp. 3d 1094 (N.D. Cal. 2020) .............................................. 16

*Marsh v. Cnty. of San Diego*,
680 F.3d 1148 (9th Cir. 2012) ............................................... *passim*

*Martinez v. City of L.A.*,
141 F.3d 1373 (9th Cir. 1998) ..................................................... 16

*McCorkle v. City of L.A.*,
70 Cal. 2d 252 (1969) ........................................................... 16

*McCoy v. City of Vallejo*,
2021 WL 492535 (E.D. Cal. Feb. 10, 2021) ......................................... 36

*Mendez v. City of Chi.*,
2020 WL 1479081 (N.D. Ill. Mar. 26, 2020) ........................................ 33

*Mendez v. City of L.A.*,
897 F.3d 1067 (9th Cir. 2018) ..................................................... 16

*Miller v. Fairchild Indus., Inc.*,
885 F.2d 498 (9th Cir. 1989) ...................................................... 30

*Moore v. Rodriguez*,
2021 WL 2222590 (S.D. Cal. June 2, 2021) .......................................... 26

*Motley v. City of Fresno*,
2020 WL 3642502 (E.D. Cal. July 6, 2020) .......................................... 28

*Nat'l Archives & Recs. Admin. v. Favish*,
541 U.S. 157 (2004) .......................................................... 2, 24, 27

*Nayab v. Cap. One Bank (USA), N.A.*,
942 F.3d 480 (9th Cir. 2019) ................................................... 13, 27

**TABLE OF AUTHORITIES**

**Page**

*Nicomedes Tubar, III v. Clift,*
    2009 WL 426608 (W.D. Wash. Feb. 19, 2009) ....................................... 29, 32, 33

*Owen v. City of Indep.,*
    445 U.S. 622 (1980) ............................................................................................... 19

*Perez v. City of Huntington Park,*
    7 Cal. App. 4th 817 (1992) ................................................................................... 20

*Polk v. Legal Recovery L. Offs.,*
    291 F.R.D. 485 (S.D. Cal. 2013) .......................................................................... 19

*Sears v. Morrison,*
    76 Cal. App. 4th 577 (1999) ................................................................................. 18

*Sherwin v. Infinity Auto Ins. Co.,*
    2012 WL 600812 (D. Nev. Feb. 23, 2012) ......................................................... 35

*Shulman v. Grp. W. Prods., Inc.,*
    18 Cal. 4th 200 (1999) .................................................................................... 13, 27

*Steinle v. City & Cnty. of S.F.,*
    919 F.3d 1154 (9th Cir. 2019) ............................................................................. 16

*Taus v. Loftus,*
    40 Cal. 4th 683 (2007) .......................................................................................... 27

*Terrell v. Childers,*
    1996 WL 385310 (N.D. Ill. July 3, 1996) .......................................................... 29

*Thornton v. Ethicon Inc.,*
    2021 WL 5578931 (D. Ariz. Nov. 29, 2021) ..................................................... 34

*Tuey v. Mammoth Mountain Ski Area,*
    2009 WL 928328 (E.D. Cal. Apr. 6, 2009) ........................................................ 30

*United States v. Redwood,*
    2017 WL 85445 (N.D. Ill. Jan. 10, 2017) ........................................................... 35

*Vichare v. AMBAC Inc.,*
    106 F.3d 457 (2d Cir. 1996) ................................................................................. 32

1

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

2

## <u>STATUTES</u>

3  28 U.S.C. § 1367 ................................................................................ 31

4  42 U.S.C. § 1983 .........................................................................*passim*

5  42 U.S.C. § 1988(b) .......................................................................... 37

6  Cal. Gov't Code § 815.2 ...................................................... 10, 16, 20

7

8  Cal. Gov't Code § 820.2 ...................................................................... 15

## <u>RULES</u>

9  Fed. R. Civ. P. 37(e) ................................................................... 21, 22

10  Fed. R. Civ. P. 42(b) .................................................................. 29, 33

11

## <u>MISCELLANEOUS</u>

12
13  9A Charles Alan Wright & Arthur R. Miller,
        Fed. Prac. & Proc. Civ. § 2388 (3d ed.) .............................. 30
14
15  Restatement (Second) of Torts § 652B ............................................. 13

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to Local Rule 16-4, Plaintiff Christopher L. Chester respectfully submits the following Updated and Amended Memorandum of Contentions of Fact and Law.

## I.   **INTRODUCTION**

This case arises out of Defendants' egregious misconduct following the helicopter crash in Calabasas, California on January 26, 2020 that tragically took the lives of Plaintiff's beloved family members.

Contrary to the "long-standing tradition of respecting family members' privacy in death images," *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012), personnel from the Los Angeles County Sheriff's Department ("LASD") and Los Angeles County Fire Department ("LAFD") took and indiscriminately shared graphic close-ups of the remains of thirteen-year-old Payton Chester and her mother, Sarah, both within and beyond their respective departments.  Defendants have conceded that these photos "served no business necessity," were "illicit," and "only served to appeal to baser instincts and desires for what amounted to visual gossip."  Within 24 hours, the close-up photos of Sarah and Payton's remains were passed around by at least eleven LASD personnel and at least a dozen firefighters for no legitimate reason.  And that was only the beginning.  The gratuitous sharing continued in the following days and weeks and included such outrageous conduct as flaunting the photos in a bar while pantomiming dismemberment, showing off the photos over cocktails at an awards gala, and casually texting the photos to a group chat of video-game buddies while playing *Call of Duty*.   Defendants' conscience-shocking behavior—described by the Sheriff as a "wildly inappropriate" and "disgusting" effort to "take away a trophy" from the scene of the Chesters' deaths—gives rise to three related claims:  (1) violation of Mr. Chester's constitutional right to control the remains and death images of his deceased loved ones (42 U.S.C. section 1983), (2) negligence, and (3) invasion of privacy.

Unfortunately, Defendants have taken steps that prevent Plaintiff Chester

from learning the full scope of their wrongdoing.  LASD and LAFD are both well aware that the first step in any investigation is to preserve the evidence.  Here, that would have entailed securing the devices, forensically preserving and examining them, determining how the photos were shared, obtaining any copies, notifying the families, and disciplining the wrongdoers.  Defendants did none of these things. Instead, after a citizen complainant bravely blew the whistle on a flagrant public display he had witnessed at a bar, LASD immediately began deleting evidence of the wrongdoing, at the direction of the Sheriff, prompting one veteran commander to ask: "Are we violating laws?" and to warn that "the last time that our deputies got instructions from our executives in a federal case that they were arrested and tried for crimes."  On the Fire Department side, a fire captain orchestrated a mass-deletion campaign which LAFD itself has characterized as a "primarily self-serving" "attempt to cover up [the captain's] role in the reported misuse of the photos."

Even more evidence was destroyed after this litigation began, when Defendant Joey Cruz intentionally wiped all of the data from his phone and nine other LASD personnel known to have possessed the photos disposed of their phones before they could be forensically examined.  This rampant and widespread destruction of evidence—on top of at least 68 false exculpatory statements by County personnel—shows a consciousness of wrongdoing.  Despite Defendants' best efforts to destroy the forensic record and cover up the truth, the evidence at trial will show the illicit photos spread quickly and widely, and that many copies of the photos remain unsecured, uncontained, and at risk of going viral with the click of a mouse.

The emotional harm from Defendants' misconduct is obvious and well-established in the most basic notions of decency in our society and the law.  *See, e.g.*, *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 168 (2004); *Allen v. Jones*, 104 Cal. App. 3d 207, 211 (1980).  Mr. Chester has suffered—and continues to suffer—mental anguish that he will carry with him forever:  distress that his loved

ones' remains were mistreated, disgust at Defendants' callous intrusion upon his grief, and an acute, persistent fear that the disturbing images could surface on the internet and go viral at any moment.  Defendants have done the unimaginable:  they have made the unbearable pain of burying one's child and spouse in the prime of life even more painful.

## II.    PLAINTIFF'S CLAIMS

Plaintiff brings the following claims against the following defendants:

- Claim 1 (42 U.S.C. § 1983 – *Monell*):  LASD, LAFD, and the County (collectively, "Agency Defendants") violated Plaintiff's rights under the Fourteenth Amendment to the United States Constitution.

- Claim 2 (Negligence):  Joey Cruz, Rafael Mejia, Michael Russell, Raul Versales, Tony Imbrenda, and Arlin Kahan (collectively, "the Individual Defendants") breached their duty to handle the remains of Plaintiff's wife and daughter with due care by negligently sharing photos of the remains.

- Claim 3 (Negligence):  The Agency Defendants are vicariously liable for their employees' negligence in taking and sharing photos of the remains of Plaintiff's wife and daughter.

- Claim 4 (Invasion of Privacy):  Defendants Joey Cruz, Tony Imbrenda, and Arlin Kahan invaded Plaintiff's privacy by sharing photos of his wife's and daughter's remains.

- Claim 5 (Invasion of Privacy):  The Agency Defendants are vicariously liable for their employees taking and sharing photos in violation of Plaintiff's right to privacy in the remains of his wife and daughter.

### A.    42 U.S.C. § 1983 – *Monell* (Agency Defendants)

#### 1.    Elements of Claim

Plaintiff may establish liability against the Agency Defendants under one or both of the following theories: (1) a policy of inaction in the form of a failure to adopt or enforce a policy or adequately train employees to prevent constitutional

rights violations; and (2) a longstanding custom or practice of taking and sharing improper death images.

With respect to a policy of inaction in the form of a failure to adopt or enforce a policy or adequately train employees, the following elements apply:

1.  The acts of one or more employees of the Agency Defendant deprived Plaintiff of his particular rights under the United States Constitution.

2.  One or more employees of the Agency Defendant acted under color of state law.

3.  The policies or training of the Agency Defendant were not adequate to prevent violations of law by its employees or to train its employees to handle the usual and recurring situations with which they must deal.

4.  The Agency Defendant was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law by its employees or to the known or obvious consequence of its failure to adopt or enforce a policy or train its employees adequately.

5.  The failure of the Agency Defendant to prevent violations of law by its employees, adopt or enforce a policy, or provide adequate training caused the deprivation of Plaintiff's rights by one or more employees of the Agency Defendant; that is, the Agency Defendant's failure to prevent violations of law by its employees, adopt or enforce a policy, or train its employees played a substantial part in bringing about or actually causing the injury or damage to Plaintiff.

*See* Ninth Circuit Manual of Model Civil Jury Instructions, No. 9.8.

With respect to a longstanding custom or practice, the following elements apply:

1.  One or more employees of the Agency Defendant acted under color of state law.

2.      The acts of one or more employees of the Agency Defendant deprived Plaintiff of his particular rights under the United States Constitution as explained in later instructions.

3.      One or more employees of the Agency Defendant acted pursuant to a widespread or longstanding practice or custom of the Agency Defendant for which they worked.

4.      The Agency Defendant's widespread or longstanding practice or custom caused the deprivation of Plaintiff's rights by one or more employees of the Agency Defendant; that is, the Agency Defendant's widespread or longstanding practices or customs were so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused the ultimate injury.

*See* Ninth Circuit Manual of Model Civil Jury Instructions, No. 9.5.

As referenced above, with respect to both theories of liability, Plaintiff must show that the acts of one or more employees of the Agency Defendant deprived her of her particular rights under the United States Constitution.  The elements of the constitutional rights violation are:

1.      One or more employees of the Agency Defendants intruded upon Plaintiff's right to personal privacy with respect to his wife's and daughter's remains and death scene through the unwarranted taking or sharing of photos of their remains or unwarranted revealing of details of the manner of their deaths or suffering in their final moments.

2.      The conduct of one or more employees of the Agency Defendants shocks the conscience.

*See Marsh*, 680 F.3d at 1154-55; Ninth Circuit Manual of Model Civil Jury Instructions, No. 9.31.

### 2. Key Evidence in Support

In brief, the key evidence that shows employees of the Agency Defendants violated Plaintiff's constitutional right to control the remains and death images of her deceased loved ones includes:

- Testimony and prior admissions by LASD and LAFD personnel regarding, *inter alia*, (i) the taking, receiving, sharing, and displaying of photos of the victims' remains, and the reasons for the conduct; (ii) the condition of the remains in the photos taken, received, shared, and displayed; (iii) identification of Sarah Chester in photos taken, received, shared, and displayed; (iv) the absence of any legitimate purpose in taking and sharing photos of the victims' remains; (v) the findings of the LASD and LAFD investigations regarding their personnel's improper taking and sharing of photos of the victims' remains.

- Testimony by Coroner's Office personnel regarding the condition of Sarah and Payton Chester's remains.

- Testimony by Victor Gutierrez regarding Joey Cruz displaying photos of the crash victims' remains at a bar in Norwalk.

- Evidence relating to Defendants' intentional deletion of evidence, failure to preserve evidence, and failure to produce evidence, including (i) testimony and prior admissions regarding Sheriff Villanueva's deletion order, Tony Imbrenda's self-serving deletion of evidence and directive to other LAFD personnel to do the same, the disposal of cell phones by LASD employees, and Joey Cruz's intentional wiping of his cell phone; (ii) documents evidencing selective deletion of text-message records; and (iii) Defendants' interrogatory responses regarding failure to preserve evidence.

- False exculpatory statements by LASD and LAFD personnel regarding their conduct with the photos.

- Documents evidencing the LASD and LAFD findings regarding their employees' improper taking and sharing photos of the crash victims' remains, including LAFD letters to discharged and suspended employees regarding their reprehensible conduct.

- Documents evidencing transmission of text and picture messages by LASD and LAFD personnel in the days and weeks following the crash.

- Testimony by Thomas Pikor regarding the identities and professions of recipients of text and photo messages sent by LASD and LAFD personnel.

- Documents evidencing photos of human remains from accident scene posted to social media.

- Surveillance footage showing Joey Cruz displaying photos of the crash victims' remains, including Sarah Chester's remains.

- Testimony by Jessica Wells about being shown crash-scene photos by a law enforcement officer three days after the accident.

- Testimony by Jennifer Bolden regarding a bar patron's detailed description of non-public details of the decedents' remains based on photos shown to the patron by a friend in law enforcement.

- Testimony by Ralph Mendez and Luella Weireter (citizens who complained to LASD and LAFD, respectively) regarding conduct they observed by employees of the Agency Defendants.

- Sheriff Villanueva's prior admissions regarding "disgusting" nature of deputies' conduct.

Evidence that shows employees of the Agency Defendants acted under color of state law includes:

- Testimony and prior admissions by LASD and LAFD employees that they took, received, or shared photos of Plaintiff's loved ones' remains while on duty, at work-related functions, and/or via access provided by their jobs as public employees.

- Documents evidencing transmission of text and picture messages while relevant employees were on duty.

- Documents evidencing Agency Defendants' internal investigation findings that employees took and shared improper photos of the crash victims' remains while on duty or at social functions for work.

With respect to Plaintiff's policy-of-inaction theory, evidence that shows the policies or training of the Agency Defendants were inadequate, that the Agency Defendants were deliberately indifferent to this inadequacy, and that the inadequacy caused the deprivation of Plaintiff's rights by one or more employees of the Agency Defendants includes:

- Testimony and prior admissions by LASD and LAFD employees regarding the Agency Defendants' (i) absence of policies and training; and (ii) failure to enforce policies regarding use of personal cell phones.

- Prior admissions by Sheriff Alex Villanueva regarding LASD's "deficient" policy with regard to photos.

- Documents evidencing an absence of policies and training in January 2020.

- Documents evidencing changes (or contemplated changes) to Agency Defendants' policies regarding photos of human remains following the accident in January 2020.

- Agency Defendants' interrogatory responses regarding absence of policies and training.

- Testimony and prior admissions by LASD and LAFD employees regarding (i) their frequent exposure to human remains in performing their job duties; (ii) employees' routine practice of taking photos at scenes using personal cell phones; (iii) the Agency Defendants' knowledge that employees in January 2020 routinely used personal cell phones to photograph work-related environments, including deceased individuals; and (iv) employees' lack of awareness of constitutional right to privacy in death images.

- Expert testimony by Adam Bercovici regarding the widespread practice in Southern California law enforcement of taking and sharing photographs of human remains for personal, non-law-enforcement reasons.

- Video and audio recordings of Sheriff Villanueva acknowledging the long-standing problem of "death books" in law enforcement.

- Testimony and documents evidencing the Agency Defendants' decision to try to sweep the misconduct under the rug rather than investigate.

- Testimony and documents evidencing an absence of discipline for LASD personnel involved in taking and sharing the improper photos, and a mere two-day suspension for Joey Cruz, who displayed photos of the victims' remains in a bar.

- Documents evidencing LASD's practice of posting pixelated photos of deceased and injured members of the public on LASD-controlled social media accounts.

- LASD and LAFD documents evidencing prior incidents of improper conduct involving photos of human remains.

With respect to Plaintiff's custom-and-practice theory, evidence that shows employees of the Agency Defendants acted pursuant to a widespread or

longstanding custom or practice and that this widespread or longstanding practice or custom caused the deprivation of Plaintiff's rights includes:

- Testimony and prior admissions by LASD and LAFD employees regarding (i) the practice of employees taking photos of human remains using personal cell phones; and (ii) the Agency Defendants' knowledge that employees in January 2020 routinely used personal cell phones to photograph work-related environments, including deceased individuals.

- Expert testimony by Adam Bercovici regarding the widespread practice in Southern California law enforcement of taking and sharing photographs of human remains for personal, non-law-enforcement reasons.

- Video and audio recordings of Sheriff Villanueva acknowledging long-standing problem of "death books" in law enforcement.

- Documents evidencing LASD posting pixelated photos of deceased and injured members of the public on Department-controlled social media accounts.

- LASD and LAFD documents evidencing prior incidents of improper conduct involving photos of human remains.

- Testimony and documents evidencing the Agency Defendants' decision to try to sweep the misconduct under the rug rather than investigate.

- Testimony and documents evidencing an absence of discipline for all but a single member of the LASD for conduct related to the photos, and a mere two-day suspension for Joey Cruz, who displayed photos of the victims' remains in a bar.

B.   **Negligence (Individual Defendants and Agency Defendants)**

1.   **Elements of Claim**

Plaintiff asserts a negligence cause of action against each of the Individual Defendants.  In addition, pursuant to California Government Code section 815.2, the

Agency Defendants are liable for injuries proximately caused by acts or omissions of their employees within the scope of their employment.  The following elements apply to Plaintiff's negligence claims:

> 1. That Joey Cruz, Rafael Mejia, Michael Russell, Raul Versales, Tony Imbrenda, Arlin Kahan and/or other employees of the Agency Defendants (such as Brian Jordan, Doug Johnson, Ruby Cable, Ben Sanchez, Travis Kelly, Stephanie Shrout, Scott Miller, or Chris Jauregui) were negligent.
>
> 2. That Plaintiff was harmed.
>
> 3. That the negligence of Joey Cruz, Rafael Mejia, Michael Russell, Raul Versales, Tony Imbrenda, Arlin Kahan and/or other employees of the Agency Defendants (such as Brian Jordan, Doug Johnson, Ruby Cable, Ben Sanchez, Travis Kelly, Stephanie Shrout, Scott Miller, or Chris Jauregui) was a substantial factor in causing Plaintiff's harm.

*See* Judicial Council of California Civil Jury Instructions ("CACI"), No. 400; *Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856 (2010); *Christensen v. Super. Ct.*, 54 Cal. 3d 868, 894-95 (1991).

## 2.    Key Evidence in Support

The very same evidence that shows employees of the Agency Defendants violated Plaintiff's constitutional right to control the remains and death images of her deceased loved ones also establishes Defendants' negligence. *See supra* at 6-7. It also will show that the Deputy Defendants acted with malice and oppression justifying an award of punitive damages. *See, e.g.*, *Ford Motor Co. v. Home Ins. Co.*, 116 Cal. App. 3d 374, 381 (1981) ("Nonintentional conduct comes within the definition of malicious acts punishable by the assessment of punitive damages when a party intentionally performs an act from which he knows, or should know, it is highly probable that harm will result." (citing *Donnelly v. S. Pac. Co.*, 18 Cal. 2d. 863, 870 (1941))).

Evidence that shows Plaintiff was harmed by Defendants' negligence includes:

- Testimony by Plaintiff Chester regarding emotional distress caused by Defendants taking and sharing photos of her loved ones' remains.
- Testimony by Plaintiff's friend and business partner regarding his observations of Plaintiff's emotional distress.
- Prior admissions by Sheriff Villanueva acknowledging anguish caused by his deputies' taking and sharing photos of the crash victims' remains.

## C. Invasion of Privacy (Joey Cruz, Tony Imbrenda, Arlin Kahan and Agency Defendants)

### 1. Elements of Claim

Plaintiff asserts two alternative bases for his invasion of privacy claim against Joey Cruz, Tony Imbrenda, and Arlin Kahan (1) they intruded into his private affairs; and (2) they publicly disclosed private facts.  He likewise asserts two alternative bases for his invasion of privacy claim against the Agency Defendants: (1) one or more of the Agency Defendants' employees intruded into his private affairs; and (2) one or more of the Agency Defendants' employees publicly disclosed private facts.

With respect to the intrusion into private affairs theory, the following elements apply:

1.     That Plaintiff had a reasonable expectation of privacy in the remains of his wife and daughter and the images of those remains.

2.     That Joey Cruz, Tony Imbrenda, Arlin Kahan and/or other employees of the Agency Defendants (such as Brian Jordan, Doug Johnson, Ruby Cable, Ben Sanchez, Travis Kelly, Stephanie Shrout, Scott Miller, or

Chris Jauregui) intentionally intruded upon Plaintiff's privacy interest in the remains of his wife and daughter or images of those remains.

3.  That the intrusion by Joey Cruz, Tony Imbrenda, Arlin Kahan and/or other employees of the Agency Defendants would be highly offensive to a reasonable person.

4.  That Plaintiff was harmed.

5.  That the conduct by Joey Cruz, Tony Imbrenda, Arlin Kahan and/or other employees of the Agency Defendants was a substantial factor in causing Plaintiff's harm.

*See* CACI No. 1800; Restatement (Second) of Torts § 652B; *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 491 (9th Cir. 2019); *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286-87 (2009); *Shulman v. Grp. W. Prods., Inc.*, 18 Cal. 4th 200, 232 (1999).

With respect to the public disclosure of private facts theory, the following elements apply:

1.  That Joey Cruz, Tony Imbrenda, Arlin Kahan and/or other employees of the Agency Defendants publicized private information concerning Plaintiff.

2.  That a reasonable person in Plaintiff's position would consider the publicity highly offensive.

3.  That Joey Cruz, Tony Imbrenda, Arlin Kahan and/or other employees of the Agency Defendants knew, or acted with reckless disregard of the fact, that a reasonable person in Plaintiff's position would consider the publicity highly offensive.

4.  That the private information was not of legitimate public concern.

5.  That Plaintiff was harmed.

6.      That the conduct by Joey Cruz, Tony Imbrenda, Arlin Kahan and/or other employees of the Agency Defendants was a substantial factor in causing Plaintiff's harm.

See CACI No. 1801; *Kinsey v. Macur*, 107 Cal. App. 3d 265, 270-72 (1980); *Doe v. John F. Kennedy Univ.*, 2013 WL 4565061, at *11 (N.D. Cal. Aug. 27, 2013).

## 2.      Key Evidence in Support

The very same evidence that shows employees of the Agency Defendants violated Plaintiff's constitutional right to control the remains and death images of her deceased loved ones also supports her invasion of privacy claim under California law. *See supra* at 6-7.  Similarly, the harm caused by Defendants' invasion of privacy is the same harm caused by their negligence. *See supra* at 11-12.

With respect to Joey Cruz specifically, the evidence that establishes he intruded into Plaintiff Chester's private affairs and publicly disclosed private facts includes:

- Testimony and prior admissions by Cruz regarding his transmission and display of crash scene photos to multiple people.
- Testimony by Victor Gutierrez regarding Cruz displaying photos of the crash victims' remains, including Sarah Payton's remains.
- Testimony by Ralph Mendez, Jr. regarding his observations during the evening Cruz displayed photos of the victims' remains at the bar in Norwalk.
- Surveillance footage showing Cruz publicly displaying photos of the crash victims' remains.
- False exculpatory statements by Cruz regarding his conduct related to the photos.
- Written admissions by Cruz regarding his conduct, as contained in internal LASD memoranda.

- Documents evidencing LASD findings regarding Cruz's conduct.
- Sheriff Villanueva's prior admissions regarding "disgusting" nature of deputies' conduct.
- Testimony by Coroner's Office personnel regarding condition of Sarah and Payton's remains.

Evidence that shows Plaintiff had a reasonable expectation of privacy in the remains of her loved ones and the images of those remains includes:

- Plaintiff's testimony regarding her expectation of privacy in his wife's and daughter's remains and images of those remains.
- Prior admissions by Sheriff Villanueva regarding "additional anguish" caused by improper taking and sharing of photos of crash victims' remains.
- Testimony and prior admissions by LASD and LAFD personnel regarding harm that would be caused to families by release of human remains photos.

With respect to the public disclosure of private facts theory, the evidence that shows the private information was not of legitimate public concern includes:

- Testimony and prior admissions of LASD and LAFD employees regarding their purpose in transmitting and displaying photos of the accident victims' remains.
- Sheriff Villanueva's admissions that there is no purpose for LASD personnel to take and share photos of accident victims' remains.
- LAFD letters of discharge and suspension detailing absence of justification or business purpose for taking and sharing photos of the crash victims' remains.

## III.   DEFENDANTS' AFFIRMATIVE DEFENSES

Defendants have asserted the following affirmative defenses:

- <u>First Affirmative Defense (Discretionary Act Immunity)</u>: Defendants allege that they are entitled to discretionary act immunity under California Government Code section 820.2.
- <u>Second Affirmative Defense (Superseding and Intervening Acts)</u>: Defendants allege that the damage sustained by Plaintiff was caused, in whole or in part, by the superseding and intervening acts and omissions of persons or entities for whose conduct Defendants allege they are not responsible.
- <u>Third Affirmative Defense (Qualified Immunity)</u>: Defendants allege that they are entitled to qualified immunity from Plaintiff's Section 1983 claim.
- <u>Fourth Affirmative Defense (Good Faith)</u>: Defendants allege that they undertook any alleged acts or omissions in good faith.
- <u>Fifth Affirmative Defense (No Vicarious Liability)</u>: Defendants allege that the Agency Defendants are immune from individual tort liability and are not vicariously liable under California Government Code section 815.2.
- <u>Sixth Affirmative Defense (No Standing)</u>: Defendants allege that Plaintiff lacks Article III standing to assert her claims in this Court.

A. **First Affirmative Defense (Discretionary Act Immunity)**

   1. **Elements Required to Establish Discretionary Act Immunity**

An individual defendant is not liable for an injury that results from (1) a deliberate and considered policy decision, as opposed to an operational decision, and (2) the exercise of vested discretion to make that considered policy decision, as opposed to negligence in carrying out the decision after it has been made. *See Mackie v. Cnty. of Santa Cruz*, 444 F. Supp. 3d 1094, 1116 (N.D. Cal. 2020) (quoting *Mendez v. City of L.A.*, 897 F.3d 1067, 1084 (9th Cir. 2018); *McCorkle v. City of L.A.*, 70 Cal. 2d 252, 261 (1969)); *see also Steinle v. City & Cnty. of S.F.*,

1  *919 F.3d 1154, 1160-61 (9th Cir. 2019)*; *AE ex rel. Hernandez v. Cnty. of Tulare,*
2  *666 F.3d 631, 639-40 (9th Cir. 2012)*; *Martinez v. City of L.A.*, 141 F.3d 1373, 1379
3  *(9th Cir. 1998)*.  "Applying this rule, the California Supreme Court has held that
4  even if a police officer exercises his discretion in deciding to investigate an
5  automobile accident, he may be liable for negligently conducting that investigation."
6  *Martinez*, 141 F.3d at 1379.

**2.    Key Evidence in Opposition**

8    Defendants have waived this affirmative defense by failing to timely put forth
9  corresponding jury instructions.

10    Plaintiff's key evidence in opposition to this affirmative defense includes the
11  testimony of the Deputy Defendants and the testimony of LAFD and LASD
12  employees, which will confirm that the Deputy Defendants did not engage in any
13  conscious balancing of risks and benefits before engaging in the relevant conduct, as
14  well as COLA001200 (Villanueva Press Briefing), VB00003620 (Villanueva CBS 2
15  Interview), VB00003622 (Villanueva Fox 11 Interview), COLA001182 (Villanueva
16  ABC 7 Interview), COLA006932 (Villanueva KNX1070 Interview), COLA030878
17  (Villanueva NBC Interview), which will confirm that the Deputy Defendants did not
18  make discretionary policy decisions.

**B.    Second Affirmative Defense (Superseding and Intervening Acts)**

**1.    Elements Required to Establish Superseding and Intervening Acts**

22    To establish that a third-party's conduct is a superseding cause, a defendant
must prove:

23    1.    That a third party's conduct occurred after the conduct of the
24          defendant;

25    2.    That a reasonable person would consider the third party's conduct a
26          highly unusual or an extraordinary response to the situation;

-17-

3.  That the defendant did not know and had no reason to expect that the third party would act in a negligent/wrongful manner; and

4.  That the kind of harm resulting from the third party's conduct was different from the kind of harm that could have been reasonably expected from the defendant's conduct.

*See* CACI No. 432.

A party "is liable for the foreseeable consequences" of his negligence. *Sears v. Morrison*, 76 Cal. App. 4th 577, 580 (1999). "The intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about." *Id.* (citation omitted); *see also Anaya v. Super. Ct.*, 78 Cal. App. 4th 971, 973 (2000) ("An actor . . . is not relieved of liability because of the intervening act of a third person if such act was reasonably foreseeable at the time of the original negligent conduct.").

## 2. Key Evidence in Opposition

Defendants have waived this affirmative defense by failing to timely put forth corresponding jury instructions. In any event, Sheriff Villanueva's prior admissions acknowledging the anguish caused by his deputies' taking and sharing photos of the crash victims' remains, together with the evidence enumerated above of Defendants' misconduct and how that specific misconduct harmed Plaintiff Chester, precludes Defendants from establishing any superseding cause for that harm. .

## C. <u>Third Affirmative Defense (Qualified Immunity)</u>

### 1. Elements Required to Establish Qualified Immunity

Where available, qualified immunity involves a two-step inquiry. First, the factfinder must ask whether the facts alleged show that the officer's conduct violated a constitutional right. If a constitutional violation occurred, the second inquiry is whether the constitutional right was clearly established. *See Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002).

However, qualified immunity is not an available defense in this case because Plaintiff brings his section 1983 claim only against the Agency Defendants.  It is well-established that "[a] municipality is not entitled to assert the defense of qualified immunity."  *Huskey v. City of San Jose*, 204 F.3d 893, 902 (9th Cir. 2000) (citing *Owen v. City of Indep.*, 445 U.S. 622, 638 (1980)).

### 2. Key Evidence in Opposition

The Agency Defendants facing Section 1983 liability are municipalities that are ineligible for qualified immunity as a matter of law.  *See id.*

### D. Fourth Affirmative Defense (Good Faith)

### 1. Elements Required to Establish Good Faith

Good faith is not a defense to the asserted claims.  "[A] good faith defense fails as a matter of law with regard to [a] negligence claim because a plaintiff's claim for negligence may stand irrespective of the defendant's state of mind." *Polk v. Legal Recovery L. Offs.*, 291 F.R.D. 485, 491 (S.D. Cal. 2013).

Nor is a good faith defense available to a municipality facing Section 1983 liability: "a municipality will be held liable for constitutional injuries caused by its practice, policy, or custom, irrespective of its officers' ability to assert qualified immunity and irrespective of any good faith reliance on state statutes . . .  this Court cannot hold that the County is entitled to assert the good faith affirmative defense." *Campos v. Fresno Deputy Sheriff's Ass'n*, 535 F. Supp. 3d 913, 920 (E.D. Cal. 2021).

### 2. Key Evidence in Opposition

Defendants cannot invoke a good faith defense as a matter of law.  The claim elements of negligence and invasion of privacy do not depend on the defendant's state of mind and thus are not susceptible to a good faith affirmative defense.  Likewise, good faith is inapplicable to the Section 1983 claim against the Agency Defendants.  *See id.*

### E.   Fifth Affirmative Defense (No Vicarious Liability)

#### 1.   Elements Required to Establish No Vicarious Liability

The doctrine of respondeat superior "imposes vicarious liability on an employer for the torts of an employee acting within the scope of his or her employment, whether or not the employer is negligent or has control over the employee." *Jeewarat v. Warner Bros. Ent. Inc.*, 177 Cal. App. 4th 427, 434 (2009). Under Cal. Gov't Code § 815.2(b), "a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." Thus, the elements of this defense are the same as for discretionary act immunity on the part of the individual employee: an injury that results from (1) a deliberate and considered policy decision, as opposed to an operational decision, and (2) the exercise of vested discretion to make that considered policy decision, as opposed to negligence in carrying out the decision after it has been made.

#### 2.   Key Evidence in Opposition

Testimony and prior admissions by LASD and LAFD employees that they took, received, or shared the improper photos while on duty, at work-related functions, and/or via access provided by their jobs as public employees demonstrates that their tortious conduct was within their scope of employment. The evidence relevant to Defendants' first affirmative defense (discretionary act immunity) also applies to this defense.

Under California law, there is no requirement that an employee must be sued individually to hold the employer vicariously liable for the employee's conduct. *See* Cal. Gov't Code § 815.2 legisl. comm. cmts; *Perez v. City of Huntington Park*, 7 Cal. App. 4th 817, 820 (1992). As a result, the Agency Defendants' vicarious liability can be based on the tortious conduct of *any* of the Agency Defendants' employees (including but not limited to Brian Jordan, Doug Johnson, Ruby Cable,

Ben Sanchez, Travis Kelly, Stephanie Shrout, Scott Miller, or Chris Jauregui), not just the Individual Defendants.

### F.   Sixth Affirmative Defense (Standing)

Standing is an issue of law for the Court, not an affirmative defense.  And this Court has already concluded that Plaintiff has Article III standing to pursue his claims—first, in denying Defendants' motion for summary judgment and again at the February 4, 2022 pre-trial conference (*see* Hr'g Tr. 8:5-8).

#### 1.   Elements Required to Establish Standing

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

#### 2.   Key Evidence in Opposition

The evidence set forth in Section II above establishes that Plaintiff suffered a concrete and particularized harm as a result of Defendants' conduct.

## IV.   ANTICIPATED EVIDENTIARY ISSUES

The following evidentiary issues are the subject of pending motions in *limine*:

### A.   Plaintiff's Motion *in Limine* #1 Regarding Defendants' Spoliation

Plaintiff moves to admit evidence showing that each Defendant irretrievably deleted and disposed of electronically stored information that they should have taken reasonable steps to preserve.

Defendants' destruction of evidence severely prejudiced Plaintiff's ability to prosecute this case.  To cure this prejudice, pursuant to Fed. R. Civ. P. 37(e)(1), Plaintiff moves to preclude Defendants from presenting testimony or argument at trial (1) disputing that the photos they took and shared of the crash site depicted the

1   remains of Sarah and Payton Chester; (2) denying that they electronically

2   disseminated the photos; or (3) claiming that all copies of the photos have been

3   secured and contained.  As set forth in the parties' joint memorandum regarding

4   disputed jury instructions, in addition to these evidentiary sanctions, Plaintiff also

5   seeks an adverse inference instruction pursuant to Rule 37(e)(2) or alternative

6   spoliation-related instructions pursuant to Rule 37(e)(1).

7        **B.**      **Plaintiff's Motion *in Limine* #2 to Exclude Expert Testimony**

8        Plaintiff moves to exclude Defendants' expert Dr. Marc Cohen from

9   testifying at trial as a witness.

10       **C.**      **Plaintiff's Motion *in Limine* #4 to Admit Eyewitness Statements**

11       Plaintiff moves to admit the eyewitness testimony of Rafael Mendez, Jr. and

12  Luella Weireter, third-party citizens who complained to LASD and LAFD,

13  respectively, regarding public displays of crash scene phones by County personnel.

14  Specifically, Plaintiff seeks to allow Mendez to testify as to what Victor Gutierrez

15  excitedly told Mr. Mendez he had just seen and heard in his interactions with

16  Defendant Joey Cruz at the Baja California Bar & Grill on the night of January 28,

17  2020.  Plaintiff seeks to allow Luella Weireter to testify as to statements she heard at

18  the Golden Mike Awards on February 15, 2020, including Imbrenda's statements

19  about what he had seen at the crash scene, statements by Imbrenda's girlfriend that a

20  group was looking at "the Kobe pictures," and LAFD employee Sky Cornell's

21  statement that he had just seen pictures of "Kobe all burnt up."

22       **D.**      **Plaintiff's Motion *in Limine* #5 to Admit Recordings and Letters**

23       Plaintiff moves to admit without the need for a sponsoring witness:  (1) six

24  recordings of public statements made by Sheriff Alex Villanueva regarding the

25  improper taking and sharing of crash-scene photos (produced at COLA001200,

26  VB00003620, VB00003622, COLA001182, COLA006932, and COLA030878);

27  (2) a recording of statements made by Sheriff Alex Villanueva and Commander

28  Jorge Valdez to a *Los Angeles Times* reporter (available at

1  https://www.latimes.com/california/story/2021-12-21/vanessa-bryant-kobe-bryant-
2  death-photos-lawsuit-la-county-sheriff); and (3) three letters signed by LAFD
3  Deputy Chief William McCloud informing Brian Jordan, Tony Imbrenda, and Arlin
4  Kahan of discipline against them in connection with their taking or sharing photos
5  of the crash victims' remains (COLA001311-18, COLA001384-92, COLA001341-
6  49).

7       **E.**    **Defendants' Motions *in Limine***

8      To date, Defendants have filed the following motions *in limine*, each of which
9  should be denied for the reasons outlined in Plaintiff's oppositions:

10          1.  To Exclude Evidence of Photographs and Witnesses Who Have
11              Nothing to Do With and No Connection to the County
12          2.  To Exclude Expert Testimony of Adam Bercovici
13          3.  To Exclude Evidence of Captain Vander Horck's Job Transfer
14          4.  To Exclude Expert Testimony of David Freskos
15          5.  To Exclude Late Disclosed Documents

16  **V.**    **ISSUES OF LAW**

17      In addition to the outstanding issues of law raised in the parties' motions *in*
18  *limine*, Plaintiff anticipates issues of law relating to the proper interpretation and
19  application of (A) the holding in *Marsh*, 680 F.3d at 1154; (B) the duty of care owed
20  by Defendants to Plaintiff; and (C) Plaintiff's common law right to privacy.
21  Plaintiff's positions on these legal issues are set forth below.

22       **A.**    **The Constitutional Right Articulated in *Marsh***

23      "Few things are more personal than the graphic details of a close family
24  member's tragic death.  Images of the body usually reveal a great deal about the
25  manner of death and the decedent's suffering during his final moments—all matters
26  of private grief not generally shared with the world at large." *Id.*  Given the "long-
27  standing tradition of respecting family members' privacy in death images," the
28  constitutional right to privacy "encompasses the power to control images of a dead

family member." *Id.* at 1153.  Drawing on *Favish*, 541 U.S. at 170-71, the Ninth Circuit held in *Marsh* that sharing death images without any legitimate governmental purpose violates this right and shocks the conscience when it deprives the bereaved of their right to control death images of family members.  *See Marsh*, 680 F.3d at 1155.

Defendants contend that *Marsh* involved "publication of death images" in the press and on the internet.  They are wrong.  In *Marsh*, a district attorney kept a death photo and later sent a copy to two reporters.  *Id.* at 1152.  But neither reporter published the photo, and it never appeared on the internet.  *Appellees' Brief, Marsh*, No. 11-55395, 2011 WL 3436959, at *1 (9th Cir. Aug. 1, 2011).  Nevertheless, the mishandling of the death images shocked the conscience, and the district attorney's actions gave rise to the plaintiff's *fear* that she *might* one day "stumble upon photographs of her dead son," given the "viral nature of the Internet."  *Marsh*, 680 F.3d at 1155.

Defendants' argument betrays a fundamental misunderstanding of the privacy right recognized in *Marsh*.  The right rests on two pillars: the government's duty to treat the dead with respect, and the bereaved's right to control the remains and death images of her loved ones.  *Id.* at 1155-56.  The heartland of the privacy right is a protection against the government gratuitously revealing "the graphic details of a close family member's tragic death."  *Id.* at 1154.  That a defendant's "unwarranted public exploitation of death images" has not yet been featured in mass media does not make their conduct permissible, *id.* at 1155-56, any more than the conduct in *Marsh* was excusable because the news outlets never published the photo.

**B.     Defendants' Duty of Care**

California law has long recognized a duty to handle dead bodies with due care because such conduct "is likely to cause serious emotional distress to members of the decedent's immediate family regardless of whether they observe the actual negligent conduct or injury to the remains of their decedent."  *See Christensen*, 54

-24-

1   Cal. 3d at 894-95.  For similar reasons, California law also specifically imposes a

2   duty on law enforcement officers to "refrain from exploiting gruesome death images

3   by disseminating them to friends and family members or others with no involvement

4   in official [law enforcement] activities."  _Catsouras_, 181 Cal. App. 4th at 884.  As

5   this Court itself recognized in ruling on Defendants' motion to dismiss, "_Catsouras_

6   strongly supports the existence of a duty in this case with respect to the LASD

7   deputies who took the photos of the victims and shared them with others."  _Bryant v._

8   _Cnty. of L.A._, 2020 WL 8024857, at *7 (C.D. Cal. Dec. 28, 2020).

9          Defendants contend that _Brown v. USA Taekwondo_, 11 Cal. 5th 204 (2021),

10   holds to the contrary.  But _Brown_ did not overrule _Catsouras_ or _Christensen_ or even

11   address the duties recognized by those cases.  Instead, _Brown_ clarified "the

12   applicable framework for determining whether a defendant has a duty to protect a

13   plaintiff from harm _caused by a third party_," a duty that generally does not exist.

14   _Id._ at 213 (emphasis added).  _Brown_ held that an exception to the general "no-duty-

15   to-protect rule" can exist only if the plaintiff proves a special relationship with the

16   defendant.  _See id._ at 211, 219.

17          _Brown_ has no application here because Defendants themselves, not a third

18   party, caused Plaintiff Chester's harm by gratuitously taking and sharing photos of

19   the Chesters' remains.  Thus, this case involves what _Brown_ described as "active

20   misconduct working positive injury to others," rather than exceptional liability for

21   nonfeasance.  _Id._ at 214-15; _see, e.g._, _Issakhani v. Shadow Glen Homeowners Ass'n_,

22   63 Cal. App. 5th 917, 926 (2021), _review denied_ (Aug. 18, 2021) (noting that _Brown_

23   involved a "circumstance where, unlike here, there is no underlying duty running

24   between the parties that might apply").  In such cases, courts have continued to

25   apply _Catsouras_ after _Brown_.  _Moore v. Rodriguez_, 2021 WL 2222590, at *21-22

26   (S.D. Cal. June 2, 2021) (relying on _Catsouras_ to find a duty to refrain from

27   infringing on plaintiff's privacy interest in his psychiatric records).

28

Neither logic nor law warrants Defendants' efforts to limit *Catsouras* to a duty to refrain from disseminating death photos on the internet.  The very same policy considerations *Catsouras* relied upon to recognize a duty in that case apply with equal force here.  "[I]t unquestionably was foreseeable" that taking and disseminating gruesome photos of Sarah and Payton Chester's dead bodies would cause Plaintiff Chester harm, *Catsouras*, 181 Cal. App. 4th at 882, and there is a close connection between Defendants' conduct and that harm, *see id.* at 884-85.  The conduct by the County's employees was also morally blameworthy.  "[C]oncepts of morals and justice clearly dictate that those upon whom we rely to protect and serve ought not be permitted to make our deceased loved ones the subjects of" lurid gossip or spectacle, *see id.* at 883—regardless of where the spectacle-making occurs.  As in *Catsouras*, recognizing a duty on these facts would not impose an "intolerable burden" on agencies and their officers to control their future conduct, *id.* at 884, as evidenced by LASD and LAFD having since adopted policy directives to protect these fundamental rights.  Liability for the violations of those rights here would further those policy directives and help prevent future harm, which weighs strongly in favor of recognizing the duty.  *See id.* at 885.

## C.   The Contours of Plaintiff's Common Law Privacy Right

Plaintiff may prove invasion of privacy under either of two theories: intrusion into private affairs, or private disclosure of public facts.  Defendants conflate the two theories, which have distinct elements.  Neither requires publication in the press or on the internet.

Intrusion into Private Affairs.  The common law privacy right broadly protects against any "[h]ighly offensive intentional intrusions upon another person's private affairs or concerns."  *Taus v. Loftus*, 40 Cal. 4th 683, 725 (2007).  Such intrusions are tortious even if no publicity is garnered by the intrusion.  *See Nayab*, 942 F.3d at 491 ("Importantly, '[t]he intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the

photograph or information outlined.'"). A privacy claim for intrusion into private affairs thus has only two necessary elements: "(1) intrusion into a private place, conversation, or matter, (2) in a manner highly offensive to a reasonable person." *Shulman*, 18 Cal. 4th at 231.

It is well-settled that Plaintiff Chester had a reasonable expectation of privacy in the death images of her deceased loved ones. *See Favish*, 541 U.S. at 167-70. As a Kentucky appellate court held more than a century ago, unauthorized photographs of dead children constitute an invasion of privacy akin to an intrusion on the sanctity of the bodies themselves. *See Douglas v. Stokes*, 149 S.W. 849, 850 (Ky. 1912).

<u>Public Disclosure of Private Facts</u>. A claim based on public disclosure of private facts likewise does not require publication on the internet or in the press. Disclosure of private affairs to a "diverse group of people" who know the plaintiff suffices. *See Kinsey*, 107 Cal. App. 3d at 271; *see also John F Kennedy Univ.*, 2013 WL 4565061, at *11 (alleged disclosure to six classmates and one professor stated a valid invasion of privacy claim).[1] Nor does the tort require disclosure through a written communication. *See, e.g.*, *Ignat v. Yum! Brands, Inc.*, 214 Cal. App. 4th 808, 819 (2013) (oral communications in workplace).

## VI.   <u>BIFURCATION OF ISSUES</u>

All of Plaintiff's causes of action arise from the actions of LASD and LAFD personnel who took and shared photos depicting her deceased family members. Although one of Plaintiff's claims arises under federal law (42 U.S.C. section 1983) while the rest invoke state law, the evidence supporting them is effectively identical. *See supra* at 3-15. The only claim that is more proof-intensive than the others is the federal claim, which will require additional evidence regarding the Agency Defendants' policies and training.

---

[1] *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss at 10 n.7, *Doe v. John F Kennedy Univ.*, No. 4:13-cv-01137-DMR (N.D. Cal. June 28, 2013), ECF No. 28.

As such, trying Plaintiff's state claims together with her federal claim will not increase the amount of testimony or evidence introduced at trial. Conducting a single trial will, however, dramatically decrease the potential for a second, multi-week trial based on identical evidence. The possibility of a second trial in state court would be eliminated, and a jury finding on two or three claims (as opposed to only the federal claim) would provide multiple grounds for affirmance, should there be an appeal.

A single trial will also shield witnesses, including Plaintiff Chester himself, from unnecessary trauma. Trial will require Plaintiff Chester to relive horrific events, hear disturbing testimony regarding photos of his loved ones' remains, and testify about his emotional distress. It is Defendants—not Plaintiff Chester—who elected to remove this case to federal court, and it would be unfair if Defendants' forum-selection strategy forced Plaintiff Chester to endure two emotionally-wrenching trials to receive a full hearing on her claims. Defendants, by contrast, would not suffer any prejudice from trying the federal and state claims simultaneously.

Plaintiff is mindful that the Court's usual practice is "to bifurcate the state law claims and try only the federal claim," then decide based on the outcome whether to exercise supplemental jurisdiction over the remaining state claims. (Hr'g Tr. at 17:21-18:3.) Although this is undoubtedly sound policy in many cases, Plaintiff respectfully contends that it is not necessary under the facts of this case, where the evidence required to establish the state claims is entirely subsumed in the evidence that will already be submitted for the federal claim. *See Motley v. City of Fresno*, 2020 WL 3642502, at *2 (E.D. Cal. July 6, 2020) ("Bifurcation is an inherently case-specific inquiry . . . ."). Plaintiff requests that the Court not bifurcate and instead allow her to try her federal and state claims in a single trial.

### A.   Bifurcation Should be Granted Only Rarely.

Federal Rule of Civil Procedure 42(b) grants district courts authority to bifurcate trial "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). Although the decision on whether to bifurcate lies within the court's discretion, the presumption typically is against bifurcation. *See* *Kimbro v. Miranda*, 2015 WL 7353927, at *3 (E.D. Cal. Nov. 20, 2015); *Nicomedes Tubar, III v. Clift*, 2009 WL 426608, at *1 (W.D. Wash. Feb. 19, 2009). As one court explained in the context of a request to bifurcate *Monell* claims, "[t]he presumption is that all claims in a case will be resolved in a single trial, and 'it is only in exceptional circumstances where there are special and persuasive reasons for departing from this practice that distinct causes of action asserted in the same case may be made the subject of separate trials.'" *Tubar*, 2009 WL 426608, at *1 (citations omitted).

This presumption reflects the reality that resolving all issues in one trial is usually more efficient than piecemeal litigation. *See id.* (noting the "general principle that a single trial tends to lessen the delay, expense and inconvenience to all parties." (citation omitted)). "Routine bifurcation for trial of claims that were initially properly joined would result in an insurmountable burden on" the courts. *Kimbro*, 2015 WL 7353927, at *3 (citation omitted); *see* *Terrell v. Childers*, 1996 WL 385310, at *14 (N.D. Ill. July 3, 1996) (explaining in the context of a request to bifurcate that a "single trial on the merits of all the contested issues and claims of the parties is preferred to their piecemeal adjudication").

## B. Bifurcation is Not Necessary in This Case.

When deciding whether to bifurcate, courts consider case-specific factors, including "whether the issues are clearly separable and whether bifurcation would reduce the risk of jury confusion, avoid prejudice to the parties, and increase

1  convenience and judicial economy." *Barillas v. City of L.A.*, 2021 WL 4434977, at
2  *2 (C.D. Cal. Apr. 12, 2021) (denying motion to bifurcate *Monell* claims).

3        Courts applying these factors have noted that bifurcation "may be
4  appropriate where doing so would be economical and efficient, and where there is
5  little overlap in the evidence that would be presented at each phase." *Tuey v.*
6  *Mammoth Mountain Ski Area*, 2009 WL 928328, at *11 (E.D. Cal. Apr. 6, 2009)
7  (citing *Arthur Young & Co. v. U.S. Dist. Ct. (Kaufman)*, 549 F.2d 686, 697 (9th
8  Cir. 1977)).  However, bifurcation is disfavored when the claims—such as those
9  presented here—are "intertwined" and depend on common proof.  *Miller v.*
10 *Fairchild Indus., Inc.*, 885 F.2d 498, 511 (9th Cir. 1989).  "If . . . the preliminary
11 and separate trial of an issue will involve extensive proof and substantially the
12 same facts or witnesses as the other issues in the cases, or if any saving in time and
13 expense is wholly speculative, it is likely that a separate trial on that issue will be
14 denied by the district judge . . . ."  9A Charles Alan Wright & Arthur R. Miller,
15 Fed. Prac. & Proc. Civ. § 2388 (3d ed.).  This is such a case.

**1.    Holding Separate Trials on Plaintiff's Federal and
State-Law Claims Would Not Promote Judicial
Economy.**

19        Under the circumstances presented here, trying Plaintiff's federal civil rights
20 claim in a separate trial before Plaintiff's state claims would not promote judicial
21 economy.  It would instead undermine judicial economy by increasing the
22 likelihood of having two lengthy trials with nearly identical evidence concerning a
23 single series of events.  Two facts compel this conclusion.

24        ***First***, Plaintiff's federal civil rights claims are factually intertwined with
25 Plaintiff's claims for negligence and invasion of privacy.  Defendants themselves
26 acknowledged as much when they removed this lawsuit to federal court.  (*See* ECF
27 No. 1 at 3 ("This Court has supplemental jurisdiction over Plaintiff's state law
28 claims under 28 U.S.C. section 1367, as those claims form part of the same case or

controversy as Plaintiff's federal claims.").)  Plaintiff's claims all turn on the actions of LASD and LAFD personnel, who needlessly took and shared graphic photos of Plaintiff's husband and daughter.  Leaders of the Sheriff's and Fire Departments have admitted that these photos were "illicit" and served "no business necessity."  What remains is for a jury to decide whether Defendants' taking and sharing of those photos, as proven by evidence at trial, breached duties that Defendants owned Plaintiff under the Fourteenth Amendment and/or California law—and, if so, Plaintiff's damages.

Trying these claims will require Plaintiff to introduce testimony about the actions of the LASD and LAFD personnel who took the photos, what the photos depicted, and how they were disseminated.  Plaintiff herself will testify about the emotional distress she suffered and continues to suffer because of Defendants' actions.  All this evidence is relevant both to Plaintiff's federal civil rights claim and to her tort claims under California law.  The same proof will inform the jury's decisions on whether Defendants' conduct shocks the conscience in violation of Fourteenth Amendment guarantees, *Marsh*, 680 F.3d at 1155, whether Defendants breached their duty under California law to "refrain from exploiting gruesome death images by disseminating them to friends and family members or others with no involvement in official [law enforcement] activities," *Catsouras*, 181 Cal. App. 4th at 884, and Plaintiff's damages.[2]

---

[2] In addition to witness testimony, Plaintiff also intends to introduce documentary evidence that is relevant to both the federal and state causes of action.  For instance, Plaintiff will introduce cell phone records that document communications involving LASD and LAFD personnel who possessed illicit photos of Plaintiff's deceased family members.  This evidence bears directly on fact issues that are relevant to all causes of action, such as the extent to which Defendants disseminated the photos, the adequacy of Defendants' efforts to secure and contain them, and the reasonableness of Plaintiff's fear that unsecured photos will reemerge.

The extent of the overlapping proof is substantial.  Plaintiff anticipates that not a single piece of evidence or testimony will be offered in support of the state law claims that would not have been offered in support of the federal claim. Although certain witnesses will offer testimony that is relevant only to the federal claim—*e.g.*, evidence regarding Defendants' training and policies that bears on *Monell* liability—the same is not true of the state claims.  Rather, proof of the state claims relates exclusively to Defendants' employees' taking and sharing photos of the victims remains without any legitimate purpose—something Plaintiff must already prove for the federal claim.  In other words, by testifying at a trial on Plaintiff's federal cause of action, Plaintiff's witnesses will necessarily provide all the testimony they would offer in a trial on the state-law claims.  Thus, if Plaintiff's state-law claims are bifurcated, the same witnesses may need to undertake the time-consuming (and, in some instances, emotionally taxing) process of giving the same testimony in two different proceedings.

This fact weighs heavily against bifurcation.  Indeed, courts in this Circuit and elsewhere routinely deny requests to bifurcate related claims when doing so would require the parties to present the same evidence in multiple trials.  *See Briones v. City of San Bernardino*, 2012 WL 13124163, at *2 (C.D. Cal. Feb. 16, 2012) (denying request to bifurcate *Monell* claims because doing so would require "overlap in testimony by witnesses who would be required to testify during each stage of the trial," which would "not promote convenience or efficiency, nor would it be economical"); *Tubar*, 2009 WL 426608, at *1 (denying request to bifurcate *Monell* claim when the same witnesses would need to testify in both phases of a bifurcated trial); *see also Vichare v. AMBAC Inc.*, 106 F.3d 457, 466-67 (2d Cir. 1996) (affirming decision not bifurcate a discharged employee's federal discrimination claims from the employer's breach of fiduciary counterclaim when "litigation of [the employee's] claim would not necessarily obviate [the employer]

counterclaim" and "[s]everal of the same witnesses would have to be called on [the employer's] counterclaim as on [the employee's] claim").

**Second**, none of Plaintiff's state claims depend on the outcome of Plaintiff's federal cause of action.  Regardless of which side prevails on Plaintiff's claim that Defendants violated her Fourteenth Amendment rights by taking and disseminating death photos of her family, both sides will retain the possibility of prevailing on claims that challenge the same conduct under state tort law.  As a result, trying the federal claim first will not streamline the litigation by eliminating the need to try the remaining causes of action.  *See Tubar*, 2009 WL 426608, at *1 (declining to bifurcate *Monell* claim for trial where "a second phase on that claim would likely be necessary regardless of the disposition in the first phase"); *Mendez v. City of Chi.*, 2020 WL 1479081, at *4 (N.D. Ill. Mar. 26, 2020) (declining to bifurcate *Monell* claim because it would not dispose of the plaintiffs' other claims and would thus "create more work, not less").  Bifurcation will, however, create a substantial risk that Plaintiff's federal and state causes of action will need to be resolved in multiple, lengthy trials involving nearly identical evidentiary presentations.

This redundancy would not only prejudice Plaintiff and inconvenience the testifying witnesses—a topic addressed below—but it would also undermine the very efficiency goals that Federal Rule of Civil Procedure 42(b) is intended to advance.  Bifurcation of federal and state claims is doubtless a sound judicial policy in many cases before the Court.  But under the unique facts presented in this lawsuit, such a trial would serve no purpose "other than resulting in duplicative proceedings undermining judicial economy." *Estate of Alderman v. City of Bakersfield*, 2018 WL 4156740, at *3 (E.D. Cal. Aug. 28, 2018).

### 2. Holding Separate Trials Would Prejudice Plaintiff and Inconvenience Non-Party Witnesses.

In addition to undermining judicial economy, bifurcating Plaintiff's state-law claims would prejudice Plaintiff and inconvenience non-party witnesses in several important ways.

**First**, bifurcation would require numerous witnesses, including Plaintiff, to testify multiple times about horrific personal experiences.  For Plaintiff, nothing compares to the dual hardship of losing his family members and then experiencing the indignity of Defendants' morbid voyeurism.  Reliving those experiences by recounting them at trial and hearing others testify about them ensures further trauma, particularly given the public and adversarial nature of trial.  *See Thornton v. Ethicon Inc.*, 2021 WL 5578931, at *5 (D. Ariz. Nov. 29, 2021) (noting difficulty of testifying about "a topic that is personal, sensitive, and traumatic").  This gives Plaintiff a strong interest in avoiding any needless duplication of trial proceedings.  *See id.* (denying bifurcation because, *inter alia*, the minimal benefits did not outweigh plaintiff's harm from testifying multiple times about personal and traumatic matters).

But this concern is not limited to Plaintiff.  Nonparties who will testify at trial have described experiencing extreme stress and sadness arising from the events at issue.  For instance, Luella Weireter will testify about her experiences at a gala where she heard an LAFD officer brag about seeing photos of Plaintiff's husband "all burnt up" and watched people huddle over photos of human remains. (Weireter Depo. Tr. at 31:10-19, 33:1-25, 34:6-15, 35:1-5, 35:15-21.)  Ms. Weireter herself lost relatives in the accident, and she has described feeling "emotional," "traumatiz[ed]," and "shocked" by the crash and the subsequent display of human remains photos.  (*Id.* at 11:7-10, 12:19-13:8, 38:8-10, 44:23-45:2.)  Like Plaintiff, Ms. Weireter and other witnesses have a strong interest in avoiding the trauma of testifying twice.  *See Thornton*, 2021 WL 5578931, at *5;

1   *see also* *United States v. Redwood*, 2017 WL 85445, at *4 (N.D. Ill. Jan. 10, 2017)

2   (denying bifurcation request in part because it would "subject[ ] Niki to the stress

3   of testifying twice in this case"); *Derrick Through Tina v. Glen Mills Schs.*, 2019

4   *WL 7019633, at *19 (E.D. Pa. Dec. 19, 2019)* (denying motion to sever claims

5   when "[d]uplication of trials thus would be inefficient and could unnecessarily

6   expose the plaintiffs, who are minors, to additional trauma").

7          Even witnesses who experienced less emotional distress have a strong

8   interest in avoiding the burden on their time of testifying in multiple trials. *See*

9   *Sherwin v. Infinity Auto Ins. Co.*, 2012 WL 600812, at *4 (D. Nev. Feb. 23, 2012)

10   (finding that convenience and efficiency factors favored unified trial when

11   bifurcation would require "the same witnesses to testify twice").

12          ***Second***, bifurcating Plaintiff's state claims for a separate trial would

13   substantially increase Plaintiff's costs.  This is a complex trial which will involve

14   testimony from approximately forty-five witnesses and as many as four experts.

15   Much of this complexity is attributable to Defendants and beyond Plaintiff's

16   control.  For instance, because Defendants destroyed forensic evidence of the

17   distribution of illicit photos Plaintiff can only prove the full extent of that

18   dissemination by introducing multiple eyewitness accounts, cell phone records that

19   support inferences about the distribution, and evidence concerning Defendants'

20   spoliation.  Trying a case of this nature will require substantial expense, and trying

21   it twice will multiply that expense.  *See* *IDS Prop. & Cas. Ins. Co. v. Fellows*, 2017

22   *WL 202128, at *7 (W.D. Wash. Jan. 18, 2017)* (denying motion to bifurcate trial

23   because it "would likely lead to duplicated efforts and increased costs"); *Gravity*

24   *Defyer Corp. v. Under Armour, Inc.*, 2013 WL 12138987, at *3 (C.D. Cal. July 23,

25   2013) (denying bifurcation that would "lead to significant additional costs").

26          ***Third***, bifurcation would prejudice Plaintiff by delaying the final disposition

27   of this matter.  Plaintiff seeks to hold Defendants accountable for their desecration

28   of his loved ones' remains.  Plaintiff welcomes the opportunity to present his

federal civil rights claims at trial.  But he will not achieve finality until a jury has ruled on all the claims presented in his complaint.  Bifurcating the state claims for a later trial will delay their resolution, particularly if the Court remands those claims to California Superior Court.  Courts across the country are grappling with heavy caseload and backlogs attributable to the COVID-19 pandemic.  *See McCoy v. City of Vallejo*, 2021 WL 492535, at *2 (E.D. Cal. Feb. 10, 2021) (declining to bifurcate *Monell* claim where it would "exacerbate the Court's crushing caseload . . . that has been considerably worsened by the COVID-19 pandemic").  A remand at this juncture may prevent Plaintiff from trying her state-law claims for months or even years after her federal trial concludes.

Plaintiff has worked diligently in filing his lawsuit, conducting discovery, and preparing this case for trial.  He now stands ready and able to try all his claims in a single proceeding that addresses all the issues presented.  Placing two-thirds of Plaintiff's claims in limbo pending a phase-one trial and later decision on whether to exercise supplemental jurisdiction would be unfair to Plaintiff and burdensome to non-party witnesses.  Plaintiff appreciates the discretionary nature of this Court's supplemental jurisdiction.  But it was not Plaintiff's decision to remove this case from state to federal court.  Defendants' tactical decision to change forums should not saddle Plaintiff with the substantial burden of conducting two substantially identical trials in two separate proceedings.

### 3. Defendants Have Identified No Prejudice from Trying the Federal and State Law Claims in a Single Proceeding.

Although Plaintiff would be severely prejudiced by bifurcation, Defendants have identified no prejudice that they would experience from trying Plaintiff's federal and state claims together.  When ordered to address bifurcation in an earlier filing, Defendants did not cite any difficulty or unfairness that would arise from trying Plaintiff's federal and state claims simultaneously.  Defendants instead made

PLAINTIFF'S AMENDED MEMORANDUM OF CONTENTIONS OF FACT AND LAW

the novel request that the Court bifurcate the "issue" of public dissemination of the illicit death photos—an issue that is not actually subject to reasonable dispute—from the other issues to be tried, which the Court rightly rejected.  (Hr'g Tr. at 10:4-9 (COURT: "Mr. Miller, I'd like to hear from you on this issue. This is an issue that has been in this case from the outset. And you want to bifurcate the case, which I'm not going to do, to try the dissemination.").)  Together with the factors discussed above, the absence of any prejudice to Defendants from a single trial weighs heavily against bifurcation.

## VII.   JURY TRIAL

All of Plaintiff's claims are triable to a jury as a matter of right, and Plaintiff has made a timely demand for a jury.

## VIII.  ATTORNEYS' FEES

Upon prevailing on his section 1983 claim, Plaintiff will seek an award of attorneys' fees pursuant to 42 U.S.C. § 1988(b), which provides in relevant part:

> In any action or proceeding to enforce a provision of section[] . . . 1983 . . . of this title . . . , the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . .

Plaintiff's request for attorneys' fees will be based on post-trial briefing according to the relevant standards, with an evidentiary hearing if the Court believes one is necessary.

## IX.   ABANDONMENT OF ISSUES

None of Plaintiff's claims have been abandoned and he will pursue all of them at trial.  With the exception of the affirmative defenses outlined above, all other affirmative defenses raised in Defendants' answer have been abandoned.

Defendants have repeatedly argued that Plaintiff "abandoned" certain theories for *Monell* liability by not raising them in her opposition to Defendants' summary judgment motion.  Defendants are wrong on multiple levels, for the reasons detailed

in Plaintiff's supplemental *Monell* briefing, which remains pending before the Court.

DATED:  June 17, 2022

By: _____
    */s/ Jerome M. Jackson*
    JEROME M. JACKSON

Attorneys for Plaintiff Christopher L Chester

-38-